# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) CRIMINAL NO. 3:13CR226(RNC) |
| | ) |
| DANIEL E. CARPENTER, et al. | ) |
| | ) DECEMBER 1, 2014 |

## DEFENDANT CARPENTER'S REPLY BRIEF
## TO GOVERNMENT'S MEMORANDUM RE:
## DEFENDANT'S MOTION TO SUPPRESS

### INTRODUCTION

Defendant, Daniel Carpenter, takes exception to the Government's position in Response to Defendant's Motion to Suppress concerning items seized under both the 2010 and 2011 searches of the premises located at 100 Grist Mill Road, Simsbury, CT and 300 First Stamford Place, Stamford, CT. Additionally, the Government, essentially using the same search warrant affidavits, sought additional warrants to search and seize documents earlier seized (in 2010) by IRS-CID agents at the same location, thirteen months after the IRS conducted their raid on the same commercial sites. It is to be noted that by that time the DOL seized IRS-CID Carpenter material, the IRS had held

onto the seized documents for thirteen (13) months without bringing any criminal proceedings against Mr. Carpenter or for that matter against any person employed by any of Mr. Carpenter's businesses. Still four years later, no such indictment involving the 2010 raids has occurred. Finally, it is to be noted that the IRS seizure had nothing to do with the conduct under scrutiny by DOL and the U.S. Attorney's Office in the instant matter.

## 2010 SEARCH WARRANT

The April 2010 warrant focused on certain welfare benefit plans and possible tax benefits to employers/employees who participated in such plan under Internal Revenue Code 419 and 419A. The instant matter is totally different in that there is no claim that the defendants were involved in any IRS tax fraud scheme. There were no tax benefits under the COT welfare benefit plans, subject matter of the instant prosecution. What is known is that agents in 2010 seized 322 boxes of documents and 13 images of computers located at 100 Grist Mill Road, Simsbury, the same location as the present matter. While some of the documents were returned to the attorneys of the targeted businesses to hold indefinitely, the targets themselves, including Mr. Carpenter, did not enjoy the full return of the seized items, notwithstanding demands for the same. Those

documents which in part form the subject matter of search warrants in the instant matter were essentially held hostage by the Federal Government, giving the same Government via DOL the opportunity to seize them a second time for the instant prosecution. It is noted in the Government's brief (Gov. Br. p10) that they blame Mr. Carpenter and others for not providing certain logs or other information to the Government in a timely fashion. However, in reality four and one-half years later, 2014, the same Governmental agency has continued to control the fruits of their unlawful search of 2010; including 13 hard drives, comprising of the IRS seized material from 2010. Certainly, there is no evidence that Daniel Carpenter or the co-defendant are responsible for that. Hence, the defendants' claim that the IRS abused the seizure of the documents and computer images from 2010 has merit and the Government's claims to the contrary are without merit.

The chief evil that prompted the forming and adoption of the Fourth Amendment was the indiscriminate searches and seizures conducted by the former British Government, under the authority of a wide-ranging exploratory search. *United States v. Galprin*, 720 F.3d 436, 445 (2d Cir. 2013). There can be no dispute but that the Fourth Amendment limits the authorization to search to the specific areas and things for which

there is probable cause to search in order to put limitations and restraints on the Government in order to secure the people, their possessions, papers and effects against all unreasonable searches and seizures. *Weeks v. United States*, 232 U.S. 383 (1914).

The Government relied on a cooperating witness (CW) in the 2010 search warrant affidavit, apparently without checking the representations made, including fairly easy ones to do. For example, the search warrant of 2010 authorizes the search of offices in "Nova Benefits Plans LLC ("Nova") also known as Benistar ...." (Gov. Br. p2). In fact Benistar is not the predecessor to Nova Benefits Plans, LLC; there is no Benistar/AKA Nova. The Benistar 419 Plan exists to this day. The NOVA Plans were created after 419 regulations were changed in order to be compliant with the new regulations. (All of this could have been verified without raiding Nova's offices. They each had their own respective Tax ID. See p7, para 18 of Affidavit of Shaun Schroeder for 2010 Search Warrant – "Affidavit 2010"). The CW in para 18 of the Affidavit 2010 claims he sold 412i plans through NOVA and their predecessor Benistar from 2002. Again, aside from the fact that Benistar still exists to this very day, a simple check of the records would reveal Benistar never sold 412i plans. (See para 18, Affidavit 2010.)

The claim in the supporting affidavit in 2010 raid also mistakenly claims that Nova kept 5% of the contribution as administrative fees, when in fact the 5% stayed in the plan as a cash asset for plan expenses; it is clearly so stated in the adoption agreement referred to by the Government. (P8, Affidavit 2010).

Concerning Paragraph 20 of the Affidavit, there was no foundation provided as to how the CW would have been in any position to provide insight into the internal workings of Nova and their 419 Plans, which provided disability, disfigurement and sickness claims. Buying out of the plan was discouraged, unless extreme hardship.

In paragraph 20, the CW describes the process through which a participant can buy his or her policy or annuity. However, the process had changed over the years in order to comply with Nova's understanding of what is expected of the Plan and Administrator under the new Section 419 Regulations of July, 2003. Participants could purchase their policies/annuities based on a non-recourse loan, which amounted to 3 years of interest up front and a collateral assignment on the policy. If the participant allowed the policy to lapse or caused a surrender, a 1099 IRS form would be issued. If a participant surrendered the policy on their own, it would be up to the carrier to issue a 1099. In addition if a former participant requested Nova release of the collateral

assignment, the Plan would have issued a 1099. This and the claims process could also easily have been verified without a raid. (See para 20, pp.8-9 of 2010 Affidavit.)

Reviewing paragraph 21 of the 2010 Affidavit reveals additional misleading information to the Court. It stated that the Plan in fact only "set up" employees who were "company principals or relatives of the principals." What it failed to tell the Court was that the welfare benefit plan offered by Nova Benefits was <u>not</u> subject to the so-called rules regarding non-discrimination; meaning that one could just cover certain employees, including those at the top, without violating any IRS rule. This is not evidence of any crime or attempt to file false tax returns; this could have been found in the IRS's <u>own</u> regulations. However, there can be no doubt this paragraph was inserted with the intent to suggest some wrong doing by Nova, Mr. Carpenter and others.

Paragraph 23 of the 2010 Affidavit search also is misleading. In it, it is suggested that because some participants bought out of the plan and apparently thereafter some owners failed to properly report the events in their respective personal tax returns that the targets are responsible. What the authors of the affidavit fail to report is that Nova Benefits would receive no information regarding the policies once they are owned by the former participants. In fact, the staff cannot get any information

once the change of ownership takes place. They would have had no way of knowing what the insurance company or the former participant did or did not do. At that point it was not the responsibility of Nova to report events to the IRS.

Paragraph 25 of the 2010 Affidavit search is also misleading and speculative in nature in that it claims that "Nova's 419 Plans may not actually qualify for the 10 or more employer exception with 419A; that somehow it matters that if the beneficiary files a claim or terminates the plan, they are only entitled to the amount in their individual policy. This is somebody's mere speculation. Claims are not determined based on cash value. They are based on contributions and overall plan experience, clearly laid out in Plan Documents and claim forms provided to claimants. It is also stated in the adoption agreement. Also, see earlier claim that Nova keeps 5%. All plan assets are available to pay all claims. In fact, the very first SADI claim was a death claim, the Plan retained 20% of the death proceeds and those funds were used to pay subsequent claims so that the annuities could continue to grow. There was nothing inappropriate or illegal in the conduct of Nova in how it handled any monies retained.

Paragraph 26 is also misleading in that the CW talked to one Guy Neumann, a disgruntled former salesman for BASI. Apparently, a conference was set up with

Neumann and some undercover agents along with other individuals in various relationships with Nova, but not Mr. Carpenter. Mr. Neumann did most of the talking. No foundation was laid that Mr. Neumann was in a position to actually know of that which he spoke. No allegations were offered that Mr. Neumann was an officer or director of Nova; he was neither. He had no personal knowledge about claims and he did not have the authority to approve or deny claims or buyouts. Yet, the dialogue inserted into the affidavit suggested otherwise, resulting in misleading the reader to erroneously rely upon the statements of Mr. Neumann to have any basis for being accurate.

In sum, looking at the affidavit used in the 2010 search, aside from being overly broad in terms of failing to limit the areas to be searched and the items to be seized, coupled with a lack of probable cause, as fully discussed in Mr. Carpenter's initial brief, much of the information in the affidavit simply was not accurate and was clearly misleading.

The 2010 search and seizure by the IRS resulted in a vast number of documents to be seized and stored by the Government. While the Government is allowed some leeway in the time of review, any delay is still subject to the rule of reasonableness.

*United States v. Ramirez*, 523 U.S. 65, 71 (1998).  In the instant matter the IRS seized electronically stored documents that are generally unconstitutional to seize, as they were not described in the warrant.  *Horton v. California*, 496 U.S. 128 (1990).  As one knows, the Fourth Amendment does not allow indiscriminate searches.  The seizure of computer files that are beyond the scope of a warrant are the same as a general search; hence, the time the Government holds on to these papers are critical.

Many of the papers seized from Mr. Carpenter's office by the IRS are still under the control of the Government, thereby depriving the owner of exclusive control of the files.  *United States v. Ganias*, 755 F3d 125, 136 (2nd Cir. 2014).  In *Ganias*, the court concluded that the Government holding onto the papers for two and one-half years was unreasonable.  In the instant matter, DOL and the Government sought and obtained a warrant in May 2011, to seize many of the papers the IRS seized in 2010 that were beyond the scope of the 2010 warrant.  Here in 2014 no indictment of Mr. Carpenter or any business associated with Mr. Carpenter has occurred as a result of the 2010 or its related subject matter.  The Government claims that because it obtained a search warrant in May of 2011, to seize these illegally stored papers, that somehow this makes an unlawful seizure legal; to allow the Government to be rewarded by such conduct

renders the Fourth Amendment meaningless. All papers, electronically stored or hard copy, seized by DOL in 2011 from the 2010 raid concerning Mr. Carpenter's personal or business records should be prohibited from use in the instant matter. Any claim of good faith exception must not prevail because over 4 years have passed since the raid in 2010. Clearly the agents in 2011 as well as now realize that the seizure in 2010 of documents went beyond the scope of the 2010 warrant were seized and held unlawfully by the Government. Accordingly, all the items seized which were the fruits of the 2010 searches should be suppressed and not permitted in any trial against Mr. Carpenter.

**2011 SEARCH WARRANT**

The Government, materially claims that the 2011 search, like the 2010 search was proper and lawful; that it was appropriate to seize the items taken from the respective premises. Indeed, they continue to claim that the May 26, 2011, along with the May 25, 2011 search, for the same reasons was lawful. (See p43, et seq. Gov. Br.) Although they do note that if the Court rules otherwise, the exclusionary rule should prevail. This would allow the Government to use otherwise illegally seized documents, irrespective of how they secured the same. (See page 44, et seq. of Gov. Br.)

In supporting their position they are claiming that Charter Oak Trust, COT, of which Mr. Carpenter was not an officer or director, was engaged in criminal activity, including wire and mail fraud. Specifically, the Government claims that COT, a 419 welfare benefit plan, was a scheme by Mr. Carpenter and others "... to operate a STOLI scheme whereby they (or their associates) solicit individuals to purchase life insurance through COT, submit materially false insurance applications on the insured's behalf; compensate the insureds by financial incentives; and sell the policies following the contestability period." (See p43 of Gov. Br.) While the Government makes this general claim against all the targets listed in the search warrant, a close look shows the opposite as it relates to Mr. Carpenter. There is no evidence offered anywhere in the Government's brief demonstrating that Mr. Carpenter instructed anyone to submit a false application.

First, it must be noted in Agent Allen's affidavit that she suggests STOLI insurance policies are illegal; that is false. (See para 31, Allen Affidavit.) There is absolutely nothing illegal about such policies, certainly not in Connecticut or most states. Some carriers may prefer not to deal with them, but that does not make them illegal. Selling STOLI policies certainly is not a crime; if so, every well-known life

insurance company could be indicted.  The warrants must state a crime upon which guidance can be given to the agents to limit the scope of a search.  (One would not look in a medicine cabinet for a stolen 50 inch television set.)  Additionally, when searching Mr. Carpenter's office, there must be legal justification for it.  What the Government has done in the search warrant affidavits is to make bold general statements about purported crimes but fail to adequately demonstrate factually that Mr. Carpenter, personally, was committing criminal acts as to justify searching him and his businesses for evidence.  (While a warrant may justify the probable cause standards to search some of the targets, the fact does not justify searching other targets for which probable cause is lacking. One need look no further than the Government's brief for determining if Mr. Carpenter had committed any crime.

On page 44 of the Government's brief, they claim that the "**... affidavits set out in detail how each of the individuals and entities relate to the COT and its fraud schemes.**"  They go on to note that several people sent misleading emails to the respective carriers but not Mr. Carpenter.  They noted that several people profited with "millions of dollars in commissions," but not Mr. Carpenter.  They claim several people signed numerous COT applications containing allegedly false information, but not Mr.

Carpenter. Their claim was that others ran COT but not Mr. Carpenter. They claim that various licensed insurance agents provided false financial information concerning the wealth of the so-called straw insureds to the carriers but not Mr. Carpenter.

The only specific alleged conduct found in the warrant, according to the Government, is the following:

> **Carpenter was authorized to request advances under the Ridgewood loan to GMC, AA ¶ 15; he signed commitment letters with Ridgewood on behalf of GMC, in order to fund the COT policies, AA ¶ 44; and he accepted DAC agreements on behalf of GMC memorializing the loan between the COT and GMC in order to fund individual COT policies, AA ¶¶ 54, 63, 91, 100.** (See p44 of Gov. Br.)

Where is the "criminal activity" involving Mr. Carpenter? Other than bold unsubstantiated claims, the answer is none. It is not a crime to lend COT money; banks lend money all the time to businesses. There is no claim that Mr. Carpenter received commissions as an agent, unlike the Government's soon to be star witness, Ed Waesche, who according to Agent Allen, received "millions of dollars in commissions" from the carriers (not COT). Nor is there any claim that Mr. Carpenter sent misleading emails to the insurance company representatives, as Agent Allen states Mr. Waesche did. Because there is no crime listed on the warrants, certainly none involving Mr.

Carpenter, any search of his documents, papers, computers is unlawful, a violation of Mr. Carpenter's Fourth Amendment protections and should be excluded from any trial involving the defendant.  The fact of the matter is that the desperate governmental agents threw Mr. Carpenter's name into the affidavit where 99% of it relates to others who allegedly submitted false documents to the carriers to secure life insurance and who apparently made huge commissions on the issuing of said life policies; nothing in these facts justifies applying this broad general search warrant to Mr. Carpenter.  In fact in responding to a separate motion by Mr. Carpenter to subpoena certain insurance carrier records from the carriers themselves, the Government essentially states that Mr. Carpenter's request should be denied because there is no evidence Mr. Carpenter was engaged in providing <u>any</u> <u>false</u> information to the carrier:   ".. he **(Carpenter) repeatedly asserted that he never communicated with insurance carriers regarding the policies and that he had no dealings with the so-called insurance carriers that insured the policies.... Accepting Carpenter's representations as true ....**" (emphasis added.)  (See p14 of Government's brief re Defendant's Motion to Subpoena records dated November 5, 2015.)

For all the reasons found in Defendant's Motion to Suppress the 2011 searches, coupled with the aforementioned comments, all the items seized in 2011 should be suppressed not allowed in evidence in any trial against the defendant.

### These Facially Invalid Warrants Cannot Be Saved by the Good Faith Exception to the Exclusionary Rule in *Leon* or the Balancing Test in *Herring*

The Government spends a large part of its brief trying to defend the illegal searches and defective warrants associated with them. The Government's efforts are both misplaced and unavailing. As the Supreme Court stated in *Elkins v. United States*, 364 U.S. 206 (1960): "The [exclusionary] rule is calculated to prevent, not to repair. Its purpose is to deter, to compel respect for the constitutional guaranty in the only effectively available way, by removing the incentive to disregard it." This way, when things are done wrong – as was done twice in this case – the end result will be the exclusion of evidence.

Since most of the Government's unpublished cases mention *George*, (*United States v. George*, 975 F.2d 72 (1992)), it is safe to assume that since both of these search warrants did not have the affidavit attached, contained the fatal language "any evidence of a crime," and did not have the crime listed on the front of the warrant as required by law, that both of these warrants are facially invalid. (See pp.99-100 of list

of exhibits filed under seal – 5/25/11 Search Warrant.)  A careful examination of the Search Warrant itself fails to sight <u>any</u> crime under purpose of search; it only refers to Attachment D.  A review of Attachment D, p.103, <u>et seq</u>., fails also to cite any alleged crime, only a general search of all records involving financial business and tax documents.

Since both warrants are clearly unlawful on their face, one only need read the warning at the end of *United States v. Buck*, 813 F.2d 588 (2nd Cir. 1987) that no other facially-invalid search warrants will ever be allowed in the Second Circuit after *Buck*, based on the "Good Faith Exception" in *United States v. Leon*, 468 U.S. 897 (1984). Also, because the Second Circuit relies so heavily on the Supreme Court's decision in . *Groh v. Ramirez*, 540 U.S. 551 (2004), (*see, e.g.,* the discussion in *United States v. Cioffi*, 668 F. Supp 2d 385 (E.D.N.Y. 2009), it should be safe to assume that the facial defects make these warrants unlawful to begin with, so we need only discuss whether they can be saved under *Leon*.  The Government cannot qualify for the "good faith" exception under *Leon* or the "balancing test" as described in the Supreme Court decision in *Herring v. United States*, 555 *U.S.* 135 (2009), because the excellent analysis in *Galprin* from 2013 and *Ganias* from 2014.  In *Galprin*, 720 F.3d 436, 445

(2nd Cir. 2013), the Second Circuit clearly delineates three components that must be in a valid warrant. The warrant must:

1. Identify the specific offense that there is probable cause for;

2. Identify specifically the place to be searched; and

3. Specify the items to be seized and their specific relation to the designated crimes.

   (Also see *United States v. Bianco*, 998 F.2d 1112, 1116 (2nd Cir. 1993).)

This was not done in any of the search warrants; there was no crime listed on the face of the warrant. The search warrants were facially invalid and none had the search warrant affidavit attached as required by law. See, e.g., one of the Government's many unpublished cases, *United States v. Hernandez,* No. 09 CR 625 (HB), 2010 WL 26544, at *7 (S.D.N.Y. January 6, 2010), where it cites *United States v. Cohan,* 628 F.Supp.2d 355 (S.D.N.Y. 2009) twice (App. p. 65 & 67) ("A warrant...can be unconstitutionally infirm in two conceptually distinct but related ways: either by seeking specific material as to which no probable cause exists, or by giving so vague a description of the material sought as to impose no meaningful boundaries."). *Id.* at 359. Finally, *Hernandez* quotes extensively from *George* as well as *Buck*: "An affidavit in support of a search warrant

may not be considered in the particularity analysis where, as here, it was not incorporated and attached." *George*, 975 F.2d at 76.

Both warrants suffer from three of these constitutional defects listed above. So, *Galprin*, a Second Circuit published opinion from 2013, lists the now familiar four circumstances where the "good faith" exception under *Leon* would **not** apply:

1. The Magistrate was misled;

2. The Magistrate abandoned his or her judicial role;

3. The application was lacking in probable cause; and

4. The warrant was facially defective.

*Galprin*, 720 F.3d at 452 (internal citations omitted).

Although Mr. Carpenter need only argue one of the four to prevail and the burden is on the Government to prove the "reasonableness" of the unlawful search and seizure, Mr. Carpenter submits that three out of the four are readily apparent in both of these warrants, namely: the magistrate was misled, as earlier noted in the brief; the applications in both cases lacked any probable cause, and both warrants were fatally flawed on their face.

*Galprin* stands for the fact that these unlawful warrants without the affidavits attached cannot be saved by the "good faith" exception under *Leon*. Can they be saved under the balancing test of *Herring*? *Ganias*, which did the required balancing test under *Herring*, says no. Because the *Herring* balancing test did not save the warrants in *Ganias*, there is no chance here to save the raids on 100 Grist Mill Road because there were no indictments from the 2010 raid, and there was no probable cause for any crime by Mr. Carpenter, and the only people indicted from the 2011 raid are Mr. Carpenter and Mr. Bursey. There were numerous other offices raided, so assuming a dozen or so innocent people were exposed to the same tactics that the people at Benistar in Simsbury and Stamford were put through, you have well over 100 people that were put through the trauma for the crime of, what, lying on an insurance application? *Ganias* was accused of tax evasion and fraud, and the search and seizure in his case was not nearly as invasive as the raids on 100 Grist Mill Road, Simsbury and the Benistar office in Stamford. The warrant in *Ganias* was not even close to the facially-defective warrants here, and yet the Second Circuit overturned Ganias's conviction and stated the motion the suppress should have been granted and the balancing test under *Herring* and

the good faith exception under *Leon*  could not save the unlawful and unreasonable search and seizure.

Moreover, in *Ganias*, no one brought up the lack of exigent circumstances as Mr. Carpenter has done here. IRC Section 7608 prohibits the use of guns when carrying out a search or delivering a subpoena unless Alcohol, Guns, or Drugs are involved.  A petite CPA with glasses could have delivered the grand jury subpoena to 100 Grist Mill Road. DOL could have delivered a subpoena as DOL officials from Boston and Washington have come to 100 Grist Mill Road before, without weapons, to conduct an investigation. For the Government to say in its brief that the Supreme Court decision in *United States v. Grunewald*, 353 U.S. 391 (1957) is inapplicable because it deals with the IRS instead of the DOL is either disingenuous or wrong-headed or both.  Do the IRS and DOL not work for the same Government?  The IRS Manual itself says that information gathering is to be done with subpoenas in the least intrusive manner to a business, and the Supreme Court has stated that a small business office has all of the constitutional protections of a man's home. *See GM Leasing Corp. v. United States*, 429 U.S. 338, 353 (1977)(business premises protected by the Fourth Amendment).  Finally, the Supreme Court in *Chadwick* gave full Fourth Amendment protection to a locked

footlocker and states several times in its opinion the lesson of *Katz*, that the "Fourth Amendment protects people, not places."

Since the Government's search warrants did not have the affidavits attached as required by *George* and *Groh*, and the search warrants were invalid on their face, they are not savable by the "good faith" exception under *Leon* as described in *Galprin*. Nor can the warrants be saved under the balancing test in *Herring* as described in *Ganias*, because Mr. Carpenter is not a dangerous criminal, he did not fill out, sign, or submit **any** of the 84 applications that the DOL claims are false, but even if he did, that would still not justify or save the commando raid on 100 Grist Mill Road from the Exclusionary Rule.

## STANDING

The Government claims that Mr. Carpenter has not proven standing to contest either search. This claim is inconsistent with the Government's own theory of the case; that Mr. Carpenter played a role in the alleged criminal conduct of others. There is no dispute that Mr. Carpenter's documents were the "target" of the search. (See p10 of Gov. Br.) Indeed, the Government does not deny going after Mr. Carpenter's business and personal computers or hard copies of documents, irrespective of whether they are

covered by either of these broad warrants.  Such things as Mr. Carpenter's personal insurance or financial records were seized and removed from the premises. (See p11 of Gov. Br. where Mr. Carpenter's business and personal records were fair game.)

Nowhere in their brief do they mention the leading Supreme Court case on standing, *Mancusi v. DeForte*, 392 U.S. 364 (1968), which is cited heavily by the Second Circuit in *United States v. Chuang*, 897 F.2d 646, 649 (2d Cir. 1990), that is the basis for the court granting part of the motion to suppress in the Government's unpublished case of *United States v. Costin*, No. 3:05CR38(JCH), 2006 WL 2522377 (D. Conn. July 31, 2006). The decision in *Costin* is not important here, but it supports Mr. Carpenter because it holds that a defendant has standing to challenge the search of an office, even if shared with other people.  The Supreme Court's decision in *DeForte*, though, is much more powerful and helpful because DeForte was a union leader that did not own the building where his office was and he shared the facilities with other union officials.  Not only did Mr. Carpenter's company own the building where both raids took place, he had a separate suite of office rooms in the back of the building that were not only private but separated from the other businesses there by a large partition that no one entered unless they had business with Mr. Carpenter.  However, nowhere in either

warrant does the Government establish probable cause to search this other office space in the same building in Simsbury.

Mr. Carpenter had an inner sanctum where he had his own computer where he did his own private email.  The agents took Mr. Carpenter's personal cell phones and tablet as he was walked from one side of the building, where all of the Benistar employees were being held in his inner office.  There were more than 20 agents listed on the Inventory Sheet, so the claim that 100 Grist Mill Road was only invaded by 8 armed plus 7 unarmed (15) agents is inaccurate.  (See pp16-17 Gov. Br.)  It might be that only several agents had weapons and Kevlar vests on, but there were many more than the fifteen agents claimed at 100 Grist Mill Road and dozens more in Stamford.  Furthermore, the Search Warrant Inventory had detailed records of documents taken from Mr. Carpenter's personal conference room, his personal credenza where his personal tax returns and personal insurance policies were taken from.

Mr. Carpenter spent more awake hours at his office than at his home, and as the owner, officer, and manager of several small companies, the *DeForte* opinion also helps because it cites to Justice Holmes' decision calling the raid on another small business, Silverthorne Lumber, "outrageous." *See, Silverthorne Lumber Co.* v. *United States,* 251

U.S. 385 (1920).  *See, also, United States v. Zemlyansky*, 945 F. Supp. 2d 438 (S.D.N.Y. 2013).  Zemlyansky was the sole officer of a small company called Tri-State, just like Mr. Carpenter is the sole officer of several of the companies listed in the Search Warrant.  Just as the court determined that Zemlyansky had standing to bring a motion to suppress and granted that motion to suppress, this Court should respectfully do the same here.  Additionally, because of the extreme nature of the raid without **any** "exigent circumstances" to justify the use of weapons, the Government acted in derogation and disregard of IRC Section 7608 and the IRS's own manual and IRS internal memorandums.

Even a cursory glance at *Silverthorne* and what happened to them pales in comparison to what happened to Mr. Carpenter and the other people located at 100 Grist Mill Road.  If Mr. Carpenter, a small business owner, is not safe from a Governmental intrusion on his privacy, then no one in America is safe.  Similarly, the Government's discussion over who owns the email server is totally misplaced.  Mr. Carpenter has several domain names separate and apart from Benistar and like most small companies, Mr. Carpenter uses service providers in the Cloud.  If someone uses Google's Gmail to send an email message, there is no one who would say that the email belongs to Google

BROWN PAINDIRIS & SCOTT LP – ATTORNEYS AT LAW
100 PEARL STREET – HARTFORD, CONNECTICUT 06103 – (860) 522-3343 – JURIS NO. 20767

and not the individual who sent it. Even if a "Benistar" server was used to send emails through Microsoft Outlook or Microsoft Exchange, the emails are still personal to Mr. Carpenter, and Mr. Carpenter has a reasonable expectation of privacy to his own emails just as he would to a letter sent in the mail.

A case directly on point on this very issue, where the search warrant was quashed and the motion to suppress was granted and involves both email and Google, is *United States v. Cioffi*, 668 F.Supp.2d 385 (E.D.N.Y. 2009). The court in *Cioffi* made it clear that the nature of searches here were contrary to law. People have standing to protect their privacy right to email; the Government cannot save an invalid warrant with an affidavit that is not attached. If the search warrant affidavit is not attached, the warrant is invalid, and if there is no way to relate the emails to a specific crime, the motion to suppress should be granted. The court in *Cioffi* talks about the need for warrants to be very specific about not only what is asked for in the warrant and its relationship to a specific crime, but also the timeframe. Once again, both of the warrants in this case fail not one, but all of these standards.

"Property used for commercial purposes is treated differently for Fourth Amendment purposes than residential property." *Minnesota v. Carter*, 525 U.S. 83, 90

(1998).  Certainly, the Government's ability to conduct searches of a business is broader than its ability to search a residence.  However, the fact that Mr. Carpenter has a lesser expectation of privacy in the business *vis-a-vis* a residence does not mean that he has no legitimate expectation of privacy in the business. As the Supreme Court has recognized, in a variety of contexts, even where a defendant does not own the property searched, he or she may nonetheless have a reasonable expectation of privacy in that place by virtue of his or her relationship with that place. *See O'Connor v. Ortega*, 480 U.S. 709, 714-19 (1987) (recognizing that, in some circumstances, an employee has a reasonable expectation of privacy in his or her workplace).  A business owner "plainly has a reasonable, legitimate and objective expectation of privacy within the interior of its covered buildings. *Dow Chemical v. United States*, 476 U.S. 227, 236 (1986).  An employee may in certain circumstances have a reasonable expectation of privacy over his own workplace, such as the desks and file cabinets in his own private office, *see Ortega*, 480 U.S. at 724, or even an office he shared with other employees.  *See Mancusi v. DeForte*, 392 U.S. 364 (1968). *Also see United States v. Baron-Mantilla*, 743 F.2d 868, 870 (11th Cir.1984) (finding that defendant, who did not own or rent premises searched, "**could have established a legitimate expectation of privacy** by

BROWN PAINDIRIS & SCOTT LLP – ATTORNEYS AT LAW
100 PEARL STREET – HARTFORD, CONNECTICUT 06103 – (860) 522-3343 – JURIS NO. 20767

26

demonstrating 'an **unrestricted right of occupancy or custody and control of the premises as distinguished from occasional presence on the premises as a mere guest or invitee.**'") (*quoting United States v. Bachner*, 706 F.2d 1121, 1126 n. 6 (11th Cir.1983)) (emphasis added)

As the Supreme Court pointed out, because of the "great variety of work environments," this issue must be decided "on a case-by-case basis." *Ortega*, 480 U.S. at 718. As a general rule, employees can expect privacy as to the contents of their desks, file cabinets, and other containers in their offices and other enclosed places that they use exclusively. "It is well established," said the Tenth Circuit, "that an employee has a reasonable expectation of privacy in his office." *United States v. Anderson*, 154 F.3d 1225, 1230 (10th Cir. 1998). Thus, in *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 699 (9th Cir. 2009), the court summarily ruled that two managers of the corporate defendant had standing to challenge a search of "their own personal, internal offices." *Also see Schowengerdt v. General Dynamics, Inc.*, 823 F.2d 1328, 1335 (9th Cir. 1987). An employee might also reasonably expect privacy in an office or thing that he uses jointly with a small number of other employees. For example, in *United States v. Taketa*, 923 F.2d 665, 673 (9th Cir. 1991), the Ninth Circuit ruled that a DEA agent

retained a reasonable expectation of privacy in his office even though other agents would enter now and then on official business. Said the court: "[E]ven private business offices are often subject to the legitimate visits of coworkers, super-visors, and the public, without defeating the expectation of privacy." *Taketa*, 923 F.2d at 673.

In the instant matter, while Mr. Carpenter does not claim to have control over all the operations of Benistar or Nova or other related companies, he did have an expectation of privacy as to his personal papers, his emails, his business documents, as well as those documents upon which he worked upon, created or controlled. The Government claims  he controlled a lot of documents and engaged in a lot of financial transactions, such as with Grist Mill Capital, Avon, Charter Oak Trust; to suggest that somehow he does not possess standing to challenge the seizure of all of those documents is flat out inconsistent with the claims found in its own affidavits. (See p44, bottom of Gov. Br.)  As noted earlier in both the *Katz* case as well as the *Chadwick* case, the Fourth Amendment is meant to protect people and not places. Mr. Carpenter is clearly entitled to those same protections; nothing less. In sum, Mr. Carpenter has standing to challenge the Government's conduct in the aforementioned searches.

## CONCLUSION

For the above reasons, all documents seized in both the 2010 and 2011 searches should be suppressed and the Government prohibited in using the same in any trial against Mr. Carpenter.

Defendant, Daniel Carpenter

By _____
Richard R. Brown, Esq.
Brown Paindiris & Scott, LLP
100 Pearl Street, 2nd Floor
Hartford, CT 06103
Tel 860.522.3343
Fax 860.522.2490
Fed. Bar Ct00009
rbrown@bpslawyers.com

## **CERTIFICATION**

This is to certify that on December 1, 2014, a copy of the foregoing Reply Brief to Government's Memorandum re: Defendant's Motion to Suppress was served by email to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System. Also sent to the following by U.S. postal mail:

A.U.S.A. David Novick
Office of U.S. Attorney
157 Church Street, 23rd Floor
New Haven, CT 06510

Steven B. Manning, Esq.
500 Enterprise Drive
Suite 4B
Rocky Hill, CT 06067

Patrick Egan, Esq.
Fox Rothschild, LLP
2000 Market Street
Philadelphia, PA 19103

Richard R. Brown, Esq.
Brown Paindiris & Scott, LLP
100 Pearl Street, 2nd Floor
Hartford, CT 06103
Tel 860.522.3343
Fax 860.522.2490
Fed. Bar Ct00009