UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES                   :
                                :
v.                              :      Case No. 3:13-CR-226(RNC)
                                :
DANIEL CARPENTER                :

VERDICTS AND SPECIAL FINDINGS

This criminal case is before the Court for decision
following a bench trial.  Defendant Daniel Carpenter is charged
with devising and executing a scheme to defraud life insurance
companies by using misrepresentations to induce them to issue
high-value universal life insurance policies to straw insureds,[1]
which the companies would not have issued had they known the
policies constituted "stranger-originated life insurance"
("STOLI") policies.[2]  This document sets forth the Court's
verdicts and special findings in accordance with Federal Rule of
Criminal Procedure 23(c).

A STOLI policy differs from a regular policy in that it is
obtained not for estate planning purposes but for transfer to an
investor with no insurable interest in the life of the insured.[3]

---

[1] Universal life policies have a savings component and do
not expire as long as premiums are paid.  All but four of the
eighty four policies involved in this case had face values of $2
million or more.

[2] STOLI policies are also referred to as "investor-
originated life insurance" ("IOLI") policies.

[3] An "insurable interest" means an interest in the
continued life of the insured individual.  A person has an
insurable interest if he or she hopes for the continued life of
the insured, will sustain economic loss as a result of the

"[E]ssentially, it is a bet on a stranger's life."  United States v. Binday, 804 F.3d 558, 565 (2d Cir. 2015), petition for cert. filed, (U.S. Mar. 10, 2016) (No. 15-1140).  Life insurance providers are opposed to STOLI business and have taken steps to ensure that STOLI policies will not be issued.  But STOLI policies can be obtained through misrepresentations concerning the insured's intent to resell the policy, the existence of third-party funding of premiums, and other matters, which are characteristic of "stealth STOLI" or "STOLI in disguise."

Schemes to defraud life insurance providers by causing them to issue STOLI policies based on misrepresentations have recently been the subject of federal prosecutions.  See id.  In this case, the 57-count superceding indictment charges Mr. Carpenter with mail and wire fraud, conspiracy to commit mail and wire fraud, illegal monetary transactions, money laundering, conspiracy to commit money laundering and aiding and abetting the foregoing substantive offenses.[4]  The indictment alleges that the fraudulent scheme involved several steps.  Insurance agents recruited older persons to act as straw insureds, often with the promise of free insurance for two years and a share of the

_____

insured's death, and can use the policy's death benefit to mitigate the expected loss.

[4] Mr. Carpenter's brother-in-law, Wayne Bursey, also was a named defendant.  However, he died during the pendency of the case, and the charges against him have been dismissed.

profits from the sale of the policy.  The agents then completed life insurance applications that contained misrepresentations concerning the insured's motivation for procuring the policy, along with false denials concerning the possibility of a policy sale, third-party funding of premiums and the performance of life expectancy reports.  The indictment alleges that the applications were submitted and caused to be submitted to the life insurance providers by Mr. Carpenter and others.  See, e.g., Super. Ind. (ECF No. 53) ¶ 38.

At the trial, Mr. Carpenter testified that he was aware of the "evils of STOLI" when the applications underlying the indictment were submitted to providers.  He did not dispute that the applications contained STOLI-related misrepresentations.  He testified, rather, that he was deceived concerning the nature of the policies by people he trusted.

The evidence establishes beyond a reasonable doubt that from the outset of the conspiracy charged in the indictment, Mr. Carpenter knew the policies were being procured for resale to investors after the two-year contestability period expired.  It also establishes that at his direction and on his behalf, misrepresentations were made in applications in order to thwart the providers' attempts to ensure that STOLI policies would not be issued.  For these and other reasons explained below, I conclude that the government has sustained its burden of proving

Mr. Carpenter's guilt beyond a reasonable as to each count in the indictment.[5]

I.   Elements of the Charged Offenses

     A.   Mail and Wire Fraud

     The superceding indictment charges Mr. Carpenter with thirty-two counts of mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343.  Because these statutes use the same relevant language, they are analyzed the same way.  United States v. Schwartz, 924 F.2d 410, 416 (2d Cir. 1991).  The essential elements of both offenses are "(1) a scheme to defraud, (2) money or property [as the object of the scheme], and (3) use of the mails [or wires] to further the scheme." Fountain v. United States, 357 F.3d 250, 255 (2d Cir. 2004)

---

[5] Mr. Carpenter has previously been prosecuted for fraud. In 2004, he was charged in the District of Massachusetts with nineteen counts of mail and wire fraud.  He was tried before a jury, which returned a verdict of guilty on all counts.  His motion for a new trial was granted on the basis of prosecutorial misconduct during closing arguments.  See United States v. Carpenter, 405 F. Supp. 2d 85 (D. Mass. 2005).  Following an unsuccessful appeal by the government, see United States v. Carpenter, 494 F.3d 13 (1st Cir. 2007), Mr. Carpenter was tried a second time and a jury again found him guilty on all counts.  He moved for a new trial and the motion was granted.  See United States v. Carpenter, 808 F. Supp. 2d 366 (D. Mass. 2011).  This time, however, the order was reversed and the convictions were reinstated.  See United States v. Carpenter, 736 F.3d 619 (1st Cir. 2013).  Mr. Carpenter was subsequently sentenced to concurrent terms of imprisonment of thirty-six months, a sentence he is now serving.

(alterations in original).[6]

The first element, a scheme to defraud, requires the government to prove "(i) the existence of a scheme to defraud, (ii) the requisite scienter (or fraudulent intent) on the part of the defendant, and (iii) the materiality of the misrepresentations." United States v. Pierce, 224 F.3d 158, 165 (2d Cir. 2000) (citations omitted).  With regard to the fraudulent intent requirement, "[i]t need not be shown that the intended victim of the fraud was actually harmed; it is enough to show defendants contemplated doing actual harm, that is, something more than merely deceiving the victim."  Schwartz, 924 F.2d at 420.  To satisfy the materiality requirement, the government must establish that the misrepresentations or omissions "ha[d] the natural tendency to influence or [were] capable of influencing the [victim] to change its behavior." United States v. Rybicki, 354 F.3d 124, 147 (2d Cir. 2003) (en banc).

With regard to the second element, money or property as the object of the scheme, it is well-established in the Second Circuit that the "interests protected by the statutes include the interest of a victim in controlling his or her own assets." United States v. Carlo, 507 F.3d 799, 802 (2d Cir. 2007); see

---

[6] In addition to these elements, the wire fraud statute requires the government to prove that the communications crossed state lines.  See 18 U.S.C. § 1343.

also United States v. Rossomando, 144 F.3d 197, 201 n. 5 (2d Cir. 1998).  The government can satisfy this element by proving that the defendant's scheme "den[ied] the victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions."  Rossomando, 144 F.3d at 201 n.5.  The information in question "either must be of some independent value or must bear on the ultimate value of the transaction."  Id. (quoting United States v. Dinome, 86 F.3d 277, 284 (2d Cir. 1996)) (internal quotation mark omitted).

To satisfy the third element, the "in furtherance" requirement, the government must establish that the mails and wires were used "incident to an essential part of the scheme." Schmuck v. United States, 489 U.S. 705, 711 (1989) (quoting Pereira v. United States, 347 U.S. 1, 8 (1954)) (internal quotation marks omitted).  That the defendant did not personally participate in a mailing or wiring does not insulate him from liability if it was "reasonably foreseeable that the charged transmission would occur in the execution of the scheme."  United States v. Bahel, 662 F.3d 610, 642 (2d Cir. 2011).  Moreover, the timing of a mailing or wiring is of no moment if it "further[ed] the scheme."  United States v. Slevin, 106 F.3d 1086, 1090 (2d Cir. 1996).

B.   Money Laundering

Mr. Carpenter is charged with ten counts of money laundering

6

in violation of 18 U.S.C. § 1956(a)(1)(A)(i).  These counts require the government to prove that the defendant, "knowing that the property involved in a financial transaction represent[ed] the proceeds of some form of unlawful activity, conduct[ed] or attempt[ed] to conduct . . . a financial transaction which in fact involve[d] the proceeds of specified unlawful activity . . . with the intent to promote the carrying on of specified unlawful activity."  18 U.S.C. § 1956(a)(1)(A)(i).  The statute defines "financial transaction" as "a transaction which in any way or degree affects interstate or foreign commerce" or "a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree."  18 U.S.C. § 1956(c)(4).  "Specified unlawful activity" includes mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343.  See 18 U.S.C. § 1956(c)(7)(A); 18 U.S.C. § 1961(1).

    C.  Illegal Monetary Transactions

    Mr. Carpenter is charged with thirteen counts of illegal monetary transactions in violation of 18 U.S.C. § 1957(a).  To establish a violation of this statute, the government must show that the defendant "knowingly engage[d] or attempt[ed] to engage in a monetary transaction in criminally derived property of a value greater than $10,000," and that the property was derived from "specified unlawful activity."  18 U.S.C. § 1957(a).  The

statute defines a "monetary transaction" as "the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds . . . by, through, or to a financial institution."  18 U.S.C. § 1957(f)(1).  "Criminally derived property" means "any property constituting, or derived from, proceeds obtained from a criminal offense."  18 U.S.C. § 1957(f)(2).  And, like the identical phrase in the money laundering statute, "specified unlawful activity" includes mail and wire fraud.  See 18 U.S.C. § 1957(f)(3); 18 U.S.C. § 1956(c)(7)(A); 18 U.S.C. § 1961(1).

    D.   <u>Conspiracy</u>

Mr. Carpenter is charged with conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 1349 and conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h).  These statutes impose liability on "[a]ny person who . . . conspires to commit" the substantive offenses.  18 U.S.C. §§ 1349, 1956(h).  "To prove conspiracy, the government must show that the defendant agreed with another to commit the offense" and "that he knowingly engaged in the conspiracy with the specific intent to commit the offenses that were the objects of the conspiracy."  <u>United States v. Huezo</u>, 546 F.3d 174, 180 (2d Cir. 2008) (quoting <u>United States v. Monaco</u>, 194 F.3d 381, 386 (2d Cir. 1999)) (internal quotation mark omitted).  It must be established "that there was a conspiracy to commit a particular

offense and not merely a vague agreement 'to do something wrong.'" United States v. Provenzano, 615 F.2d 37, 44 (2d Cir. 1980) (quoting United States v. Rosenblatt, 554 F.2d 36, 38 (2d Cir. 1977)).  It must also be established that the defendant "agree[d] on the essential nature of the plan." United States v. Salameh, 152 F.3d 88, 151 (2d Cir. 1998) (alteration in original) (quoting United States v. Gleason, 616 F.2d 2, 16 (2d Cir. 1979)) (internal quotation marks omitted).  Unlike other conspiracy statutes, neither § 1349 nor § 1956(h) requires proof of an overt act in furtherance of the conspiracy.  See Whitfield v. United States, 543 U.S. 209, 219 (2005); (§ 1956(h)); United States v. Roy, 783 F.3d 418, 421 (2d Cir. 2015)(§ 1349).

II.  Findings of Fact

    A.  Stranger Originated Life Insurance

        1.  The Nature of STOLI Policies

An insured who acquires a policy for estate planning purposes may ultimately decide to sell it for various reasons, for example, if the premiums have become too costly or the insurance is no longer needed.  Under state law, it is well-established that such an insured may freely sell his policy, in which case the buyer becomes the beneficiary and assumes responsibility for paying the premiums.  See Binday, 804 F.3d at 565.  An insured who wants to sell his policy may be able to find a buyer through what is referred to as the "life settlement" or

"secondary" market.  The existence of this market has given rise
to STOLI policies.

At the trial in this case, witnesses defined a STOLI policy
with reference to the circumstances existing at the time of the
policy's "origination."  If the policy holder applied for the
policy with a prior understanding to cede control of the policy
to an investor, it is a STOLI policy.  Or if the purchase was
financed by an investor who intended to take ownership of the
policy at the end of a period of time, it is a STOLI policy.  A
typical policy, in contrast, is purchased to mitigate economic
loss expected to occur as a result of the death of the insured.[7]

2.  Life Insurance Providers' Opposition To STOLI

In the mid-2000s, life insurance companies began to notice
that policies were being purchased for investment by persons with
no insurable interest in the life of the insured:

[I]ndividuals are being recruited to consent to the purchase

_____

[7] At the trial, the defendant offered a slightly different
definition of what constitutes a STOLI policy.  He stated that
the carriers were concerned about pre-arranged sales to third
parties lacking an insurable interest in the life of the insured.
The defendant's definition would exclude policies intended for
resale to investors from the outset unless the insured had a
prior agreement to sell the policy.  The defendant's definition
of STOLI is less protective of the carriers than their own
definition, which encompasses policies purchased for resale to
investors lacking an insurable interest whether or not the resale
is pre-arranged.  In any event, there is overwhelming evidence
that the defendant orchestrated a scheme to defraud the carriers
into issuing policies based on STOLI-related misrepresentations,
which defeated the carriers' attempts to detect and avoid STOLI
business.

of life insurance and annuities on their lives.  In some
instances, the individual is told that a charity will
receive part of the death benefit at no cost to the charity.
In other instances, the individual is told that they can
receive "free" insurance coverage for a year or two, with
the option to retain the policy by repaying [the] loan.
Some concepts also contemplate a life settlement of the
policy.  Because the "strangers" or "investors" financing
these programs are not interested in long-term investments,
these programs typically target an older individual with
high net worth that can qualify for large amounts of
insurance.

Gov't Ex. 2001 at 2.  These practices were indicators of STOLI.

The life insurance industry responded by emphatically
opposing STOLI policies.  Typical of this unequivocal stance was
the opposition to STOLI by companies that sold policies involved
in this case -- The Phoenix Companies, Lincoln National
Corporation, and Penn Mutual Life Insurance Company.[8]  Phoenix
refused to "engage in [STOLI] business" and was "opposed to any
transactions that 'manufacture' life insurance specifically to
position it for early sale."  Gov't Ex. 2126 at 1.  Lincoln
announced that it "[did] not want its life insurance and annuity
products used as part of a 'strange-originated life insurance'

---

[8] During the trial, Thomas Buckingham (The Phoenix
Companies), Michael Parker (Jefferson Pilot Financial and Lincoln
National Corporation), and Frank Best (Penn Mutual Life Insurance
Company) testified regarding the companies' opposition to STOLI
business, and Patrick Glynn (The Phoenix Companies), Tom Webb
(Penn Mutual Life Insurance Company), and Ken Elder (Lincoln
National Corporation) testified regarding actions the companies
took to discover and avoid STOLI business.  This case also
involves policies issued by Sun Life Assurance Company of Canada.
Though no witness from Sun Life testified at trial, the evidence
shows that all the carriers had the same concerns about STOLI and
undertook to detect and avoid STOLI in similar ways.

program." Gov't Ex. 2171 at 2. Jefferson Pilot Financial, which ultimately became part of Lincoln, notified its agents that it would "no longer accept applications for life or annuity policies sold under [STOLI] programs" and warned that "violation of this policy will result in disciplinary action, up to and including, termination for cause." Gov't Ex. 2001 at 2. Other companies took the same position. For example, the ING Life Companies "strongly oppose[d] arrangements designed to obtain life insurance for the benefit of a third party that lacks an insurable interest in the insured" and advised their agents that they were "prohibited from selling any ING Life insurance product" if certain indicators of STOLI were identified. Gov't Ex. 2108 at 2. Mr. Carpenter, a lawyer and longtime participant in the life insurance field, knew the companies were opposed to STOLI.

### 3. Reasons For The Anti-Stoli Stance

Insurance company witnesses testified at trial that STOLI policies differ from traditional policies in a number of material respects as set forth in the indictment. Two differences were highlighted. The first relates to the way policies are funded; the second involves lapse rates. To appreciate these differences, it is necessary to understand certain aspects of the life insurance business.

As shown by the evidence in this case, universal life

insurance policies produce two sources of revenue: (1) charges assessed against each insured's account, principally a "cost-of-insurance" charge, which is calculated based on the mortality risk of the insured; and (2) investment income. The amount of investment capital available to a company is a function of the amount of premium it receives relative to the charges assessed with regard to each insured's account. If the premium exceeds the charges, the carrier can invest the excess "cash value."

Life insurance companies must pay a variety of expenses. The most important of these are sales commissions and death benefits. Commissions paid to agents can range between 70 and 130 percent of the "target" premium for the first year. For policies with face values in excess of $2 million, the first-year commission can be several hundred thousand dollars. In addition to paying commissions, companies are responsible for paying death benefits. Generally, this expense will cost the company the difference between the policy's death benefit and its cash value.

Returning to the differences between STOLI policies and regular policies, and dealing first with policy funding, companies have learned from experience that insureds typically will pay a "level premium" during the life of a policy, one that exceeds the charges and fees assessed against the insured's account. When level premiums are paid, the company is able to invest the excess cash value, earning investment income. And

when the insured dies, the company can use the policy's cash value to offset the amount of the death benefit.[9]

STOLI policies do not conform to this pattern of level premium payments. Instead, after payment of a "target" premium in the first year (one the company will use to pay a significant commission), STOLI policies are funded at the minimum level required to keep them in force. Because STOLI policies do not build up cash value, they do not provide a source of investment capital for the company. Moreover, when the insured dies, there may be no cash value to offset the death benefit required to be paid.

With regard to lapse rates, companies have learned to expect that a certain percentage of insureds will allow their policies to lapse for various reasons. When a policy lapses, the carrier is no longer responsible for paying the death benefit, which usually results in a net gain to the carrier -- i.e., the savings produced by not having to pay the death benefit exceeds the loss in premiums and investment income. STOLI policies have a lower lapse rate than regular policies.

The carriers also had more basic reasons to oppose STOLI. The underwriting process for life insurance seeks to ensure that

---

[9] According to the trial testimony, paying more in premium than the minimum necessary to keep a policy in force is advantageous because the cash value of the policy will be available to satisfy future premium payments, which increase significantly as an insured ages.

the beneficiary has an interest in the continued life of the insured. Investors in STOLI policies have no such interest and stand to benefit if the insured dies prematurely. Life insurance companies do not want to be perceived as being in the business of enabling others to bet against the lives of their insureds.

The carriers also worried that STOLI could call into question the favorable tax treatment of life insurance.[10] If life insurance policies were to become just another vehicle for speculative investment, like stocks or bonds, lawmakers might well decide to change the applicable tax laws. A change in the tax laws could make life insurance less attractive to consumers, adversely affecting the carriers' business.

4. <u>The Providers' Attempts to Detect and Avoid STOLI</u>

The insurance companies took various steps to ensure that STOLI policies would not be issued. They formulated and disseminated the anti-STOLI policies described above and circulated information regarding STOLI indicators. For example, Lincoln provided a list of "common 'red flags'" that the carrier believed were "present in many of the more common [STOLI] arrangements." Gov't Ex. 2097 at 4. These included: (1) offers to the insured or applicant of "some financial inducement for applying for the life insurance policy," (2) the insured or

_____

[10] The cash value of a policy earns interest, which accrues on a tax-deferred basis.

applicant "borrowing all of the premiums and . . . not making any personal investment in the life insurance program," (3) unreasonable interest rates (greater than LIBOR plus 300 basis points), loan terms, and fees, (4) an understanding that "the lender will accept ownership of the policy in full satisfaction of any outstanding premium financing," and (5) if a trust is involved, the existence of a relationship between the trustee and a lender or life settlement company. Id. The carriers required their agents to protect them against STOLI business. See id. ("[Lincoln] expect[s] that our producers and representatives will understand, and actively support, our efforts to not issue any new life insurance policies where any of the parties are considering, or actually intend, the eventual transfer of the life insurance policy to a life settlement company or other investors.").

In addition, companies required prospective insureds and others involved in the application process to provide information that would expose "red flags" associated with STOLI programs. Forms and questions developed by Phoenix and Lincoln are illustrative. In November 2006, Phoenix began to require all applicants age 65 and over seeking a policy with a face value of $2 million and up to complete a Statement of Client Intent

("SOCI") form.[11]  A notice at the top of the form explains the
form's purpose: "Phoenix will not knowingly participate in sales
programs or strategies, including premium financing arrangements,
designed primarily to facilitate the eventual sale or transfer of
the policy to investors.  The purpose of this form is to provide
Phoenix with the information it needs to implement that policy."
Gov't Ex. 2009 at 1.  This notice is followed by several
questions requiring an answer of either "yes" or "no."  These
include:

> Will any of the first year or subsequent premiums for the
> policy be borrowed by the proposed owner or proposed insured
> or by any other individual, trust, partnership, corporation
> or similar or related entity?
>
> Is the policy being purchased in connection with any formal
> or informal program under which the proposed owner or
> insured have been advised of the opportunity to transfer the
> policy to a third party within five years of issuance?
>
> Do the proposed insured or proposed owner have any
> understanding or agreement providing for a party, other than
> the owner, to obtain any legal or equitable right, title or
> interest in the policy or entity owning the policy?
>
> Has any entity, including, for example, any life expectancy
> valuation company or premium financing company, conducted
> (or made plans to conduct in the future) a life expectancy
> evaluation of the insured within the past two years?
>
> Have either the proposed insured or the proposed owner, in
> the past five years, sold a policy to a life settlement,
> viatical, or other secondary market provider?
>
> Have the proposed insured or proposed owner, or any
> individual, trust, partnership, corporation or similar or

---

[11] As the testimony at trial established, this was the
demographic in which STOLI business was most prevalent.

> related entity received cash or other financial inducements
> in connection with this application or the purchase of this
> insurance?

Id. at 1-2.  The form also asks the proposed insured or proposed

owner to "state in detail" their "bona fide need . . . for [the]

insurance."  Id. at 2.  Phoenix required the form to be signed by

the proposed insured, the proposed owner, and the life insurance

agent.  The testimony at trial established that "yes" answers

would have raised concerns that the policy was being procured for

STOLI purposes.  If the form contained a number of "yes" answers,

or if an investigation revealed additional concerns, Phoenix

could decline to issue the policy.  It is undisputed that Phoenix

relied on the information provided in the SOCI form to detect and

avoid STOLI policies.[12]

Lincoln's agents were required to fill out an Agent's Report

with the following questions:

> Is this policy being paid for with a premium financing loan?

> Is this policy being paid for with funds form any person or
> entity whose only interest in the policy is the potential
> for earnings based on the provision of funding for the
> policy?

Gov't Ex. 801 at 14.  For insureds age 70 and up seeking a policy

with a face value of at least $2 million, Lincoln expected its

agents to fill out the Required Producer and Representative

---

[12] Most, if not all, of the questions on the SOCI form were
ultimately integrated into the Phoenix life insurance
application.

Certification Regarding Stranger Originated Life Insurance, which

asks:

> Will the Insured/Annuitant or Owner/Applicant receive any
> compensation as a result of the issuance of this policy,
> other than the benefits provided by the policy?
>
> Is any premium financing contemplated to pay the initial or
> future premiums for this policy?  If "Yes," . . . [a]re you
> aware of any understanding (whether written or oral) that
> the lender or other party will accept ownership of the
> policy in full satisfaction of any outstanding premium
> financing . . . [or] any discussion that the premium
> financing is based on a projected or estimated future fair
> market value of the life insurance policy in excess of the
> illustrated cash surrender values?
>
> Have you been involved in any discussion with the
> Insured/Annuitant and/or Owner/Applicant about the possible
> sale or assignment of a beneficial interest in a trust,
> limited liability company, or other entity created or to be
> created on the Insured/Annuitant's and/or Owner/Applicant's
> behalf?
>
> If the policy will be owned by a trust, limited liability
> company, or other entity created or to be created for the
> Insured/Annuitant's behalf, are you aware of any business or
> financial relationship between the trustee or entity
> managers and any premium financing, life settlement,
> viatical, or other secondary market provider?

Gov't Ex. 801 at 3-4.  The agent was required to sign the form

after certifying that he or she had read the attached Lincoln

Policy Regarding Stranger Originated Life Insurance.  See id. at

4-5.[13]

　　As part of the application process, Lincoln also required

---

[13] The Required Producer and Representative Certification
Regarding Stranger Originated Life Insurance was eventually
renamed the Required Producer and Representative Certification
Regarding Investor Originated Life Insurance.  However, the
relevant content remained nearly identical.

insureds age 70 or over to complete a Defined Age Questionnaire.

Among other things, this asked the insured:

> Have you, the proposed insured, been involved in any discussion about the possible sale or assignment of this policy to an unrelated third party, as an inducement to purchase the life insurance policy?  Have you been involved in any discussion about the possible sale or assignment of a beneficial interest in a trust, limited liability company or other entity created or to be created on your behalf which will have an ownership or beneficial interest in this policy?
>
> Have you, the proposed insured, been involved in any discussion about the projected value of this policy in a future sale to an unrelated third party?
>
> Have you, the proposed insured, ever sold a policy in a life settlement, viatical or other secondary market provider, or are you in the process of selling a policy?

Gov't Ex. 1411 at 4.  This form also required the proposed owner of the policy, if different from the proposed insured, to answer the same questions.  See id.  In addition, the proposed owner was required to identify whether "this policy [is] being funded via a premium financing loan or with funds borrowed, advanced or paid from another person or entity?"  Id.  Lincoln's standard life insurance application, which required input from both the proposed insured and the proposed owner, contained similar or identical questions.

Lincoln relied on the representations made by or on behalf of applicants to determine whether a policy was being obtained for the purpose of resale in the life settlement market.  If Lincoln determined that there was such an intent, the application

would be declined.

In addition to relying on the information provided in the application and related forms, companies hired investigators to conduct "inspection reports." An investigator doing an inspection report was expected to contact the agent and prospective insured to verify the information provided in connection with the application, including the answers to the STOLI-related questions discussed above. The investigator would then prepare a report. If the report disclosed material discrepancies, the carrier could conduct a further review or decline to issue the policy.

To combat STOLI, policies were monitored for changes in ownership, which could be indicative of STOLI. Companies also brought lawsuits to rescind what they believed to be STOLI policies, in some instances after the contestability period expired. Agents caught doing STOLI business were terminated.

B. The Scheme to Defraud the Insurance Providers

1. The Defendant's Background

The evidence establishes that Mr. Carpenter is a sophisticated businessman with considerable expertise in life insurance matters. Soon after graduating from law school in 1979, he began working for the Northwestern Mutual Life Insurance Company. After working in underwriting, he became a licensed life insurance agent. In 1983, he became an agent for the New

England Life Insurance Company, an affiliation that continued until 2004. Witnesses testified that he demonstrated a high level of knowledge regarding life insurance, which is unsurprising given his legal education and career in the insurance field. Based on the evidence, it is reasonable to conclude that his level of expertise with regard to life insurance matters surpassed that of most, if not all, of the other people involved in this case.

During his career, Mr. Carpenter was prominently involved in welfare benefit plans involving life insurance. A welfare benefit plan is a mechanism by which an employer can provide employees with various types of benefits. Welfare benefit plans are usually organized under one of two sections of the Internal Revenue Code. See 26 U.S.C. § 419; 26 U.S.C. § 419A. Certain welfare benefit plans, like the ones discussed during the trial, provide only death benefits. These plans generally operate in the following way: An employer adopts the plan and contributes to a trust, which purchases a life insurance policy on the covered employee and acts as the owner and beneficiary of the policy. The employer pays the premiums to the trust, which pays the insurance carrier. When the insured dies, the trust receives the death benefit and distributes it to the beneficiary.

While still employed by Northwestern Mutual, Mr. Carpenter started a company called Benefit Concepts and eventually became

22

the trustee for several of the largest welfare benefit plans in the United States.

### 2. The Benistar Entities

During the time period relevant to this case, Mr. Carpenter controlled a number of business entities located in offices at 100 Grist Mill Road in Simsbury, Connecticut and 300 First Stamford Place in Stamford, Connecticut (the "Benistar Entities"). Of the numerous different entities that operated out of these locations, the most significant for purposes of this case are Benistar Admin Services, TPG Group, Grist Mill Trust, Grist Mill Capital, Avon Capital, and the Charter Oak Trust.[14]

Benistar Admin Services ("BASI") provided administrative services to the Benistar Entities. Most of the individuals who worked for the Benistar Entities received their paychecks from BASI. Don Trudeau was the President of BASI, and the defendant's wife, Molly Carpenter, was its Chairman.

TPG Group ("TPG") was responsible for collecting commission payments from life insurance carriers and disbursing them to agents associated with Benistar. TPG was often referred to as "the House." Mr. Carpenter testified that his wife Molly and Mr. Trudeau controlled TPG.

The Grist Mill Trust was a multiple employer trust providing

---

[14] The superceding indictment refers to these entities as the "Subject Entities."

death benefits to covered employees of participating employers. Gov't Ex. 1917 at 17. The corporate structure of Grist Mill Trust is somewhat unclear, but the signatories on its bank account at JP Morgan Chase were the defendant's wife and Wayne Bursey, his late brother-in-law.

Grist Mill Capital ("GMC") and Avon Capital were financing companies that loaned money to other Benistar Entities. Mr. Carpenter acknowledged at trial that he controlled GMC, and documents admitted into evidence show that he signed on its behalf as "Chairman of Managing Member." The structure of Avon Capital is less clear. Many of the documents bear Mr. Trudeau's signature. However, Mr. Carpenter is listed as the signatory on both of Avon Capital's bank accounts.

The Charter Oak Trust was formed by the defendant to serve, and did serve, as a vehicle for obtaining STOLI policies, as will be discussed in detail below.

### 3. The Defendant's Control of the Benistar Entities

The superceding indictment alleges that Mr. Carpenter "was in control of the [relevant] Entities both in effect and, in many cases, through direct or indirect ownership interests." Super. Ind. (ECF No. 54) ¶ 2. Mr. Carpenter denies that he was in control. But the evidence at trial establishes that the allegation in the indictment is well-founded. Four witnesses who worked for or with the Benistar Entities credibly testified that

Mr. Carpenter was in control.  Though one of these witnesses had an incentive to implicate Mr. Carpenter in criminal wrongdoing, the others did not.  All four were consistent in testifying that everyone reported to him.

Mr. Carpenter's denial is also refuted by documentary evidence, which demonstrates that he and Benistar employees consistently acted as though he was in charge.  With regard to TPG Group, for example, the record includes an email sent by Molly Carpenter to Jenny Valedaserra and Jason Concatelli, employees of BASI, directing them to "hold up any payments" by TPG to agents "until Dan approves."  Gov't Ex. 1926 at 1.  The defendant was copied on the email, and there is no doubt that "Dan" is a direct reference to him.  In another email, the defendant told Ed Waesche, an internal life insurance agent and BASI employee, that a particular allocation of commissions between TPG and the internal agents was appropriate.  Gov't Ex. 1947 at 1.  Finally, in a memorandum to employees of the Benistar Entities, the defendant mandated that TPG receive 40 percent of the commission or "no deal."  Gov't Ex. 2033 at 2.  The defendant added that "all deals" had to be "approved" by him.  Id.

In addition, the evidence shows that the formal corporate structure of the various Benistar Entities had little meaning for the people involved.  For instance, in a document sent by Mr. Carpenter to several Benistar employees, Mr. Waesche was listed

as both the Chairman of a company called Benefit Plan Advisors, LLC and as the President of Grist Mill Capital. Gov't Ex. 1922 at 2-3. But Mr. Waesche indicated that he did not recall holding these titles until he saw the document at trial. The evidence also shows that in communications with an insured, Mr. Waesche held himself out as Vice President of Advanced Markets of NOVA Benefit Plans, LLC, another Benistar Entity. Gov't Ex. 1210 at 1. Mr. Waesche admitted on cross-examination that he created the title for himself.

The evidence also shows that corporate entities were created and discarded at Mr. Carpenter's direction when it suited his purposes. For example, in a chain of emails between the defendant, Mr. Waesche and Missy Vallerie, the office manager in Stamford, Ms. Vallerie was directed to "[g]et rid of [Benefit Plan Advisors, LLC] everywhere." Gov't Ex. 1923 at 1. The defendant also reminded Mr. Waesche to "remember you are US Benefits Group, Inc now" and directed him to "[w]ork . . . on new stationary etc etc[.] No more BPA." Id. at 2. The last email in the chain is Ms. Vallerie's response to the defendant: "OK. We'll deep six BPA." Id. at 1. Mr. Waesche testified that the purpose of creating US Benefits Group and discarding Benefit Plan Advisors was to help create the impression that the Stamford office was not associated with the other Benistar Entities. I credit this testimony.

4.  <u>The Charter Oak Trust</u>

a.  <u>Formation and Purpose of the Charter Oak Trust</u>

The genesis of the Charter Oak Trust ("COT") was a life insurance policy held by an insured named Marvin Carrin.[15]  Mr. Carrin, who at the relevant time was in his late seventies or early eighties, was a successful businessman.  He was interested in life settlements and had sold a number of policies on the secondary market before being introduced to Mr. Carpenter through a connection at Phoenix.  The defendant helped Mr. Carrin obtain a policy that was placed in the Grist Mill Trust.  The premiums for the policy were financed entirely by GMC, and the defendant understood that Mr. Carrin intended to sell the policy on the secondary market.  This policy provided the defendant with an introduction to STOLI business.  As the defendant would later remark to Mr. Waesche, Mr. Carrin was more than "just a client," he was a "partner" who "taught us a lot when we began this journey together two years ago."  Gov't Ex. 2169 at 1.

The defendant's experience with Mr. Carrin led him to create the Charter Oak Trust as a vehicle for doing STOLI business.  On its face, COT appeared to be a multiple employer death

_____

[15] The superceding indictment refers to COT participants as "Straw Insureds," and Mr. Carrin is identified as "Straw Insured 1."  During the relevant time period, Mr. Carrin had several life insurance policies.  The policy described in this section does not form the basis of any count in the superseding indictment.  Rather, those counts are premised on wirings associated with a different policy acquired by Mr. Carrin in 2009.

benefit-only welfare benefit plan organized under § 419 of the Internal Revenue Code. But COT was formed to engage in transactions like the one involving Mr. Carrin. Mr. Carpenter denies this. According to his testimony, the purpose of COT was to fund, by means of what he calls a "modified split-dollar arrangement," life insurance policies that the insureds themselves would purchase from the trust after two years.

Overwhelming evidence refutes the defendant's account. Several witnesses credibly testified that COT was formed to serve as a vehicle for acquiring life insurance policies for resale to investors. Stefan Cherneski, an employee of the Benistar Entities, testified that COT was structured to appear like an ordinary welfare benefit plan but that its true purpose was to procure policies on elderly insureds for resale in the life settlement market. His testimony is corroborated by the testimony of Ed Waesche and Charles Westcott, a licensed life insurance agent with Lincoln who recruited insureds to participate in COT. In addition, the evidence establishes that individuals recruited to participate in COT as straw insureds believed their policies would be sold to third parties after two years.[16]

_____

[16] Henry Cooper, a COT participant referred to as "Straw Insured 7" in the superseding indictment, testified that Mr. Waesche told him he would receive free life insurance coverage for two years, after which his policy would be sold on the secondary market. Mr. Cooper believed he would be able to profit

Documentary evidence corroborates the witnesses' testimony. As early as December 2006, Mr. Carpenter and others at Benistar began to discuss a business model predicated on obtaining high-value life insurance policies for resale on the secondary market. On December 14, 2006, Jack Robinson, an attorney who held the title of General Counsel of Benistar, sent an email to the defendant and others to which he attached a "**CONFIDENTIAL** spreadsheet on our costs and profit for discussion tomorrow." Gov't Ex. 2014 at 1 (emphasis in original). The spreadsheet illustrates what GMC could earn by financing and selling a hypothetical life insurance policy with a face value of $5 million and an annual premium of $300,000. The spreadsheet provides an estimate of the debt GMC would incur by borrowing funds to pay the premiums. It then calculates the total proceeds from a sale of the policy at different percentages of the face value. Various costs and fees are then subtracted from the total. These include the cost of repaying GMC's debt and an Origination Fee (20 percent of total premiums paid), a Placement Fee (5 percent of the policy's face value), a Premium Funding Fee (3 percent of the policy's face value), and a Termination Fee (1 percent of the policy's face value). The spreadsheet indicates

---

from the sale. Others had the same understanding, including Teresa Martinez ("Straw Insured 4"), Luella Paulsrud ("Straw Insured 5"), Judith Musiker ("Straw Insured 9"), Betty Von Noorden ("Straw Insured 11"), Beat Zahner ("Straw Insured 12"), and Christine Lambert ("Straw Insured 14").

that any remainder would be distributed to the insured.

Following revisions by Mr. Robinson, this spreadsheet was
resubmitted to the defendant on December 17, 2006. Mr. Robinson
wrote that, after factoring in the changes, GMC could "make a
$200K profit on each $5MM deal," and the client would "hit[] a
home run[]" if the policy was sold above 23 percent of its face
value. Gov't Ex. 2017 at 1. The email concluded that there was
a lot of money to be made using the welfare benefit plan
"approach," and referred to "Plainfield," meaning Plainfield
Asset Management LLC, a hedge fund. Id. As discussed below,
Plainfield would ultimately provide a $35 million credit facility
to fund premiums for COT policies.[17] The spreadsheet attached to
this email revises the fees that GMC would collect out of the
total proceeds of the sale. Gone are the Premium Funding Fee and
the Termination Fee; only the Origination Fee and Placement Fee
remain. The change is significant because these two fees, and no
others, were ultimately integrated into the COT documents.

It is apparent that Mr. Robinson's revised spreadsheet,
which became the basis for COT, contemplated the resale of life
insurance policies on the secondary market after the
contestability period. There is no indication of an intent to

---

[17] On cross-examination, the defendant claimed that this
email reflected brainstorming on Mr. Robinson's part as to how to
use the $35 million credit facility. He also suggested that the
email referred to a different project, not COT. Neither
explanation is credible.

sell policies to the insureds themselves. Indeed, the Origination and Placement fees contemplated by Mr. Robinson's revised spreadsheet could be expected to act as a deterrent to a purchase by an insured. For example, Henry Cooper, who became a COT insured, held a Phoenix life insurance policy with a face amount of $5 million. To buy his policy from COT, he would have to pay fees of nearly $300,000, in addition to reimbursing COT for approximately $230,000 in premiums. This is the functional equivalent of paying an interest rate greater than 100 percent.

The record also contains written communications regarding the sale of COT policies on the secondary market, many of which involved the defendant. The following are illustrative: On March 12, 2007, the defendant received an email from Mr. Waesche that compared the profitability of policies on the lives of "MC" and "DS." Gov't Ex. 2032 at 1. The testimony at trial established that "MC" was Marvin Carrin and "DS" was David Siewert, another COT participant. Attached to the email is a set of profit analyses that mirrors the revised spreadsheet discussed above.

The same day, the defendant sent a number of Benistar employees a memorandum addressing COT "underwriting and compensation issues." Gov't Ex. 2033 at 2. In this document, the defendant wrote that "[w]e," meaning those who were participating in the administration of COT, "do not get paid

until if and when the deal is completed satisfactorily 25-30 months from now." Id. at 4. The time period the defendant mentions is significant because it corresponds to the two-year contestability period. It must be concluded that the defendant was referring to the sale of policies on the life settlement market.

On July 30, 2007, Mr. Westcott sent an email to the defendant concerning a potential COT client. According to Mr. Westcott, the client was "thinking after 2 yrs to turn over the profit to charity." Gov't Ex. 2065 at 1. The defendant responded by telling Mr. Westcott to "go for it." Id. This exchange makes sense only if the client expected to earn a profit from the sale of his policy to an investor.

On May 21, 2008, the defendant received an email from Mr. Trudeau regarding a policy on the life of Judith Amsterdam, who would ultimately become a COT participant. In the email, Mr. Trudeau acknowledged that Ms. Amsterdam's life expectancy was longer than investors would like. Even so, he advocated for funding her policy because "the secondary market is starting to look at these types of policies more favorably and I believe that they will gain in value over the next few years." Gov't Ex. 2124 at 1. This email makes no sense if the purpose of COT was to sell the policies to the insureds.

On December 16, 2008, the defendant received an email from

Mr. Waesche that discussed the possibility of improving the marketability of Lincoln policies. Mr. Waesche wrote that "with this idea we could stay in this market and have the best [internal rate of return] in the market place and when it comes to buy time I can't imagine that [the policies] wouldn't sell at a significant premium." Gov't Ex. 2174 at 1. The defendant's response: "This is a brilliant idea" that "could be a game changer for us. . . . Do not share this idea with anyone else." Id. This exchange also makes no sense if the purpose of COT was to sell policies to insureds.

Another clear indicator of Mr. Carpenter's intent to sell policies on the secondary market is provided by an email sent by his assistant, Kevin Slattery, to Mr. Westcott on November 15, 2008, regarding COT. See Gov't Ex. 2156. The defendant was copied on the email, and it was signed "Dan & Kevin." Id. at 1-3. At the trial, the defendant attempted to distance himself from this email, but the evidence easily supports a finding that he wrote it. The email states: "we need . . . to get policies [the] Market wants to buy. The Market knows what it wants, and we should feed it the same. Give the Market what it wants." Id.[18]

---

[18] Confronted with this email, the defendant initially claimed it was not related to COT. But the email's subject line and contents show that it concerns COT. The defendant then claimed that he did not write the email. Viewed in the context of the evidence as a whole, it is highly unlikely that anyone

The defendant testified that COT was not permitted to sell a policy to anyone but the insured and that the insureds were expected to buy the policies after two years. Indeed, according to the defendant, it would have been a "financial disaster for Grist Mill Capital" if the insureds did not purchase their policies because this was the only mechanism by which GMC could repay its indebtedness to Ridgewood. The defendant's assertion that he planned to sell the policies to the insureds must be rejected. No provision in the trust documents has been cited or found that purported to prevent COT from selling policies to third parties, and the defendant has conceded that the "employers" involved in COT had no obligation to repay anything at the end of the two year period. In addition, he testified that neither COT nor GMC investigated the accuracy of the financial information in the paperwork submitted by insureds. A person in the defendant's position who thought he could avoid financial disaster only by selling policies to the insureds themselves could be expected to take steps to ensure that the financial information he received concerning their ability to buy the policies was accurate. The defendant contends that he relied on Mr. Waesche and others to provide accurate information and they betrayed him. At the same time, however, he denies that Mr.

---

else would have written the email. If the defendant did not write the email himself, he must have approved it.

Waesche ever worked for him or on his behalf.

The defendant's testimony that COT was not permitted to sell a policy to anyone but the insured is contradicted by the evidence of what he said and did during the conspiracy.  In addition to the evidence discussed above, the record shows that when a COT insured named Sash Spencer died, the trust refused to pay the beneficiary on the ground that a beneficial interest in the policy had been sold to Grist Mill Capital.  There is no doubt the defendant made the decision to deny the claim on this basis.  Moreover, the defendant ultimately tried to sell COT policies himself through Chad Gerdes, an active participant in the life settlement market.[19]

Mr. Carpenter points to certain provisions in the trust documents to support his claim that COT policies were not

---

[19] On January 6, 2009, the defendant requested that Mr. Gerdes "email [him] your typical package that someone has to fill out for you to sell the policy for them" and asked "[w]hat needs to be signed by the Insured?"  Gov't Ex. 2185 at 3.  On February 18, 2009, Mr. Gerdes e-mailed the defendant to inform him that one of his clients wanted to purchase two policies.  The defendant responded: "We have a bunch of policies that we own in our trusts that we could sell to your client immediately.  Some are under the 85 month [life expectancy] . . . others are close.  Do you care about 2 year contestability period if we own the policy???"  Gov't Ex. 2193 at 1-2.  Several days later, the defendant sent Mr. Gerdes another email with several attachments, including a life insurance policy on the life of COT insured Allen Tucker and two different life expectancy reports.  See Gov't Ex. 2194.  The defendant wrote: "I have 3 policies on this guy in one of our Trusts.  Please price this out with your client.  I can send you more if the price is right."  Id. at 1.  These are not the words of one who believed that COT policies could be sold only to the insureds.

purchased for resale to investors.  It is apparent, however, that these provisions served no purpose except to disguise the true nature of COT.  For example, paragraph 4 of the Disclosure, Acknowledgment and Certification Agreement, which was signed by every insured who participated in the trust, provides: "The Policy is not being purchased with the intent of selling it in a settlement or viatical sale, and there have been no offers to sell or buy the Policy.  Neither Agent, nor Funder, nor the Trust have recommended such a sale."  Gov't Ex. 2066 at 26.  However, the credible evidence proves that the straw insureds hoped to profit from the sale of the policies to investors.  Similarly, section 5.01 of the Declaration of Trust obligates a participating employer to "contribute to the Trust an amount sufficient to meet the costs for benefits selected in the Adoption Agreement executed by the Employer."  Gov't Ex. 2020 at 8.[20]  This provision purports to hold the employer responsible for contributing premium payments to the trust.  But no such payments were actually expected or made.[21]

_____

[20] The record contains several different versions of the Declaration of Trust.  The defendant claimed that two earlier versions, which were sent between various Benistar employees and the defendant, were not official.  I do not credit this testimony.  Moreover, the provision quoted in the text remained unchanged in all the versions.

[21] Indeed, the provision quoted in the text is contradicted by another document stating that "[t]he Funder," not the employer, "shall provide premium payments for so long as the Trust owns the Policy."  Gov't Ex. 2066 at 26.

b.    <u>Operation of Charter Oak Trust</u>

i.    <u>Funding Policy Premiums</u>

Financing for COT policies was provided by an entity called
Ridgewood Finance, Inc.  Ridgewood was a portfolio company owned
by Plainfield Asset Management, LLC, the hedge fund mentioned
earlier.  Edward Stone, who worked for Plainfield, testified that
Ridgewood was set up as a speciality finance lender.  In this
capacity, Ridgewood made loans to other finance companies, often
at high rates of interest.  In late 2006, Ridgewood entered into
an agreement with GMC to provide a $35 million credit facility
for the purpose of funding COT policy premiums.

Plainfield stood to benefit from this transaction in two
ways.  The first was direct -- Plainfield would be able to
recover interest and fees on the amounts Ridgewood loaned to GMC.
There was also the possibility of an indirect benefit.  At the
pertinent time, one of the areas in which Plainfield was active,
through another portfolio company called Caldwell Funding
Corporation, was the life settlement market.  Plainfield
understood that COT policies would be obtained for the purpose of
resale on the secondary market and envisioned that Caldwell would
be able to bid on the policies.  Caldwell could then generate
additional profit for Plainfield by reselling policies or holding
them to maturity.

The agreement between Ridgewood and Grist Mill Capital was

memorialized in a series of documents, which provided for the following arrangement: At its discretion, Ridgewood would advance funds from the $35 million credit facility to Grist Mill Capital for the purpose of paying premiums on life insurance policies owned by COT. At the end of the loan period, GMC would repay the loan amount plus interest. The loan was secured by "a first priority perfected and continuing security interest in and to all of [GMC]'s right, title and interest in and to . . . all assets and personal property." Gov't Ex. 1902 at 17. GMC would use the money advanced by Ridgewood to fund life insurance polices that would be placed in COT. Under GMC's agreement with COT, GMC was entitled to recover the value of its loan to COT, plus origination and placement fees. As collateral, COT assigned to GMC a power of attorney over the policies COT owned so long as GMC owed money to Ridgewood. By operation of these various agreements, Ridgewood's loan was secured primarily by the COT policies themselves, and if GMC defaulted, Ridgewood could step in and exercise control over the policies.

The parties agreed that Christiana Corporate Services, Inc., a Delaware corporation, would act as the custodian of documents and insurance trustee. Christiana was responsible for disbursing funds to pay premiums. This process involved several steps. GMC was first required to compile and submit to Ridgewood a number of

documents, including life insurance premium illustrations,[22] a
Health Insurance Portability and Accountability Act form, a
complete medical underwriting file or life expectancy report, and
a copy of the original insurance application.  Ridgewood would
use these documents to complete an internal underwriting process
to determine whether to fund the premiums.  If Ridgewood decided
to fund the policy, it would issue a commitment letter to Wayne
Bursey, who acted as the trustee of COT, and Kathy Kehoe, a
Benistar employee.  If GMC found the terms of the commitment
letter acceptable, it would submit to Ridgewood a funding
memorandum and disbursement request.  Simultaneously, GMC would
submit to Christiana a "closing package" that included all the
documents ordinally submitted to Ridgewood along with the funding
memorandum and disbursement request.  Christiana, in turn, would
transmit the "closing package" to Ridgewood, which would have
five business days to authorize funding.  In the event funding
was authorized, Ridgewood would wire funds to an account in GMC's
name at Christiana.  Ridgewood would then direct Christiana to
transfer the funds to an account in COT's name at PNC Bank and to

_____

[22] An "illustration" is a document that shows, usually on a
year-by-year basis, the amount of premium that an insured expects
to pay.  Illustrations are frequently submitted to a carrier as
part of the application process.  As part of the funding
arrangement, Ridgewood required GMC to provide it with two
different illustrations, one showing the insured paying a level
premium over time, and the other showing minimal funding after
the first year.

authorize the release of the funds from that account to the insurance carrier.

Ridgewood had a right to decline funding if its internal underwriting process revealed that a particular policy was not a sound investment. And it did so on a number of occasions. When this occurred, the defendant had a choice: fund the policy or walk away. The record shows that in some instances, he chose to have GMC fund the policies.

## ii. Recruiting Prospective Insureds

COT was not widely marketed in order to reduce the risk that the true nature of the trust would be revealed. As the defendant stated in an email to several Benistar employees and external life insurance agents, "[W]e fly under the radar . . . don't talk to anyone . . . don't give presentations to anyone." Gov't Ex. 2039 at 2. Consistent with the defendant's directive, COT was marketed to "friends and family." COT's ideal insured was a person over 65 with substantial wealth. Policies on the lives of people over 65 were easier to value and sell in the secondary market. And carriers were more apt to approve applications seeking coverage of $2 million and up if the applicants appeared to be wealthy.[23]

---

[23] The defendant testified that the applicants' wealth mattered because the purpose of COT was to sell the policies back to the insureds. As discussed above, this explanation is not credible.

People were recruited to participate in COT as straw insureds by third parties with whom COT had a preexisting business relationship, including the following: Ken Landgaard, who operated a company called Tranen Capital Alternative Investment Fund, Ltd.; Bruce Mactas, a life insurance agent who operated a financial planning company in New York City; Fred Prelle, who ran an insurance general agency in Texas; and Derek Siewert, a life insurance agent.  These recruiters or their employees often completed insurance applications and related forms, which would then be processed by employees of the Benistar Entities at the 100 Grist Mill Road offices in Simsbury.  In return, they were paid part of the first-year commission by TPG, even if they were not licensed agents.

In addition, a number of straw insureds were recruited directly by Ed Waesche.  Some of these individuals were referred to Mr. Waesche by Marvin Carrin in return for a small percentage of Mr. Waesche's commission.[24]  After Mr. Carrin presented the initial pitch to the prospective applicant, Mr. Waesche would work directly with the applicant to complete the necessary paperwork.

To induce people to participate in COT as straw insureds, the agents used a sales pitch learned from discussions at the 100

---

[24] It appears that the defendant did not know Mr. Carrin was being paid for referring applicants.

Grist Mill Road offices.  The prospective insureds were promised free life insurance for two years.  They were told that if they died during the two-year period, the policy proceeds would be disbursed to their beneficiaries.  After two years, the policy would be sold and the insured could potentially profit from the sale.  No effort was made to attract people with an interest in buying long-term life insurance coverage then or later.[25]

For some COT insureds, the recruiting pitch included offering to create a limited liability company so the individual could participate in COT.  For example, Mr. Waesche helped Henry Cooper create an entity called HLC Real Estate, LLC.  Mr. Cooper testified that this company was created solely to allow him to participate in COT, and that he never intended to transact any business under the HLC Real Estate name.

### iii. Completing Applications

In some instances, prospective COT insureds completed the application for the policy and related documents with help from the agent who recruited them.  In others, they signed blank documents to be completed by the agent.  Regardless of the manner in which the documents were completed, they invariably contained misrepresentations designed to prevent the carriers from

---

[25] As the defendant remarked to Charles Westcott in an email in March 2010, "in some cases we have offered the people back their own policies at no cost and the people wouldn't even take back their own policy after we paid for it for two years."  Gov't Ex. 2272 at 1.

discovering that the policies were intended for resale on the secondary market.  In this way, the defendant and his associates sought to induce providers to issue STOLI policies they otherwise would have refused to issue.

All the applications in the record contain inaccurate answers to questions used by the carriers to detect STOLI policies.  Rather than discuss each question and answer on every application, I will group the relevant questions into categories and provide examples of the answers that were given.

All the applications asked about the source of funds for premiums.  For example, applications submitted to Phoenix on behalf of Luella Paulsrud and Beat Zahner included the following questions:

> Will any of the first year or subsequent premiums for the policy be borrowed by the proposed owner or proposed insured or by any other individual, trust, partnership, corporation or similar or related entity?

> Will the owner, now or in the future pay premiums funded by an individual and/or entity other than the proposed insured?

See Gov't Ex. 501 at 5; Gov't Ex. 1201 at 5.  Similar questions in other carriers' applications also encompassed any sort of borrowing by either the insured or the policy owner.  Regardless of their wording, these questions were invariably answered "no."  As discussed above, however, COT was borrowing from GMC and/or Ridgewood to pay the premiums.

The defendant testified that these questions were answered

43

correctly.  He stated that the agreement between COT and GMC was not "premium financing," which would be characteristic of STOLI and thus "bad," but a "modified split-dollar arrangement," which was acceptable to the carriers and thus "good."[26]  A "split-dollar arrangement" is an agreement between an owner and non-owner of a life insurance policy, most often an employer and employee, to split premium payments in exchange for a split of the death benefit.  The carriers were willing to accept such arrangements between an employer and employee.  But premium funding arrangements that involved third parties raised STOLI concerns, as the defendant knew at the time.  The series of agreements between Ridgewood, GMC, COT, and the insureds created the very type of premium funding arrangement carriers sought to discover by asking questions about the source of premium payments.[27]

Given the defendant's awareness of the carriers' opposition to STOLI, his testimony that the questions on the applications were answered correctly must be rejected.  The arrangement

---

[26] As numerous witnesses testified, the defendant often remarked that COT's way of doing things should be understood as a "modified split-dollar arrangement."

[27] The defendant testified that he believed the carriers were only concerned about non-recourse premium financing, that is, financing arrangements in which the insured is not required to put up any collateral.  It is undisputed that the financing of COT policies was without recourse to the straw insureds.

between COT and GMC was a form of premium financing.[28]  Moreover,
most of the applications asked not whether the insured would rely
on "premium financing," but more generally whether funds would be
borrowed, either by the insured or the policy owner.  The
accurate answer to these questions was "yes."

The applications also asked whether offers of financial
inducements had been made to the prospective insured.  For
example, the Phoenix SOCI Form asked:

> Have the proposed insured or proposed owner, or any
> individual, trust, partnership, corporation or similar or
> related entity received cash or other financial inducements
> in connection with this application or the purchase of this
> insurance?

Gov't Ex. 2009 at 2.  Questions on this topic also were answered
"no."  However, the pitch used to recruit COT insureds included a
promise of free life insurance for two years.[29]  As the life
insurance carrier witnesses testified, such a promise constitutes

---

[28] That the defendant knew he was engaged in premium
financing is shown by a letter he sent to a retired judge in
connection with a mediation involving BASI and Mr. Trudeau.  In
this letter, he stated that GMC was "involved in aspects of the
premium financing of insurance policies business."  See Gov't Ex.
1939 at 2.  This was not the only time the defendant used the
term "financing" when referencing COT.  In a March 2010 email to
Charles Westcott, the defendant stated: "I have a lot of ideas
for a lot of good things . . . financing old people on the basis
of LE's is not one of them."  Gov't Ex. 2272 at 1.

[29] The defendant was aware that insureds were being
recruited in part on the basis of this promise.  In an email to
Mr. Waesche on March 30, 2011, he stated that an insured who was
unhappy because he could not sell his policy should nonetheless
"thank us for the two years of free insurance."  Gov't Ex. 2303
at 2.

the type of financial inducement the applications were designed to uncover.  In addition, COT insureds were told that they could receive a payout after their policy was sold.  Accordingly, the truthful answer to all these questions was "yes."

A third category of questions for which false answers were given asked whether any discussions had occurred regarding a sale of the policy.  For example, Penn Mutual required applicants to answer the following question:

> Have you been involved in any discussion about the possible sale or assignment of this policy to a Life Settlement, Viatical or other secondary market provider?

Gov't Ex. 101 at 4.  These questions were invariably answered "no."  However, the evidence establishes that recruiters induced prospective applicants to participate by telling them that when the policy was sold on the life settlement market after two years, they could share in the profits from the sale.  And the communications excerpted above show that the defendant and other Benistar employees frequently discussed the sale of policies.[30] Accordingly, the correct answer to these questions was "yes."

The applications also contained misrepresentations on questions related to whether a third party would have an interest in the policy.  Several of the insureds completed a Phoenix

---

[30] In the ordinary course of business, some life insurance agents choose to tell prospective applicants about the option available to them under state law to sell a policy.  The life insurance carrier witnesses testified that they would expect such conversations to be disclosed on the application.

application that asked:

> Does the proposed insured or proposed owner have any understanding or agreement providing for a party, other than the owner, to obtain any legal or equitable right, title or interest in the policy or entity owning the policy?

Gov't Ex. 501 at 5. Questions in this category were always answered "no." As shown by the discussion of the funding arrangement, however, COT assigned a security interest in the policies to GMC which, in turn, assigned its right to control the policies to Ridgewood.[31] Thus, the correct answer to these questions was "yes."

Other questions that were answered falsely related to life expectancy reports. For example, a Phoenix application asked:

> Has any entity, including, for example, any life expectancy valuation company or premium financing company, conducted (or made plans to conduct in the future) a life expectancy evaluation of the insured within the past two years?

Gov't Ex. 501 at 5. Though questions along this line were all answered "no," the funding arrangement with Ridgewood required that life expectancy evaluations be performed.[32] Thus, the

---

[31] The defendant, who signed these agreements on behalf of GMC, was well aware of this arrangement.

[32] Emails sent by or to the defendant show that he knew life expectancy reports were being done. The following are illustrative: Attached to an email sent to the defendant by Charles Westcott on June 28, 2008 are several life expectancy reports for Doug Sanders, referred to in the superceding indictment as "Straw Insured 15." Gov't Ex. 2134. The defendant received a similar email from Mr. Westcott regarding Christine Lambert on December 5, 2008. Gov't Ex. 2165. On July 16, 2007, the defendant received an email from Guy Neumann containing a spreadsheet of prospective insureds referred to COT by a general

answers to these questions should have been "yes."

Misrepresentations also were made regarding the prospective insured's purpose in applying for coverage. Luella Paulsrud's application stated that coverage was being sought for "[e]state tax liquidity" and "wealth transfer." Gov't Ex. 501 at 5. Applications submitted on behalf of Marvin Carrin, Vito Esparo ("Straw Insured 2"), and Teresa Martinez indicated that they wanted coverage in connection with "Estate Planning." See Gov't Ex. 101 at 3; Gov't Ex. 201 at 3; Gov't Ex. 402 at 3. And the Agent's Report submitted in connection with Christine Lambert's application stated that the insurance was for "estate planning" and "family income" purposes. Gov't Ex. 1413 at 1. However, the evidence establishes that the prospective insureds intended to sell the policies on the secondary market.

Finally, at least some of the applications contained misrepresentations regarding the financial resources of the prospective insureds. For example, Teresa Martinez testified at her deposition that she and her husband never made more than $100,000 a year. When she applied for a policy, she had approximately $200,000 in assets and was collecting about $21,000 per year in social security benefits. Yet she applied for a policy with a face value of $4,000,000. See Gov't Ex. 402 at 1.

---

agency in Texas, which included two columns for life expectancy evaluation results. See Gov't Ex. 2056 at 4.

The application stated that she earned income of $21,000 per year, received "other income" in the amount of $300,000 per year, and had a net worth in excess of $7 million. Id. at 5. Christine Lambert's applications provide another example. At trial, Mrs. Lambert's son testified that her net worth at the time the applications were completed was between $10 and 12 million. However, applications submitted to Lincoln represented that her net worth was $17 million. Gov't Ex. 1401 at 1; Gov't Ex. 1411 at 1.

Mr. Waesche testified that he inflated insureds' financial information before submitting applications for review by COT and never told the defendant. Relying on this evidence, the defendant argues that he, like the insurance carriers, was a victim of fraud. The defendant may well be correct that Mr. Waesche, Mr. Landgaard, and others involved with COT misled him regarding the financial condition of their recruits. Even if true, however, this does not exonerate him. As discussed above, COT was formed by the defendant to provide a vehicle for STOLI business. Having wealthy applicants mattered to him, not because the straw insureds were expected to buy the policies after two years, but because their wealth helped facilitate the STOLI scheme. In accordance with what can fairly be described as the defendant's "playbook," applications contained numerous material misrepresentations, in addition to misrepresentations regarding

the applicant's finances.  Moreover, while the defendant may have
been unaware of the degree to which information relating to
income and assets was being inflated by the agents, it was
reasonably foreseeable that agents would inflate financial
information in furtherance of the scheme to defraud the carriers,
and there is no evidence the defendant instructed them not to do
so or made any effort to check the accuracy of the information
they provided.[33]  In addition, it is difficult to credit the
defendant's testimony that he would have refused to submit any
application that misrepresented the applicant's financial
condition.  In the case of Christine Lambert, for example, there
is no reason to think he would have refused to submit the
applications had he known her wealth was less than reported.

The defendant played a key role in instructing others how
STOLI-related questions should be handled.  Stefan Cherneski
credibly testified that the defendant provided instructions
during group meetings in Simsbury.  Mr. Cherneski also witnessed
a conversation between the defendant and Charles Westcott during
which the defendant instructed Mr. Westcott to complete the
Lincoln applications in a certain way.  Mr. Cherneski recalled
that in both instances, the defendant provided the same
justifications for the answers -- i.e., the spurious explanation

---

[33] The defendant testified that COT did not run background
checks or credit checks on prospective insureds or investigate
whether the information provided in COT documents was accurate.

that COT was participating in a "modified split-dollar arrangement."

That the defendant gave instructions to Mr. Westcott is confirmed by Mr. Westcott's credible testimony, which, in turn, is corroborated by documentary evidence. For example, in an email dated January 28, 2009, Mr. Westcott asked the defendant: "How would you explain to a COT customer why they can answer the following question no. . . . Is this policy being funded via a premium financing loan or with funds borrowed, advanced or paid from another person or entity? (If yes please complete Premium Financing Application Supplement)." Gov't Ex. 2189 at 3. The defendant responded: "NOT premium financing . . . The Trust pays for everything and splits the death benefit 80-20. . . . Zero interest is charged . . . no financing at all. . . . Just like Merrill Lynch doing Split dollar . . . . Call me if you need more." Id. at 1-2.[34]

On November 18, 2008, Jenny Valedaserra sent an email to Mr. Westcott, asking whether a question on an application concerning discussions about a possible sale of the policy had been

_____

[34] Later in the email chain, the defendant wrote: "Remember . . . if you check YES they will expect you to say the name of an approved finance program like Credit Suisse . . . Problem is . . . they haven't approved any programs so they kill the application." Gov't Ex. 2189 at 1. Viewing this latter statement in context, it appears that the defendant is referring to the fact that the carriers would accept premium financing from approved programs. However, Grist Mill Capital was never approved by any of the carriers to act in that capacity.

completed properly.  See Gov't Ex. 2159.  The attached
application stated that there had been a discussion with the
insured about selling the policy, and added that the agent
believed it was his duty to explain to the prospective insured
all possible options.  See id. at 2.  In response to Ms.
Valedaserra's email, Mr. Westcott initially suggested that the
agent's statement was acceptable.  See Gov't Ex. 2160.  But ten
minutes later, he emailed Ms. Valedaserra again, asking her to
hold the application because he was "checking" if the question
concerning discussions about a possible sale of the policy should
be answered "no."  See Gov't Ex. 2161 at 1.  Mr. Westcott
testified that "checking" meant asking the defendant.  The next
day, Ms. Valedaserra sent an email to the agent who completed the
application to inform him that the question should be answered
"no."  See Gov't Ex. 2162 at 1.  According to Mr. Westcott, whose
testimony on this point I credit, the defendant instructed him
and Ms. Valedaserra to so inform the agent.

Ed Waesche and Wayne Bursey also relied on the defendant to
instruct them how to answer specific questions.  On January 29,
2008, Mr. Waesche sent Mr. Bursey an email that included the
Lincoln Required Producer and Representative Certification
Regarding Investor Owned Life Insurance and asked whether Mr.
Bursey was "comfortable with this form for COT case as required
by Lincoln."  Gov't Ex. 2099 at 4.  Mr. Bursey responded that he

"[would] have counsel look at this." Id. at 3. Mr. Bursey forwarded the email and attached form to the defendant several times, eventually asking whether the defendant "had a chance to review" it. Id. at 1. On February 3, 2008, Mr. Bursey wrote to Mr. Waesche that "[c]ounsel approved with no to the questions." Gov't Ex. 2101 at 1. Mr. Waesche testified that he assumed Mr. Bursey was referring to the defendant.[35]

At the trial, the defendant argued that if a conspiracy to defraud the carriers actually existed, his co-conspirators would have known how to answer questions without consulting him. In seeking the defendant's guidance, however, Benistar employees were simply doing what was expected of them. Not long after the first few COT policies were issued, the defendant ordered that "[a]ll questions regarding the COT . . . be directed to [him] in Simsbury, directly or through [other Benistar employees]." Gov't Ex. 2033 at 3.

The defendant also argues that the people who completed the applications, including Ed Waesche, Charles Westcott, and their associates, were acting on behalf of the insurance companies, not him. Here again, the defendant's position at trial is contradicted by reliable evidence of his own words and actions

---

[35] On cross-examination, Mr. Waesche acknowledged that Mr. Bursey might have been referring to Jack Robinson, who held the title of General Counsel of Benistar. Based on the evidence, I find that the "counsel" consulted by Mr. Bursey was the defendant, as Mr. Waesche believed at the time.

during the charged conspiracy. For example, in an email to Mr. Waesche regarding an investigation initiated by Phoenix into a policy on the life of a COT insured, the defendant stated: "Do what I say . . . Phoenix is rapidly going out of business . . . you will need to live with me for another 30 years . . . Understood?" Gov't Ex. 1948 at 1. In addition, the defendant's argument is refuted by the level of control he exercised over COT and its affiliates. Just as with the other Benistar Entities, the defendant exercised ultimate authority over COT's operations. As the defendant stated in an email discussing a policy on the life of a COT insured, "[d]o everything thru me please. . . . I am privy to all the issues and problems." Gov't Ex. 2077 at 1. The record shows that he instructed others about policies that should be sought,[36] approved potential applicants,[37] reviewed materials related to prospective insureds,[38] decided what

---

[36] To provide just one example: On October 31, 2008, the defendant sent an email to Charles Westcott instructing him to "[k]eep new cases to $5MM" and to "get Lambert and Twiggs done as $5MM cases." Gov't Ex. 2155 at 3. Testimony at trial established that "Lambert" referred to Christine Lambert.

[37] For example, the defendant gave Charles Westcott permission to recruit a potential COT insured in Georgia who wanted to give his share of the proceeds from the policy's sale to charity. See Gov't Ex. 2065. This refutes the defendant's testimony that he became involved with COT cases only after they had been funded by Ridgewood. As Charles Westcott testified, the defendant was involved in "everything."

[38] In a conversation regarding a policy on the life of COT insured Charles Deckard, Mr. Westcott was directed to scan and send to the defendant two life insurance premium illustrations,

documents should be sent and when,[39] determined the amount of commissions agents would receive,[40] and even provided funding for some of the policies.[41]

### iv. Submitting Applications

Completed applications were subject to review and approval by the defendant before they were submitted to the carriers. After completing the "first few cases for the Charter Oak Trust," the defendant sent a memorandum to a number of Benistar employees setting forth "certain underwriting and compensation issues." Gov't Ex. 2033 at 2. One of the requirements was that application materials for the COT policies be sent to 100 Grist Mill Road where the defendant had his office. Id. ("All cases will be sent to Simsbury, cleared through Simsbury, processed and underwritten through Simsbury, and the policies delivered through

_____

life expectancy reports, and the COT documents. Gov't Ex. 2079 at 1.

[39] On January 26, 2007, a Benistar employee emailed the defendant to inform him that she had forwarded a separate communication after a discussion with Ed Waesche. See Gov't Ex. 2025. The defendant responded: "Never send anything to anyone [without] me." Id. at 1.

[40] The commissions for COT policies were paid to TPG Group, over which the defendant exercised control.

[41] In a memorandum sent to various Benistar employees, the defendant wrote: "When everyone needs money they come calling on Benistar, which has to call on TPG or GMC or BPA, which in turn has to call on Carpenter Financial Group, which in turn has to call on me." Gov't Ex. 2033 at 4.

Simsbury. I hope that is clear.").[42] The defendant reiterated
this requirement. In an email to Charles Westcott on June 27,
2008, the defendant wrote: "[S]end in all details on all cases to
me so we can make sure everything is reviewed . . . Send me
copies of everything and we will work on it." Gov't Ex. 2133 at
2. In another email he wrote: "[a]ll deals must be approved
through [me] and GMC in Simsbury." Gov't Ex. 2033 at 2.

As discussed above, the applications that were submitted to
the carriers invariably contained affirmative misrepresentations
concealing the true nature of COT.[43] In addition, documents that
would raise "red flags" were withheld. For example, the
arrangement between COT, GMC, and Ridgewood required the
preparation of two life insurance premium illustrations. One
showed level yearly premium payments throughout the life of the
policy, while the other showed minimum funding after payment of

---

[42] Don Trudeau, who worked at the Stamford Benistar office,
responded to this memorandum in the following way: "I was totally
blindsided by this. I'm bitterly disappointed and upset. . . .
[I]t seems to me that our general counsel should be competent
enough to complete forms, have them reviewed by the appropriate
people and then execute a [signature] stamp. . . . I don't
understand not having a conversation and just sending this out."
Gov't Ex. 2034 at 1-3. The defendant responded that he was
concerned that having a signature stamp in the Stamford office
would "avoid scrutiny by Simsbury," i.e., by the defendant. Id.
at 1.

[43] The defendant testified that he never told anyone to lie
on the applications. The defendant might not have uttered the
word "lie" when instructing others. But there is credible
evidence that others lied when completing applications because he
told them to do so.

the first year's target premium. Though the latter illustration
accurately represented the manner in which the policy would be
funded, only the former was provided to the carriers, no doubt
because the illustration showing minimal funding would arouse
suspicion.[44] In addition, documents regarding the funding
arrangement between COT, GMC, and Ridgewood were never produced
to the carriers. As Edward Stone testified, producing those
documents might have caused the carriers to decline the policies
or conduct additional investigation.

v.    Responding to Providers' Concerns

Aside from the affirmative misrepresentations in the
applications and the withholding of critical documents, the
defendant and those working on his behalf took other steps to
deceive the carriers. In an attempt to ensure that no "red
flags" would be raised, agents instructed prospective insureds

---

[44] The defendant was aware of the manner in which the
policies were illustrated and directed Benistar employees in the
preparation of illustrations. In a series of emails between the
defendant and Sheila O'Grady, a Benistar employee, the defendant
received an email that said: "[A]s you are aware, when we fund
these cases, Ed [Waesche] runs two illustrations, sold for the
carrier and minimum for the funder." Gov't Ex. 2102 at 1. Mr.
Waesche testified that "sold" meant an illustration showing
payment of a level premium. The defendant forwarded this email
to Mr. Waesche and others, commenting: "We need to make sure
there are no more second year 'zero funding' illustrations . . .
is a dead give away that it is LS biz." Gov't Ex. 2105 at 1-2.
In this context, "LS biz" meant "life settlement business." Mr.
Waesche responded: "We will illustrate anyway you want. We pay
target yr one and minimum yr 2, which on occassion [sic] is 0.
Just let us know and we can illustrate it any way you want. The
insurance company gets target forever illustration." Id. at 1.

how to answer questions that might be asked by investigators doing inspection reports. For example, in an email sent on September 20, 2007, Charles Westcott instructed an agent to "prep [the COT insured] before inspection[,] net worth 34M+[,] policy will never be settled or sold (it will always remain as trust owned)[,] monies come from his companies for premium (I don't think they ask this) money does not come from Charter Oak." Gov't Ex. 2080 at 1.

Ed Waesche also engaged in this type of coaching. He sent a letter to the husband of a COT insured named Miriam Knobloch detailing the types of questions that would be asked of her and providing answers. Gov't Ex. 2118. In an email exchange with Ken Landgaard and his associates, Mr. Waesche told Mr. Landgaard to "PLEASE reach out to ALL clients regarding the phone interview whether they have or have not had it." Gov't Ex. 2148 at 2. After Mr. Landgaard responded that he would do so "ASAP," Mr. Waesche sent another email, which stated: "[P]lease assets, financial statement values must be in line . . . no financing no settlements premiums paid with earnings from trust assets everyone." Id. at 1.

On occasion, inspection reports would result in the discovery of discrepancies despite the agents' coaching of the prospective insureds. In these circumstances, the carriers sometimes contacted the agent to determine whether there was an

explanation for whatever discrepancy had been discovered. For example, Ed Waesche received a call from Tom Webb at Penn Mutual after an inspection report regarding a prospective insured revealed a potential connection to premium financing. Mr. Waesche sent a lengthy response via email:

> Tom, I called Ken Landgaard immediately after hearing the disturbing news you shared with me on the phone this morning. . . . Ken was as dumbfounded as me when he heard the story . . . you shared with me about Gloria's inspection report. Ken's initial response was that he NEVER conducted a seminar regarding ANYTHING! Never mind some premium financing arrangement that this woman referenced. Ken is a longtime friend of mine. He is not in the insurance business. . . . [L]et me say this, her assets are real. The accountant is real. . . . [E]ither Gloria was leery of scams, shams and con artists or she does not have the capacity to understand advanced trust and estate planning techniques, like the Welfare Benefit Plan! . . . In closing, I am as disturbed about this as you must be."

Gov't Ex. 2147 at 1. Mr. Waesche testified that this email was his attempt to assure Mr. Webb and Penn Mutual that there had been a simple misunderstanding.

Carriers occasionally voiced concerns unrelated to inspection reports. For example, a Phoenix underwriter working on the Steven Rose policy was "a bit confus[ed] . . . since it looked very much like a premium finance case yet the question was answered 'no' . . . Since the client does not have enough annual income to pay the premium illustrated, we felt the question needed to be addressed." Gov't Ex. 2154 at 3. In response to these concerns, Guy Neumann, who worked closely with the defendant, sent a lengthy email to Patrick Glynn at Phoenix. See

id. at 1-2.  Among other things, the email discussed Mr. Rose's financial position and how he intended to pay for the life insurance premiums.  In fact, like other COT insureds, Mr. Rose did not intend to pay the premiums.  Ultimately, Phoenix issued a policy to Mr. Rose.  See Gov't Ex. 1 at 2.

Lincoln also voiced concerns regarding COT that were deflected by deceptive behavior on the part of the defendant and others.  On April 15, 2009, Tom Eusebio at Lincoln sent an email to Fred Prelle, an external life insurance agent who referred cases to COT, to coordinate a phone call between Lincoln and COT personnel.  "The two main issues" that the call was intended to address were "[h]ow these plans are not STOLI" and "[h]ow they do not abuse section 419 of the Internal Revenue Code through the creation of LLCs to avoid estate and gift taxes."  Gov't Ex. 2208 at 3.  Mr. Prelle forwarded the email to Charles Westcott, who sent it to the defendant.

A conference call was held, during which the defendant spoke at length.  Ken Elder, an employee of Lincoln who participated in the call, testified that the defendant was "incredulous" that anyone from Lincoln believed COT was involved in the STOLI business.  According to Mr. Elder, who took detailed notes of the call, the defendant stated that the COT trust documents did not permit the sale of the policy and that the insureds were all wealthy people with complicated estates who wanted the policies

for estate planning purposes.  The defendant did not mention that the funds for the premiums were being borrowed.  Neither the defendant nor anyone else affiliated with COT ever provided Lincoln with documents that might raise additional concerns, such as those relating to the Ridgewood funding arrangement.

### vi.    Efforts to Sell Charter Oak Policies

The financial crisis of 2008 had a significant impact on the life settlement market.  By that time, most of the COT policies underlying the indictment had been issued.[45]  In November 2008, the defendant wrote that "pricing [was] getting tougher" and the market was "drying up."  Gov't Ex. 2157 at 1.[46]  As he noted, sellers of policies were being offered "premiums plus 1%," with "some offers not even covering premiums paid."  Id.  The market suffered an additional blow when one of the life expectancy evaluation service providers changed the manner in which they calculated life expectancies, resulting in much longer ranges. See Gov't Ex. 2169 (communication from the defendant stating that when two companies "extend[ed] everyone's life expectancy[,] they

---

[45] Of the eighty-four COT policies, thirty-six were issued in 2006 and 2007, thirty-two were issued in 2008, and sixteen were issued in 2009.

[46] These quotes are taken from an email sent by Kevin Slattery, one of the defendant's assistants, to Charles Westcott on November 15, 2008.  See Gov't Ex. 2157.  The subject line of the email is "Memo II, State of the Life Settlement Market," and it is signed "Kevin & Dan."  See id. at 1-2. Like the similarly signed email discussed above, I think this one also was written by the defendant.

destroyed the market").

The defendant responded to these developments by undertaking to sell COT policies through Chad Gerdes.  After that attempt proved unsuccessful, he sent a document called the "Charter Oak Trust Letter" to, among others, Wayne Bursey, Ed Waesche, and Charles Westcott.  The document was a draft form letter the defendant proposed be sent to COT insureds.  The letter began: "Pursuant to the Adoption Agreement and the Disclosure & Acknowledgment Agreements that you signed, it was always anticipated that at some time you would want you or your employees to take over this valuable coverage for themselves or for whatever estate planning or financial planning reason they had wanted to have coverage in the first place."  Gov't Ex. 2235 at 3.  The letter then provided a place to insert the following: the face value of the policy, the amount of premiums paid, the origination fee (as a percent of the premiums paid), the placement fee (as a percent of the policy's face value), and an administrative fee.  The letter invited the recipient to buy the policy by paying the total of the premiums and fees.[47]

The defendant asked for comments on the draft.  Charles

_____

[47] If, for example, the policy had a face value of $5 million and COT had paid premiums of $600,000, the origination fee would be $120,000 (twenty percent of the premiums paid), and the placement fee would be $300,000 (six percent of the policy's face value)  Combined with the standard administrative fee of $1,500, the insured would have to pay $1,021,500 to buy the policy.

Westcott proposed putting the letter "in the hand of the [agent] to personally deliver" because "[i]f we mail it to the employer or insured we run the risk that they call the carrier" but "[i]f we coach the [agent] and he goes out and meets the client and gets a signature of intent or interest then we control where the letter goes or better yet doesn't go."  Gov't Ex. 2236 at 1. Several days later, Mr. Westcott responded to the email chain with another comment: "The other question we have to deal with us [sic] how to explain that there is no value or whatever And [sic] going forward what will happen."  Gov't Ex. 2237 at 2.  Ed Waesche agreed.  Id. at 1 ("I agree with Charlie with respect to broker involvement to identify what the client's initial goal/expectation was so as to manage expectations vs. reality."). Both Mr. Westcott and Mr. Waesche testified that they were concerned about sending the letters directly to insureds because they feared that the insureds would contact the carriers and disclose the true nature of COT.  If this happened, they could lose their appointments with the carrier and even lose their licenses as agents.  Despite these reservations, the defendant directed that the letters be sent.

The defendant claims that the letters were sent to carry out a pre-existing plan to sell the policies to the insureds.  At the trial, he emphasized that unlike Mr. Westcott and Mr. Waesche, he had no reluctance to send the letters.  He points to an email

chain in which he responds to their concerns in the following way: "If people call the carrier . . . why do we care . . . why would they bother . . . what would they say . . . what are we afraid of?" Def.'s Ex. 6 at 2. "[T]he key question[s]," according to the defendant, were "What has been promised?" and "Why will people be disappointed?" Def.'s Ex. 7 at 1.

The defendant's testimony is not credible. Mr. Waesche testified that he did not take the defendant's comments seriously because the defendant knew what had been promised to the insureds and knew why they would be disappointed. Mr. Waesche believed that the defendant was just putting things in writing so it would look like he was not involved. I credit Mr. Waesche's testimony and agree that the defendant was trying to build a record to protect himself in the event COT became the subject of a STOLI investigation. In context, the letters are like false exculpatory statements, which provide circumstantial evidence of a consciousness of guilt.

Efforts to sell the policies on the secondary market continued under the direction of the defendant and Don Trudeau. On March 2, 2009, Ed Waesche emailed Don Trudeau to inquire which "case you want to shop for LS." Gov't Ex. 2197 at 1. In this context, "LS" meant "life settlement." Mr. Trudeau responded that he wanted Mr. Waesche to focus on several policies, including one on the life of Allen Tucker, a COT insured. Id.

On March 25, 2009, Mr. Waesche sent an email to Alex Barba, a person active in the life settlement market, to inquire whether there was any interest in a number of different policies.  See Gov't Ex. 2203.  The attached list includes Phoenix policies for "BZ" and "LP," meaning Beat Zahner and Luella Paulsrud.  See id. at 2.

On April 21, 2009, Mr. Trudeau sent an email to Wayne Bursey attaching a completed Life Settlement Application for a policy on the life of Allen Tucker.  See Gov't Ex. 2211.  To receive a quote on the policy, the application had to be signed by Mr. Bursey, the COT trustee.  See id. at 2.  Mr. Bursey forwarded the form to the defendant, asking: "Are you ok with me signing and scan and email [sic] back to Don?"  Id. at 1.  The defendant responded: "What price are we getting?"  Id.  Later that afternoon, Mr. Trudeau emailed the defendant to tell him that "[t]he . . . valuation on Tucker is $1,376,595 (for $8,333,333 death benefit)."  Gov't Ex. 2214 at 1.[48]  On January 5, 2010 Mr. Trudeau emailed the defendant to inform him of "the offers on the four [COT policies] [the defendant] indicated to proceed with."

---

[48] During this time period, Mr. Trudeau frequently updated the defendant regarding what was happening with the COT policies. For example, on May 5, 2009, he sent the defendant an email to inform him that "Zahner is one of the handful COT cases we have been funding.  It appears to have some value even in this market."  Gov't Ex. 2219 at 1.  Mr. Trudeau concluded the email by saying: "Just want to make sure we're all rowing in the same direction since we're all in the same canoe."  Id.

Gov't Ex. 2268 at 1.

Almost one year after the defendant's initial efforts to sell COT policies through Mr. Gerdes, no policies had been sold, and the defendant and Mr. Trudeau were still seeking potential purchasers. On March 16, 2010, Mr. Trudeau emailed the defendant to ask whether to "unload" policies on the lives of COT insureds Charles Deckard and Doug Sanders. Gov't Ex. 2277 at 1. The defendant responded, "we want to unload everything." Id. Ten days later, the defendant told Mr. Trudeau to "please figure out if we have buyers or not." Gov't Ex. 2279 at 1.

Ultimately, the defendant and his associates found a way to sell some COT policies. On November 15, 2010, Mr. Trudeau sent an email to the defendant describing the structure of a sale of policies to an entity known as Life Insurance Fund Elite. See Gov't Ex. 1932. Attached to the email is a draft Life Settlement Purchase and Sales Agreement. See id. Forty-five minutes later, Mr. Trudeau sent the defendant another email that included a flow chart describing the entities involved in the transaction. See Gov't Ex. 1933.

The documents admitted into evidence establish that the transactions worked the following way. First, COT transferred ownership of the policy to an entity known as Yates Worldwide Holdings Ltd. See, e.g., Gov't Ex. 1718. These agreements were signed by Mr. Bursey on behalf of COT and Mr. Trudeau on behalf

of Yates Worldwide.  *See* *id.* at 6.  Next, Yates Worldwide

transferred the policy to Tranen Capital Alternative Investment

Fund, Ltd.  *See, e.g.*, Gov't Ex. 1719.  Mr. Trudeau signed these

agreements on behalf of Yates Worldwide, and Ken Landgaard signed

on behalf of Tranen.  *See* *id.* at 6.  Then Tranen transferred the

policy to Avon Capital, LLC, a Wyoming company.  *See, e.g.*, Gov't

Ex. 1720.  These agreements were signed by Mr. Landgaard on

behalf of Tranen and Mr. Trudeau on behalf of Avon Capital.  *See*

*id.* at 6.  Finally, the policies were transferred from Avon

Capital (WY) to Life Insurance Fund Elite Trust.  *See* Gov't Exs.

1701-1704.

During his testimony, Mr. Carpenter attempted to distance

himself from these transactions in a number of ways.  First, he

stated that he had never seen the documents and knew nothing

about the transactions.  The documentary evidence is to the

contrary.  In addition to the email exchange between the

defendant and Mr. Trudeau just discussed, the record includes

other email exchanges that contradict the defendant's testimony.

On November 16, 2010, Mr. Trudeau received an email from Zoran

Fotak, which said: "On behalf of ISM and the management team I

would like to welcome you into Life Fund Elite.  We look forward

to making lot's [sic] of money for you."  Gov't Ex. 1936 at 3.

Mr. Trudeau forwarded this to the defendant, adding "We're in.

Bunch of work left to do."  *Id.* at 1.  The defendant responded

less than two hours later: "Keep me posted." Id. Several months later, on January 11, 2011, Mr. Trudeau sent the defendant "a more complete update" regarding various matters, including the criteria for being able to sell policies to "Life Elite." Gov't Ex. 1937 at 1. The defendant responded several minutes later: "Thanks . . . please get me ELITe [sic] portfolio ASAP." Id. It is apparent that the defendant knew of and was involved in the transfer of policies to Life Insurance Fund Elite.

The defendant also testified that COT transferred these policies on behalf of Ridgewood, which had foreclosed on the loans used to fund the premium payments. The defendant is correct that Ridgewood and GMC executed a settlement agreement on September 30, 2010, whereby ownership of COT policies was transferred to Ridgewood in exchange for extinguishing GMC's debt. See Def.'s Ex. 8. However, the transaction with Life Insurance Fund Elite involved two policies that were not included in the Ridgewood settlement agreement.[49] These policies could not have been sold on Ridgewood's behalf because they never belonged to Ridgewood. Moreover, it appears that Ridgewood did not know about COT's transfer of the policies. On May 12, 2011, counsel for Ridgewood sent a letter to St. George Asset Management, LLC, an entity that had requested original policy

---

[49] Specifically, these were (1) an AXA policy on the life of Allen Tucker (policy number 157200846) and (2) a Lincoln policy on the life of Charles Deckard (policy number JJ7008008).

documents from Christiana on behalf of Life Insurance Fund Elite. See Gov't Ex. 1752. The letter requested that St. George "cease and desist" any attempt to secure the documents because Ridgewood, not Life Insurance Fund Elite, was the proper owner of the policies. Id. at 1.

### 5. The Sash Spencer Policies

Two policies on the life of COT insured Sash Spencer require separate discussion because they provide the basis for the charges of money laundering and illegal monetary transactions in the superceding indictment. Mr. Spencer founded a successful investment company called Holding Capital Group. See Gov't Ex. 2031 at 2. His case was one of the first pitched to Ridgewood, and his two Lincoln policies were the first to be placed in COT. See Gov't Ex. 1 at 1. The two policies, which were issued on the same day, had face values of $10 million and $20 million, providing a total death benefit of $30 million. The applications for both policies contained the types of material misrepresentations described above.[50] And because both policies

_____

[50] Both policies contained "no" answers to questions concerning "discussions about the possible sale or assignment of this policy to a life settlement, viatical or other secondary market provider." Gov't Ex. 1301 at 1; Gov't Ex. 1310 at 1. The agent's report for the $10 million policy represented that the purpose of the insurance was "estate planning." See Gov't Ex. 1301 at 5. "No" answers were given to questions regarding whether the policy would be "paid for with a premium financing funding loan," whether a loan used to fund the policy would be "in any part non-recourse premium financing," and whether the policy would be "paid for with funds from any person or entity

69

were funded by Ridgewood, they went through the usual funding process.[51]

Mr. Spencer died in June 2008, within the two-year contestability period. Six days later, Lincoln received two death claims from COT signed by Mr. Bursey. See Gov't Ex. 1324.[52] As was its practice when dealing with claims within the contestability period, Lincoln began an investigation. One of the investigators was Ken Elder.[53] Mr. Elder hired an

---

whose only interest in the policy is the potential for earnings based on the provision of funding for the policy." Gov't Ex. 1301 at 5. Both applications were also amended with statements signed by Mr. Spencer attesting that "[n]either I nor any person or entity on my behalf are receiving any compensation for the issuance of this contract, whether payable currently or in the future," that "[t]he premiums illustrated to be paid in the first two years are not being advanced, loaned or financed by a third party," and that "I have not been involved in any discussion about the possible sale or assignment of this policy as an inducement to purchase the life insurance policy for sale at a later date." Gov't Ex. 1302; Gov't Ex. 1311.

[51] The required documents were submitted to Ridgewood, which decided to fund both policies and issued commitment letters. Grist Mill Capital then sent the required Funding Memorandum and Disbursement Request to Ridgewood and Christiana. The submission of these documents led to the wiring of funds from Ridgewood to various bank accounts at Christiana and PNC Bank and, ultimately, to Lincoln.

[52] The Claimant's Statement form that COT was required to complete as part of this process included a section regarding split-dollar arrangements. Notably, this section was left blank, confirming that a split-dollar arrangement was not contemplated. See Gov't Ex. 1324 at 7.

[53] As previously mentioned, Ken Elder was also involved in Lincoln's general investigation of COT over STOLI concerns and compliance with the Internal Revenue Code.

investigation firm, ICS Merrill, to assist in gathering documents and conducting interviews. ICS Merrill interviewed Mr. Spencer's widow, Mary Spencer. The interview proved to be unhelpful to Lincoln because she was not well informed regarding her husband's life insurance policies.

Lincoln also requested documents from COT concerning its relationship with Mr. Spencer. Though COT provided a number of documents, none was provided that might have raised concerns about the source of the premiums. For example, COT failed to provide the Collateral Assignment Agreement, GMC's agreement with Ridgewood, or any of the documentary evidence related to the manner in which the policies were funded. In the absence of those documents, Lincoln could mistakenly conclude that the premiums had been paid by Mr. Spencer's employer.

Despite a lengthy investigation, Lincoln was unable to determine that the two policies were procured for sale on the secondary market. In the meantime, Mr. Bursey had admonished Lincoln that the trust had a "fiduciary duty to pay death benefits to the Participant's designated beneficiary." Gov't Ex. 1327 at 1. Ultimately, Lincoln issued two checks to COT totaling $30,677,276.75, representing the proceeds of the two policies plus interest. Informed by Wayne Bursey that the checks had been issued, the defendant responded: "Big day for all of us . . . check mail and speak only to me . . . only to me. . . . May you

be in heaven before the Devil knows you're dead."  Gov't Ex. 2221
at 1.

The designated beneficiary of Mr. Spencer's two policies was
Universitas Education, LLC, a non-profit organization providing
scholarships to underprivileged students.  Not long after
learning that Lincoln had issued the checks, the defendant made
some initial calculations regarding the amount of the total death
benefit to which Universitas was entitled.  Though his
handwritten calculations are not entirely clear, it appears he
was thinking about paying Universitas approximately $19
million.  As explained below, however, Universitas received
nothing.

Approximately one month after Mr. Spencer's death, and
before the trust documents were provided to Lincoln's
investigators, Benistar employee Amanda Rossi forwarded to Joe
Castagno, one of the defendant's assistants, a 2007 email
containing "the final version[] of the Charter Oak Trust"  Gov't
Ex. 2135 at 1.  Approximately 90 minutes later, Mr. Castagno
returned the document to Ms. Rossi.  In that interval, a new
sentence was added to Section 6.01 of the COT Declaration of
Trust, which deals with limitations on the trust's liability.
The new sentence provides: "If a Participant dies while
participating in the Plan, a Death Benefit equal to Eighty (80%)
percent of the original face amount of any policies held by the

Plan on the Participant's life minus the cost of any premiums or placement or origination fees listed in the Plan Documents and minus any benefits paid under the Plan shall be paid to the Participant's designated Beneficiary." Gov't Ex. 2136 at 9. Such a provision does not exist in any earlier versions of the Declaration of Trust contained in the record. See Gov't Exs. 1931, 2020, 2027, 2135.

It appears that the Declaration of Trust was altered by the defendant in the wake of Mr. Spencer's death for the specific purpose of enabling COT to keep twenty percent of the total death benefit of $30 million. This conclusion is supported by the testimony of Stefan Cherneski, who stated that he knows the trust documents were changed at that time because he reviewed them. It is also consistent with other documentary evidence. For instance, shortly after the amended Declaration was returned to Ms. Rossi, Don Trudeau sent the defendant an email asking "[w]hich version of the COT Trust was provided to Lincoln for the claim, the most current version or the version at the time of participation." Gov't Ex. 2139 at 1. The defendant responded: "Current." Id. Mr. Trudeau also asked whether "a fulfillment kit (with Trust)" was "ever sent to Spencer." Id. The defendant responded that one had not been sent. Id. In context, Mr. Trudeau's question reflects a concern that if Mr. Spencer had received the previous version of the document, rather than the

amended version, the document might be used to challenge COT's claim to twenty percent of the proceeds of the policies.

Even factoring in this after-the-fact twenty percent offset, Universitas was still presumptively entitled to a significant portion of the total death benefit. On October 2, 2009, however, a letter signed by Mr. Bursey was sent to Universitas denying its claim to the proceeds. The letter listed five reasons for the denial. The first and second related to a settlement agreement between Universitas, Holding Capital Group, and Bruce Mactas, the life insurance agent listed on the applications, regarding the distribution of the death benefit. This arrangement, the letter stated, violated the terms of the trust and constituted an illegal transaction under New York and Connecticut law. The claim was also denied on the grounds that it was untimely and persons acting on behalf of Universitas had threatened litigation. Finally, the letter referred to "numerous discussions" between Mr. Spencer and GMC "regarding the assignment of the beneficial interest under the Policies to GMC in return for a $1.8 million payment to Universitas." Gov't Ex. 1331 at 3. According to the letter, GMC believed "a binding agreement to have been reached" and that this agreement was "enforceable." Id. The letter concluded with a settlement offer to Universitas of $1.8 million, the amount provided by the alleged oral agreement between Mr. Spencer and GMC.

Litigation ensued and Universitas lost.  As a result, no payment was made to Universitas notwithstanding Mr. Bursey's admonition to Lincoln that COT had a fiduciary duty to pay the death benefits to Mr. Spencer's designated beneficiary.

Determining how the defendant and his co-conspirators used the $30 million in policy proceeds requires reviewing a complex web of corporate entities, bank accounts, and numerous money transfers.  On May 18, 2009, the two checks from Lincoln were deposited by Wayne Bursey into a TD Banknorth account in COT's name (the "account ending in 4548"), which had been set up by Mr. Bursey six days earlier.  On May 21, 2009, $8,677,276.75 was transferred by Mr. Bursey from the account ending in 4548 to a TD Banknorth account belonging to GMC (the "account ending in 4712").  Prior to this transfer, the account ending in 4712 was empty.  On May 26, 2009, another $2,186,566 was transferred by Mr. Bursey from the account ending in 4548 to the account ending in 4712.  After these two transfers, which were the only ones into the account ending in 4712 at the relevant time, the account ending in 4548 contained just over $19.8 million.

After these initial transfers, the money went in several different directions.  Some of the money was used to repay Ridgewood's loan to GMC.  On May 22, 2009, $3,356,700 was transferred by the defendant from the account ending in 4712 to a Bank of America account in GMC's name (the "account ending in

4932").[54]  Four days later, two transfers of $1,063,045.54 and
$2,094,654.78 were made from the account ending in 4932 to
Ridgewood Financial, Inc.  The "payment detail" section for both
transfers makes clear that their purpose was to repay loans used
to fund the Spencer policies.  See Gov't Ex. 1856.

Some of the money originally deposited into the account
ending in 4712 was also used to fund additional life insurance
policy premiums.  One set of transfers involved bank accounts
held by an entity called Grist Mill Holdings, LLC.  On May 22,
2009, one day after slightly more than $8 million had been
transferred into the account ending in 4712, the defendant
authorized a transfer of $2,100,000 to a TD Banknorth account in
the name of Grist Mill Holdings (the "account ending 7136").  On
June 9, 2009, $1,946,000 was transferred from the account ending
in 7136 to a Bank of America account in the name of Grist Mill
Holdings (the "account ending in 0017").  Eight days later, the
defendant authorized two transfers of $61,925 and $139,633.33
from the account ending in 0017 to the COT PNC Bank account
operated by Christiana (the "account ending in 3247").  Then, on
June 18, 2009, $61,925 was transferred from the account ending in
3247 to Lincoln to pay premiums on a COT policy for Doug Sanders.
And on July 1, 2009, $139,633.33 was transferred from the account

---

[54] Prior to this transfer, the account ending in 4932 had a
balance of $27,152.48.  Gov't Ex. 1857.

ending in 3247 to Phoenix to pay premiums on a COT policy for Luella Paulsrud.

Another set of transfers involved the Bank of America account held by GMC. On June 2, 2009, $119,875 was transferred from the account ending in 4932 to the COT PNC Bank account ending in 3247. The next day, that exact amount was transferred from the account ending in 3247 to Lincoln for the purpose of funding the premiums of a policy on the life of Christine Lambert.[55]

The proceeds of the Spencer policies also funded the defendant's purchase of real estate in Rhode Island. The defendant made an offer on the property on behalf of an entity known as Moonstone Partners, LLC on April 8, 2009, after Mr. Spencer's death but before Lincoln agreed to pay. The purchase and sale agreement was executed on May 21, 2009, shortly after the checks from Lincoln were deposited. The agreement provided for a purchase price of $1,100,000. On June 9, 2009, $2,833,568.64 was transferred from the account ending in 4712 to a JP Morgan Chase bank account in the name of Grist Mill Trust

---

[55] During the pertinent time, there was only one other transfer into the account ending in 4932: a transfer of $700,000 from the account ending in 4712 on May 28, 2009. Four days later, $671,566.16 was transferred from the account ending in 4932 to Ridgewood Finance Inc., apparently for legal and administrative fees. In any event, it is evident that all the money in the account ending in 4932 at this time was part of the proceeds of the Spencer policies.

(the "account ending in 3305"). Before this transfer, the account ending in 3305 contained $78,287.58. That same amount was then transferred to a different JP Morgan Chase bank account held by Grist Mill Trust (the "account ending in 8488"), which contained $1,660,445.53 before the transfer. The sum of $2,700,000 was then transferred from the account ending in 8488 to an account at TD Banknorth in the name of an entity called Phoenix Capital Management, LLC (the "account ending in 4671").[56] Before this transfer, the account ending in 4671 was empty.

A little over one month later, the defendant authorized a transfer of $2,500,000 from the account ending in 4671 back to the GMC account ending in 4712. Before the transfer, the account contained $457,174.94, all part of the proceeds of the Spencer policies. From there, decreasing amounts were transferred through several other bank accounts and ultimately used to consummate the purchase of the Rhode Island property. First, the defendant transferred $2,200,000 to the Grist Mill Holdings account ending in 7136, which contained $149,985 before the transfer. He then transferred $1,200,000 from that account to a TD Banknorth account in the name of Hanover Trust Company that contained $10,000 before the transfer.[57] The defendant next transferred

---

[56] This account was created by the defendant, and he was one of the authorized signatories.

[57] This account was created by the defendant, and he was the only authorized signatory.

$1,100,000 to a TD Banknorth account in the name of Moonstone Partners LLC that contained $424,500 before the transfer.[58] Finally, he transferred $1,040,000 to John McCloskey to complete the purchase of the Rhode Island property.

During this time, the $19.8 million remaining from the proceeds of the Spencer policies was kept in the account ending in 4548, where the entire death benefit had originally been deposited. That changed after Universitas' claim was denied on October 2, 2009. On October 27, 2009, Wayne Bursey transferred $19,800,000 from the account ending in 4548 to the GMC account ending in 4712. One day later, $19,000,000 was transferred to the Grist Mill Holdings account ending in 7136. There is no evidence in the record regarding what was done with the proceeds of the Spencer policies after October 28, 2009.

III. Conclusions of Law

A. Wire Fraud, Mail Fraud, and Conspiracy

Counts one through thirty-two of the superceding indictment charge the defendant with wire fraud in violation of 18 U.S.C. § 1343 and mail fraud in violation of 18 U.S.C. § 1341. These counts are based on communications that occurred in connection with life insurance policies on the lives of twelve straw insureds: Marvin Carrin (SI-1), Vito Esparo (SI-2), Miriam

---

[58] This account was created by the defendant; both he and his wife were authorized signatories.

Knobloch (SI-3), Teresa Martinez (SI-4), Luella Paulsrud (SI-5), Judith Amsterdam (SI-6), Henry Cooper (SI-7), Ronald Goelzer (SI-8), Judith Musiker (SI-9), Joan Pennington (SI-10), Betty Von Noorden (SI-11), and Beat Zahner (SI-12). Count thirty-three charges the defendant with conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 1349.

With regard to the substantive counts, I find that all three elements of wire and mail fraud have been proven beyond a reasonable doubt as to each count and, accordingly, I conclude that the defendant is guilty of the charges in counts one through thirty-two.

The first element of wire and mail fraud, the existence of a scheme to defraud, is established by overwhelming evidence. The defendant oversaw the development and execution of a plan to defraud life insurance providers by using misrepresentations to induce them to issue STOLI policies. Pursuant to the defendant's plan, high value policies were procured by means of misrepresentations characteristic of "stealth STOLI" and "STOLI in disguise."[59] Moreover, the evidence proves that the defendant

---

[59] The government produced no direct evidence regarding the policies and practices of Sun Life Assurance Company of Canada, which issued the policy that underlies Counts Fifteen through Eighteen. Nor did the government produce evidence regarding the process by which the application was completed. However, the application itself contains the signatures of Wayne Bursey (on behalf of Charter Oak Trust), Don Trudeau, and Bruce Mactas. All three were involved in the defendant's scheme. And the application and accompanying documents contain the type of STOLI-

acted with the requisite fraudulent intent. He understood the "evils of STOLI," knew the providers did not want to issue STOLI policies and was aware of the actions they had taken to detect and avoid STOLI business. By using misrepresentations to defeat the providers' attempts to ensure that STOLI policies would not be issued, he contemplated doing actual harm to the providers. See Schwartz, 924 F.2d at 420. At a minimum, he intended to deprive them of economically valuable information, which is cognizable harm under the wire and mail fraud statutes. See Rossomando, 144 F.3d at 201 n. 5. Finally, the evidence establishes that the misrepresentations were material to the providers because of the impact they had on the providers' decisionmaking with regard to the applications.[60]

The second element of wire and mail fraud, money or property as the object of the scheme, has also been proven. It is well-established that the interests protected by these statutes

related misrepresentations discussed above. I conclude that these misrepresentations were made to induce Sun Life to issue the policy.

[60] It is no defense to these charges that, for example, Ed Waesche completed the fraudulent applications and met with the insureds; that Don Trudeau sent the emails to Deborah Lutes at Christiana; or that Jenny Valedaserra mailed via FedEx the funding memoranda and disbursement requests. Even if one or more of these actions was not done at the defendant's direction, all of them were done on his behalf and all were reasonably foreseeable acts in furtherance of the conspiracy he helped design. See Pinkerton v. United States, 328 U.S. 640, 645-48 (1946); United States v. Vario, 943 F.2d 236, 240 (2d Cir. 1991).

include the interest of the victim in controlling his or her assets.  United States v. Carlo, 507 F.3d 799, 802 (2d Cir. 2007).  "[C]ognizable harm occurs where the defendant's scheme 'den[ies] the victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions.'"  Binday, 804 F.3d at 570 (quoting Rossomando, 144 F.3d at 201 n.5) (alteration in original).  This element is easily satisfied here.  The misrepresentations in the applications deprived the providers of information necessary to make discretionary decisions whether to issue the policies and created significant discrepancies between the benefits the providers reasonably anticipated from issuing the policies and the benefits they actually received.[61]

The third element of wire and mail fraud, use of wires and mails in furtherance of the scheme, has also been proven. Mailings and wirings shown by the evidence include the following relevant communications: funding memoranda and disbursement

---

[61] In Binday, the Court of Appeals affirmed mail and wire fraud convictions of insurance brokers who used misrepresentations to induce insurers to issue STOLI policies. On appeal, the defendants argued that because non-STOLI policies are freely transferable, the insurers could have no reasonable expectation that a policy would not be sold to an investor and thus there was no cognizable harm under the mail and wire fraud statutes.  See 804 F.3d at 572-74.  The Court of Appeals concluded that a reasonable jury could infer from the evidence that the defendants' misrepresentations deprived the insurers of economically valuable information, which is a form of cognizable harm.  Id. at 574.  In this respect, this case is very much like Binday.

requests sent from the Benistar offices to Christiana (Counts 5-6, 19, 21-22, 24-25, and 27-28); emails and facsimiles sent to the carriers that include fraudulent applications (Counts 1, 20, 23, and 26); emails to Christiana that include wire transfer forms (Counts 4, 8, 10, 12, 14, 16, 18, 30, and 32); and wire transfers (Counts 2-3, 7, 9, 11, 13, 15, 17, 29, and 31). These mailings and wirings were "incident to an essential part of the scheme." See Schmuck, 489 U.S. at 711 (quoting Pereira, 347 U.S. at 8) (internal quotation marks omitted). That the defendant did not send the mailings or wirings is of no moment because they were sent by persons acting at his direction or on his behalf and it was "reasonably foreseeable that the charged transmission[s] would occur in the execution of the scheme." Bahel, 662 F.3d at 642.

Finally, the evidence establishes that the wirings crossed state lines. The parties have stipulated that the bank transfers that form the basis of Counts 2-3, 7, 9, 11, 13, 15, 17, 29, and 31 originated and terminated in different states, satisfying the interstate commerce element. See Joint Ex. 5. The emails that form the basis of Counts 4, 8, 10, 12, 14, 16, 18, 30, and 32 were sent by Don Trudeau from offices and servers in Connecticut to Deborah Lutes, who worked in Delaware. The email that forms the basis of Count 1 was sent by Jenny Valedaserra from a location in Connecticut and was received at Penn Mutual's offices

in Salem, Oregon.  Finally, the facsimiles underlying Counts 20, 23, and 26 were sent from the Benistar offices in Connecticut through a phone line to a computer server in Greensboro, North Carolina.

Turning to the conspiracy count, I find that the defendant's guilt has been proven beyond a reasonable doubt and therefore find him guilty of the charge in count thirty-three. The evidence establishes that the conspiracy charged in the superceding indictment actually existed.  The defendant and others agreed to use material misrepresentations to induce the life insurance providers to issue policies they would not have issued had they known the policies were intended for resale to investors with no insurable interest in the lives of the insureds.  The vehicle for this STOLI-related conspiracy was the Charter Oak Trust, an entity created and controlled by the defendant.  There is ample evidence that the defendant "knew of the existence of the scheme alleged . . . and knowingly joined and participated in it." United States v. Anderson, 747 F.3d 51, 60 (2d Cir.), cert. denied sub nom., Hakimi v. United States, 135 S. Ct. 122, 190 L. Ed. 2d 93 (2014) (quoting United States v. Hassan, 578 F.3d 108, 123 (2d Cir. 2008)).

The evidence establishes beyond a reasonable doubt that the defendant conspired with Ed Waesche, Charles Westcott and Don Trudeau, among others.  Though the evidence does not establish an

express agreement, it is clear that these individuals had, at the very least, "a tacit understanding to carry out the prohibited conduct." <u>United States v. Nusraty</u>, 867 F.2d 759, 763 (2d Cir. 1989) (quoting <u>United States v. Rubin</u>, 844 F.2d 979, 984 (2d Cir. 1988)) (internal quotation mark omitted). The evidence proves that the defendant was more than just a willing participant in this conspiracy; he oversaw its development and execution. And the evidence is sufficient to establish that he entered into the conspiracy with the intent to defraud life insurance providers by using misrepresentations to induce them to issue STOLI policies. See <u>Huezo</u>, 546 F.3d at 180.

B.   <u>Money Laundering, Illegal Monetary Transactions, Conspiracy</u>

The superceding indictment charges the defendant with ten counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i), thirteen counts of illegal monetary transactions in violation of 18 U.S.C. § 1957, and one count of conspiracy to commit money laundering and illegal monetary transactions in violation of 18 U.S.C. § 1956(h).

The money laundering counts are premised on the defendant's use of the proceeds of the Spencer policies to repay Ridgewood's loan and to fund additional policy premiums. I conclude that the Spencer policies, like the policies underlying the substantive mail and wire fraud counts, were procured by fraud, and that the defendant knew the proceeds he received from Lincoln "represented

the proceeds of some form of unlawful activity." <u>Hassan</u>, 578

F.3d at 127.[62]  It is beyond dispute that the death benefits paid

by Lincoln constitute the proceeds of "specified unlawful

activity," as that term is defined in the relevant statutes.  <u>See</u>

18 U.S.C. § 1956(c)(7)(A); 18 U.S.C. § 1961(1).  The evidence

establishes that the defendant or Mr. Bursey, who acted at the

defendant's direction and on his behalf, made a series of

transfers between various bank accounts that constitute

"financial transaction[s]" within the meaning of the statute.

<u>See</u> 18 U.S.C. § 1956(c)(4)(B) (defining "financial transaction"

to include "a transaction involving the use of a financial

institution which is engaged in, or the activities of which

affect, interstate or foreign commerce in any way or degree").[63]

---

[62] The applications contained the same type of
misrepresentations discussed above and were signed by Wayne
Bursey and Bruce Mactas, both of whom were involved in the
scheme to defraud.  Don Trudeau, another co-conspirator, is
listed as one of the agents entitled to a commission on the first
policy.  The record contains funding memoranda and disbursement
requests that must have been emailed to Christiana to enable the
trust to draw on the $35 million line of credit from Ridgewood.
In addition, the record contains evidence that these documents
were mailed via FedEx from the 100 Grist Mill Road premises to
Christiana's location in Wilmington.  At least one of these
documents was signed by the defendant.  As with the other
policies, I conclude that these mailings and wirings were
performed at the defendant's direction or on his behalf.

[63] The Second Circuit has held that "[p]roof that a savings
institution's accounts are federally insured is certainly
sufficient to prove that the transaction involved a financial
institution the activities of which affect interstate commerce
under 18 U.S.C. § 1956(c)(4)(B)."  <u>United States v. Leslie</u>, 103
F.3d 1093, 1103 (2d Cir. 1997).  Here, the parties have

Finally, the evidence establishes that the transactions "of laundered funds [were] made with the intent to promote the specified underlying unlawful activity . . . by promoting continued illegal activity or by being essential to the completion of the scheme." United States v. Thorn, 317 F.3d 107, 133 (2d Cir. 2003). Repaying Ridgewood's loan was essential to completing the scheme and helped promote Ridgewood's continued involvement as a source of funding for fraudulent applications.[64]

The illegal monetary transactions counts are premised on bank transfers related to the purchase of the property in Rhode Island. The money involved in the transfers was derived from the death benefits paid on the Spencer policies. The transfers themselves all meet the statutory definition of "monetary transaction." See 18 U.S.C. § 1957(f)(1).[65] The defendant was aware that the Spencer policies had been procured through mail

stipulated that Bank of America, TD BankNorth, PNC Bank, and JP Morgan Chase -- that is, the banks whose accounts were used to carry out the relevant transfers underlying these counts -- "are banks whose deposits are insured by the Federal Depositary Insurance Corporation." Joint Ex. 5 at 1. Accordingly, I conclude that the transfers at issue affected interstate commerce.

[64] The record contains ample evidence that the policies the Spencer death benefit was used to fund -- policies on the lives of Luella Paulsrud (SI-5), Christine Lambert (SI-14), and George Doug Sanders (SI-15) -- were procured in the same manner as the policies underlying the substantive mail and wire fraud counts.

[65] Section 1957 incorporates the definition of "financial transaction" stated in § 1956(c)(4)(B). Here too, the parties' stipulation satisfies the interstate commerce requirement.

and wire fraud and therefore knew that the death benefit proceeds
were "property constituting, or derived from, proceeds obtained
from a criminal offense."  See 18 U.S.C. § 1957(f)(2) (defining
"criminally derived property").  Each transaction charged in
Counts Thirty-Five through Forty-Seven was greater than the
minimum statutory amount of $10,000.  See 18 U.S.C. § 1957(a).

With regard to the illegal monetary transactions counts, one
final issue requires brief discussion.  Though the Government is
not required to trace "dirty" funds commingled with "clean" funds
to satisfy the elements of § 1596, see United States v.
Braxtonbrown-Smith, 278 F.3d 1348, 1353 (D.C. Cir. 2002), the
same may not be true under § 1597.  The Second Circuit has not
addressed this issue and other Circuits have "reached
contradictory conclusions."  United States v. Weisberg, No.
08-CR-347 NGG RML, 2011 WL 4345100, at *2 (E.D.N.Y. Sept. 15,
2011) (discussing cases).[66]  In this case, there is no need to

_____

[66] The Ninth and Fifth Circuits require the Government to
establish that the "aggregate withdrawals from a commingled
account exceed the amount of clean money in that account."
Weisberg, 2011 WL 4345100 at *4; see also United States v.
Hanley, 190 F.3d 1017, 1025-26 (9th Cir. 1999) (discussing Ninth
Circuit cases); United States v. Davis, 226 F.3d 346, 357 (5th
Cir. 2000).  The Seventh, Eighth and Tenth Circuits have rejected
an explicit tracing requirement.  United States v. Haddad, 462
F.3d 783, 792 (7th Cir. 2006); United States v. Pizano, 421 F.3d
707, 723 (8th Cir. 2005); United States v. Johnson, 971 F.2d 562,
570 (10th Cir. 1992).  The Third and Fourth Circuits allow the
Government to rely on a presumption that the funds withdrawn from
a commingled account constitute dirty money, "at least up to the
amount of dirty money present in the account."  Weisberg, 2011 WL
4345100, at *4; see also United States v. Farrington, 58 F. App'x

decide which standard applies because even under the most restrictive, which would require proof that the aggregate withdrawals exceeded the amount of clean money in the account, the government has met its burden.  That is, the government has shown that the amounts withdrawn from the relevant accounts far exceed the amount (if any) that was in the accounts when dirty money was initially deposited.  There can be no dispute that the funds at issue constitute "criminally derived property."  Because the Government has established the necessary elements of § 1597 beyond a reasonable doubt, I find the defendant guilty of the charges in counts 35-39 and 40-47.

With regard to the count thirty-four, which charges conspiracy to commit money laundering, I find the defendant guilty.  The evidence establishes that Wayne Bursey had control over a number of accounts involved in the transfers of the proceeds of the Spencer policies.  Indeed, he was the sole signatory for the account into which the proceeds were initially deposited -- having created it (possibly for this specific purpose) four days before Lincoln disbursed the funds -- and many of the transfers underlying the charges under both § 1596 and § 1597 were authorized by him.  In addition, the evidence shows that the defendant and Mr. Bursey had a particularly close

919, 923 (3d Cir. 2003); <u>United States v. Moore</u>, 27 F.3d 969, 976-77 (4th Cir. 1994).

relationship, with Mr. Bursey playing a key role in the defendant's scheme to defraud the insurance carriers.  Nowhere is this more evident than in the defendant's email to Mr. Bursey on learning that Lincoln had disbursed the death benefits of the Spencer policies : "[C]heck mail and speak only to me . . . only to me."  Gov't Ex. 2221 at 1.

Given this evidence, I conclude that there was at least a tacit agreement between the defendant and Mr. Bursey to (1) promote the defendant's scheme by means of transactions involving the illegally-obtained Spencer death benefit proceeds in violation of § 1595 and (2) engage in transactions using these funds in amounts greater than $10,000 in violation of § 1597. See Nusraty, 867 F.2d at 763.  I further find that the defendant knew the purpose of this agreement and entered into it with the requisite intent to commit the charged offenses.  See Anderson, 747 F.3d at 60; Huezo, 546 F.3d at 180 ("[A] single act may be sufficient for an inference of involvement in a criminal enterprise of substantial scope at least if the act is of a nature justifying an inference of knowledge of the broader conspiracy." (quoting United States v. Tramunti, 513 F.2d 1087, 1111 (2d Cir. 1975) (internal quotation marks omitted)).

IV.  Conclusion

Accordingly, the verdict of the Court as to each count in the superceding indictment is guilty.  As to each count, the

defendant's guilt has been established beyond a reasonable doubt.

Dated at Hartford this 6th day of June 2016.

_____
/s/ RNC
Robert N. Chatigny
United States District Judge
