UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No.   3:13CR226 (RNC) |
| | : | |
| v. | : | |
| | : | |
| DANIEL CARPENTER | : | July 28, 2017 |

**GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S
MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO FED. R. CRIM. P. 29**

# TABLE OF CONTENTS

I.      Preliminary Statement ...................................................................................................1

II.     Legal Standard ............................................................................................................2

III.    There Was Sufficient Evidence for the Court to Find Carpenter Guilty on All
        Counts ........................................................................................................................3

        A.      The Evidence Supports the Court's Finding that the Defendant and his Co-
                Conspirators Intended to Defraud the Providers.......................................... 4

                1.      The Defendant Acted with Intent to Deceive the Carriers, and Not
                        in Good Faith ................................................................................... 4

                2.      Carpenter and His Co-Conspirators Contemplated Harm to the
                        Victim Life Insurance Providers ..................................................... 12

        B.      The Evidence Showed that Carpenter Approved and Caused the
                Submission of False Insurance Applications ......................................... 18

        C.      The Interstate Mailings and Wires Were in Furtherance of the Scheme to
                Defraud ................................................................................................... 20

        D.      The Conspiracy Charge Was Proven by Sufficient Evidence ............................. 27

        E.      There Was Sufficient Evidence to Support Carpenter's Conviction on All
                Counts of Money Laundering and Illegal Monetary Transactions ...................... 31

        F.      The Aiding and Abetting Counts Were Supported by Sufficient Evidence
                and Should Not Be Dismissed. ................................................................ 34

IV.     The Evidence Supported Venue in Connecticut ..................................................37

V.      Each of the Counts Was Within the Statute of Limitations ...............................43

VI.     Carpenter's Fair Warning, Due Process, *Ex Post Facto* Clause, And Rule of
        Lenity Claims Should Be Denied .......................................................................48

        A.      A Rule 29 Motion Is Not the Proper Forum for These Claims............................ 49

        B.      The Fair Warning and Due Process Claims Lack Merit ...................................... 50

        C.      Carpenter's *Ex Post Facto* Clause Claim Lacks Merit ...................................... 55

        D.      The Rule of Lenity Claim Lacks Merit.................................................... 57

VII.    Carpenter's Sixth Amendment Claim Should Be Denied...................................61

VIII.   Conclusion .........................................................................................................63

The Government files this memorandum in opposition to defendant Daniel Carpenter's motion for judgment of acquittal pursuant to Fed. R. Crim. P. 29 and his accompanying memorandum of law (Docs. 228, 229).

## I.    Preliminary Statement

On June 6, 2016, following a 19-day bench trial, the Court issued a 91-page Verdict and Special Findings ("Verdict") finding Carpenter guilty "beyond a reasonable doubt" on all 57 counts of the superseding indictment, which had charged Carpenter with mail and wire fraud, money laundering, illegal monetary transactions, conspiracy, and aiding and abetting in connection with a scheme to defraud life insurance companies. (Doc. 212). The Court determined there was "overwhelming evidence that the defendant orchestrated a scheme to defraud the [life insurance] carriers into issuing policies based on STOLI-related misrepresentations, which defeated the carriers' attempts to detect and avoid STOLI business." Verdict at 10 n.7.

Despite the overwhelming evidence, Carpenter now seeks a judgment of acquittal on a variety of grounds. Although he often repeats the same arguments in various sections of his brief, his arguments boil down to the insufficiency of evidence (including a legal argument over the proper legal elements for wire and mail fraud); violation of the statute of limitations; lack of venue; Constitutional violations with regard to due process, fair warning, and *ex post facto* laws; and legal challenges to the indictment. Because the Court already issued a written verdict finding the evidence sufficient to judge Carpenter guilty on all counts, his challenge to the sufficiency of the evidence essentially amounts to nothing more than a motion for reconsideration. In any event, as is discussed more fully below, the evidence at trial was sufficient to find Carpenter guilty on all counts. His other arguments, many of which repeat the same arguments that Carpenter raised and the Court rejected before trial, misstate and misapply the applicable law and are wholly without merit. As such, Carpenter's Rule 29 motion should be denied.

## II.   Legal Standard

Federal Rule of Criminal Procedure 29 provides in relevant part that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." A defendant challenging the sufficiency of the evidence bears a "heavy burden." *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012); *United States v. Mercado*, 573 F.3d 138, 140 (2d Cir. 2009) (internal quotation marks omitted); *United States v. Si Lu Tian*, 339 F.3d 143, 150 (2d Cir. 2003).

The Court must deny a motion for judgment of acquittal if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Persico*, 645 F.3d 85, 105 (2d Cir. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original). "[T]he standard of review is exactly the same regardless whether the verdict was rendered by a jury or by a judge after a bench trial." *United States v. Pierce*, 224 F.3d 158, 164 (2d Cir. 2000) (quoting *McCarthy v. New York City Tech. Coll. of City Univ. of New York*, 202 F.3d 161, 166 (2d Cir. 2000).

In this regard, the Court must view all evidence in the light most favorable to the Government and credit every inference that may be drawn in favor of the Government. *See Persico*, 645 F.3d at 104. The Court must also analyze the pieces of evidence "'in conjunction, not in isolation,'" *id.* (quoting *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008)), and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others," *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999).

Further, "the law draws no distinction between direct and circumstantial evidence," and "[a] verdict of guilty may be based entirely on circumstantial evidence as long as the inferences of culpability . . . are reasonable." *United States v. MacPherson*, 424 F.3d 183, 190 (2d Cir. 2005). Because there is rarely direct evidence of a person's state of mind, "the mens rea elements of

2

knowledge and intent can often be proved through circumstantial evidence and the reasonable inferences drawn therefrom." *Id.* at 189 (italicization removed).

The Second Circuit also has held that "[t]he possibility that inferences consistent with innocence as well as with guilt might be drawn from circumstantial evidence is of no matter to the sufficiency analysis[.]" *Id.* at 190. "The task of choosing among competing, permissible inferences is for the fact-finder[.]" *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001). The Government need not disprove every reasonable hypothesis consistent with the defendant's innocence. *See United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1993)

In short, the Court may not disturb a conviction on grounds of legal insufficiency absent a showing that "no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Walsh*, 194 F.3d 37, 51 (2d Cir. 1999). "In other words, the court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *Guadagna*, 183 F.3d at 130 (internal citations and quotations omitted).

## III.    There Was Sufficient Evidence for the Court to Find Carpenter Guilty on All Counts

Although Rule 29 is limited to claims that the trial evidence was insufficient as a matter of law, in truth much of Carpenter's brief deals with unrelated and misplaced legal claims. His actual sufficiency claims are articulated separately in some instances, and in other cases take the form of repeated arguments spread throughout his 135-page brief. The Government identifies six distinct sufficiency-related claims, that is, that the evidence was insufficient to support the Court's finding (A) of intent to defraud under the wire and mail fraud statutes, including intent to deceive the carriers, contemplated harm, and lack of good faith; (B) of Carpenter's direct involvement in the submission of insurance applications with material misrepresentations; (C) that the interstate wires

and mailings were in furtherance of the scheme to defraud; (D) that there was a conspiracy between the defendant and others; (E) that the money laundering and illegal monetary transactions involved the proceeds of specified unlawful activity; and (F) of Carpenter's aiding and abetting the substantive offenses. As discussed below, each of these issues was squarely addressed by the Court in its Verdict upon review of the evidence, and nothing the defendant says in his motion in any way undermines the Court's factual and legal conclusions.

### A. The Evidence Supports the Court's Finding that the Defendant and his Co-Conspirators Intended to Defraud the Providers

There are two components to the intent requirement in the mail and wire fraud statutes—the Government must prove that "the defendant had a conscious knowing intent to defraud" and that "the defendant contemplated or intended some harm to the property rights of the victim." *Guadagna*, 183 F.3d at 129 (internal citations and quotation marks omitted). In other words, the Government must prove the defendant's intent to deceive "coupled with a contemplated harm to the victim." *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987). Here, notwithstanding and mostly ignoring the Court's careful analysis, Carpenter attacks the Government's proof on both components.

### 1. The Defendant Acted with Intent to Deceive the Carriers, and Not in Good Faith

As to the first component, intent to deceive the victim life insurance providers, Carpenter claims repeatedly that he had no intent to defraud because he understood the answers to the questions on the Charter Oak Trust ("COT") insurance applications—the main source of misrepresentations in the Government's case—to be truthful. Put another way, Carpenter claims that he acted in good faith in the way that he and his co-conspirators answered the insurance application questions. *See*, *e.g.*, Doc. 229 at 1, 8 ("[H]e would still argue he made no misrepresentations to anyone[.]"); 12 ("Mr. Carpenter still asserts . . . his honestly-held good faith

4

belief that the questions on the insurance applications in this case were answered honestly and accurately to the best of his knowledge[.]"); 37 ("Mr. Carpenter still believes the questions at issue to prevent STOLI policies were answered truthfully and accurately[.]"); 56-64 (block quoting Carpenter's self-serving testimony related to good faith); 68 (noting, as to Sash Spencer's policies, that "Mr. Carpenter testified that he believed the questions were answered accurately and truthfully").

Carpenter's claims are belied by the weight of the evidence and almost entirely ignore the Court's careful analysis. The Court set out at great length and in great detail the evidence of the misrepresentations made by the defendant and his co-conspirators on the applications for policies to be placed into the Charter Oak Trust. *See* Verdict at 43-55. The Court broke those misrepresentations down into seven distinct categories, including false answers to questions about the source of funds to pay premiums; offers of financial inducements; discussions of policy sales; third party interests in the policies; life expectancy reports; purposes for applying for coverage; and the financial resources of the applicants. *Id*. at 43-48. As to the first six categories, the Court explained why each answer to each question was invariably answered falsely, and why there were several false answers to financial resource related questions as well. *Id*.

The Court provided examples in the evidence of each of these misrepresentations, while noting that "[a]ll the applications in the record contain inaccurate answers to questions used by the carriers to detect STOLI policies." Verdict at 43. Government Exhibit 2, a summary chart, catalogs all of the non-financial resource misrepresentations made on the Charter Oak applications and identifies the exhibits in which each of the misrepresentations can be found. All of those false answers are consistent with the Court's examples.

In response, Carpenter offers no counterexamples, nor does he refer to the text of any of the application questions that underlie the Government's case. Rather, he makes general averments that are unconnected to the language on the applications, in many cases simply repeating arguments he made at trial. Moreover, Carpenter offers nothing that was not squarely addressed by the Court in its verdict.

For example, Carpenter repeats a claim he made often at trial, that he legitimately and honestly believed that the Charter Oak Trust was a so-called "split-dollar" arrangement and not premium financing, and therefore that he did not lie to the insurance companies when the applications denied "premium financing." *See* Doc. 229 at 37, 58, 61, 62. Yet, as the Court aptly pointed out, this defense fails for several reasons. *See* Verdict at 44-45. First, the COT funding arrangement was not the type of traditional employer-employee split dollar program that might be approved by insurance companies, but rather was a third-party premium financing arrangement of the type that raised STOLI concerns for insurance companies. *See* Verdict at 44, Tr. 1996 (Elder: "[My understanding of split dollar] is an arrangement where the employer and employee are both paying or contributing to the premium payment."). Carpenter's claims of good faith on this score are also betrayed by his own words. The Court points out two examples of Carpenter himself referring to "financing" in the context of the Charter Oak Trust.  *See* Verdict at 45 n.28. Likewise, in the applications that did ask specifically for disclosure of any split-dollar arrangement, the questions were answered no, "confirming that a split-dollar arrangement was not contemplated." Verdict at 70 n.52 (quoting Gov't Ex. 1324 at 7). The Government would add to that mix the text of all of the Ridgewood commitment letters, which were countersigned by Carpenter himself, in which Ridgewood says, among other things, "[w]e hereby commit to provide *financing* in the amount of [total committed amount]" and "the *financing* is for the purpose of funding Grist Mill

Capital LLC's underlying *loan* to the CHARTER OAK TRUST on *financing premium of a Life Insurance Policy*." *See*, *e.g.*, Gov't Ex. 313 (July 29, 2013 Commitment Letter for Charter Oak Trust policy on the life of Miriam Knobloch) (emphasis added). Noticeably absent from the evidence was any protest by Carpenter as to the language of these letters; rather, he simply countersigned them and had his employees submit them back to Ridgewood.

Second, as the Court also found, the questions on the applications regarding the source of funds are not limited to premium financing, and in many cases ask for *any* arrangement in which a third party is providing money. Thus, Carpenter's claim that the arrangement is not premium financing is often irrelevant on the question of whether he deceived the carriers. The Court cites as two examples Government Exhibits 501 and 1201, Phoenix applications for COT policies on the lives of Luella Paulsrud and Beat Zahner, which ask questions about (1) whether premiums will be borrowed by the proposed owner or proposed insured and (2) whether the owner will pay premiums funded by an individual and/or entity other than the proposed insured—both of which were falsely answered "no" in the submitted applications. As to both questions, regardless of whether this is a "premium financing" arrangement, COT is very clearly borrowing and GMC/Ridgewood are very clearly funding the premiums. *See* Verdict at 43. Just as he did at trial, Carpenter ignores this distinction.

Although Carpenter does not refer to the application questions specifically, the other set of false answers with which he seems to take principal issue are those related to potential sale of the COT policies. Specifically, Carpenter repeats his trial claim that he could not have intended to deceive the carriers about the prospective sale of policies—and thus he believed in good faith they were not STOLI—because the COT prevented a sale to third parties. *See*, *e.g.*, Doc. 229 at 31 ("[I]t is beyond peradventure that he was not a party to the contract in this case, he did not lie to anyone

about anything, and that the Charter Oak Trust was the owner of each policy and intended to pay each and every premium on each policy until the day the insured died[.]"); 59-64 (quoting Carpenter's testimony denying knowledge of intended sale); 110 ("[E]ven a cursory glance at the Charter Oak Trust documents show that the only person who could buy their insurance policy from the Trust, was the Insured[.]").

The Court also considered and rejected this argument, based both on the overwhelming weight of the evidence and an assessment of the credibility of witnesses, including the defendant. The questions on the applications inquire about, among other sale-related topics, discussions to sell the policy, either by the insured or the owner, *see* Gov't Exs. 101, 201, 301, 402, 801, 901, 1001, 1301, 1310, 1401, 1411, 1501, 1514, 1601; whether the policy is "being purchased in connection with any formal or informal program under which the proposed owner or proposed insured have been advised of the opportunity to transfer the policy to a third party within five years of issuance," *see* Gov't Exs. 501, 704, 1201, 1601; and whether the "policy applied for through this application [is] being purchased for the purpose of being assigned or sold to a third party or will it replace a policy whose ownership has been assigned or sold to a third party," *see* Gov't Exs. 601, 1601. In all instances, Carpenter and his co-conspirators answered no, when in fact the accurate answer was a resounding yes.

The vast evidence of Carpenter's intent that the COT policies be resold was well summarized in the Court's verdict. *See* Verdict at 28-36. First, three witnesses, Stefan Cherneski, Ed Waesche, and Charles Westcott, all testified that the true purpose of the COT was to "procure policies on elderly insureds for resale in the life settlement market." Verdict at 28; *see also*, *e.g.*, Tr. 74-75 (Cherneski: "The true purpose, from my observations, were to originate policies on older insureds for the eventual sale in the secondary market."); Tr. 705 (Waesche: "[The true purpose of

the Charter Oak Trust was] [t]o acquire life insurance policies on individuals, with no cost or risk or exposure to them, with the intent of selling the policy after two years."); Tr. 1497 (Westcott: "And then later on, at the end of two years, they'd look to go into the marketplace and try to sell the policies."). The Court credited this testimony over the defendant's claims to the contrary. *See* Verdict at 28 ("Overwhelming evidence refutes the defendant's account. Several witnesses credibly testified that COT was formed to serve as a vehicle for acquiring life insurance policies for resale to investors.").

That this was the true purpose for the COT—and that Carpenter knew as much—was corroborated by the documentary evidence described by the Court. *See* Verdict at 29-36. Perhaps most fatal to Carpenter's specious claim that COT policies were truly intended for the benefit of the insureds is a series of e-mails and spreadsheets circulated among Carpenter, his counsel Jack Robinson, and other Carpenter business associates, which set out the expected profits from reselling COT policies on the secondary market. *See* Verdict at 29; Gov't Ex. 2017. As the Court found, "[i]t is apparent that Mr. Robinson's revised spreadsheet, which became the basis for COT, contemplated the resale of life insurance policies on the secondary market after the contestability period." Verdict at 30. It also reinforced that Carpenter was well aware that the sales pitch to COT insureds focused on making money from the resale of policies, and not from the insurance itself. *See* Verdict at 30 ("Mr. Robinson wrote that . . . the client would 'hit[] a home run[]' if the policy was sold above 23 percent of its face value.") (quoting Gov't Ex. 2017). The Court then went on to explain several other pieces of evidence reinforcing Carpenter's intention to sell COT policies, including several e-mails discussing the marketability and profitability of COT policies. *See* Verdict at 31-33. Among other things, Carpenter told an associate, "we need . . . to get policies [the] Market wants to buy." Verdict at 33 (quoting Gov't Ex. 2156).

Notwithstanding the weight of the evidence, Carpenter urges the Court to reconsider its ruling and accept his version of his own state of mind, which has no support in any of the evidence, and which the Court repeatedly found to be not credible. It was up to the Court, as factfinder, to determine issues of credibility. *See United States v. Glenn*, 312 F.3d 58, 64 (2d Cir. 2002) ("[I]t is well-settled that when reviewing the sufficiency of the evidence we defer to the jury's assessment of witness credibility and the jury's resolution of conflicting testimony.") (internal citations and quotations omitted).   The Court reasonably rejected Carpenter's hollow claims of good faith in favor of the testimony of other witnesses, which was in line with the documentary evidence.

Moreover, Carpenter incorrectly claims that the Court did not even consider his good faith. Nothing could be further from the truth—as discussed above, the Court discussed at length Carpenter's intent to deceive the victim insurance providers. Intent to deceive and a lack of good faith are opposite sides of the same coin in the context of wire fraud and mail fraud. The Second Circuit has long held that "[g]ood faith is a complete defense to a mail fraud charge. If an individual believes that the information set forth in a mailing is true, it follows that he cannot have the requisite intent to defraud." *United States v. Alkins*, 925 F.2d 541, 549-50 (2d Cir. 1991) (approving jury instruction that said "[s]ince an essential element of the crime charged is intent to defraud, it follows that good faith on the part of a defendant is a complete defense to a charge of fraud.") (internal citations omitted). The Court considered Carpenter's testimony about his intent but found it was not credible. *See* Verdict at 30 n.17, 40 n.23, 64.

Finally, Carpenter claims that the insurance companies could not have been deceived because, he incorrectly states, they were aware of the true nature of the COT. *See, e.g.*, Doc. 229 at 8 (claiming that sufficient information was provided to Ken Elder of Lincoln in an April 15, 2009 conference call); 20 (imputing knowledge of Waesche, Westcott, Fred Prelle, and Bruce

Mactas to the insurance carriers).

First, the Court found, "the applications that were submitted to the carriers invariably contained affirmative misrepresentations concealing the true nature of COT.  In addition, documents that would raise 'red flags' were withheld." Verdict at 56. The withheld documents included the funding illustrations and all evidence of the funding arrangement between COT, Grist Mill Capital, and Ridgewood. *Id*. at 56-57; *see also* Tr. 900 (Waesche: "If [the disclosure, acknowledgement and certification form] ever got to the insurance companies, they would know what the program was all about and never issue the policies.").

Likewise, the Court found that neither Ken Elder nor any other insurance company employee was provided with information that would have caused them to conclude that the COT was actually STOLI. *See* Verdict at 60-61, 71-72; Tr. 2055 (Elder: "I recall [Carpenter] stating that no one could do STOLI within a 419 plan");[1] Tr. 2057-58 ("Q: In the context of his discussion of any of these plans, did he mention anything about the fact that they were being financed or funded by a third party or a hedge fund? Elder: No"); Tr. 1412 (former Penn Mutual employee Thomas Webb testifying that he did not know the COT policies were being funded by an investment company, or that the objective was to sell the policies after two years; if he did, Penn Mutual would have rejected them); Tr. 386-87 (former Phoenix employee Patrick Glynn testifying he understood the Grist Mill Trust and Charter Oak Trust to be employer funded welfare benefit plans); Tr. 419 (Glynn reviewing a Charter Oak Trust cover letter to Phoenix explaining the purpose of the policy to be estate planning, not resale). Rather, there was overwhelming evidence, far beyond just the testimony of witnesses, that Carpenter intended to keep the insurance companies in the dark about

---

[1] Carpenter's oft-repeated refrain that the COT prohibited the sale of policies to anyone other than insureds was rejected by the Court as having no basis in the evidence, other than Carpenter's self-serving and incredible testimony. *See* Verdict at 34.

the true intention of the COT. *See* Verdict at 57-61.

Last, Carpenter's contention that information known by insurance agents (including Waesche, Westcott, Prelle, Mactas, and Pacini, among others) should be imputed to the carriers was considered and soundly rejected by the Court based upon overwhelming evidence of Carpenter's "own words and actions." Verdict at 53.[2] The Court, providing specific examples from the trial evidence, found that Carpenter "instructed others about policies that should be sought, approved potential applicants, reviewed materials related to prospective insureds, decided what documents should be sent and when, determined the amount of commissions agents would receive, and even provided funding for some of the policies." Verdict at 54-55.

### 2. Carpenter and His Co-Conspirators Contemplated Harm to the Victim Life Insurance Providers

Carpenter also repeatedly claims that, notwithstanding the Second Circuit's clear statements otherwise, his STOLI scheme did not contemplate harm to the insurance companies. *See*, *e.g.*, Doc. 229 at 18 ("Absolutely no one testified that Mr. Carpenter ever intended to harm any carrier"); 22-33 (claiming *United States v. Binday*, 804 F.3d 558 (2d Cir. 2015) is no longer good law); 35 ("Mr. Carpenter certainly did not intend for anyone to lose money or be harmed[.]"). Again, Carpenter's arguments ignore and/or misstate the settled law of the Second Circuit and entirely ignore the factual record of the case and the Court's careful reasoning on this subject.

---

[2] It is also well-settled that when an agent acts adversely to the principal or is engaged in a scheme to defraud the principal, his actions and knowledge are not imputed to the principal. *See*, *e.g.*, *Nw. Mut. Life Ins. Co. v. Gil*, No. CIV.A. 3:07-CV-00303, 2009 WL 276086, at *4 (D. Conn. Feb. 5, 2009) ("The rule in Connecticut is that principals are deemed to receive and have the benefit of their agent's knowledge contemporaneously with the agent's actions, except when 1) it is not the duty of the agent to disclose, 2) the agent is acting adversely to the principal, or 3) the agent is acting in fraud of the principal.") (citing *Reider v. Arthur Andersen, LLP*, 47 Conn.Supp. 202, 784 A.2d 464, 470 (Conn. Super. 2001)) *aff'd*, 351 F. App'x 515 (2d Cir. 2009); *Bank of China, New York Branch v. NBM LLC*, 359 F.3d 171, 179 (2d Cir. 2004) ("when an agent acts adversely to its principal, the agent's actions and knowledge are not imputed to the principal.").

First, the Court accurately set out the legal standard regarding the "contemplated harm" component of the intent element of wire and mail fraud. *See* Verdict at 5-6. As the Court found, "[t]he government can satisfy this element by proving that the defendant's scheme 'den[ied] the victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions.'" Verdict at 6 (quoting *United States v. Rossomando*, 144 F.3d 197, 201 n.5 (2d Cir. 1998)). After reviewing the evidence, the Court held that "[t]he misrepresentations in the applications deprived the providers of information necessary to make discretionary decisions whether to issue the policies and created significant discrepancies between the benefits the providers reasonably anticipated from issuing the policies and the benefits they actually received." Verdict at 82. The Court noted the similarity between this case and *Binday*, where the Second Circuit found that "a reasonable jury could infer from the evidence that the defendants' misrepresentations deprived the insurers of economically valuable information, which is a form of cognizable harm." *Id*. n.61 (citing *Binday*, 804 F.3d at 574).

Indeed, the evidence reviewed by the Court supported the Court's finding that misrepresentations contemplated deprivation of economically valuable information. The Government's evidence on the economic harm that STOLI posed to insurance carriers consisted principally of the testimony of three insurance company executives: Thomas Buckingham (The Phoenix Companies), *see* Tr. 1858-1962; Michael Parker (Jefferson Pilot Financial and Lincoln National Corporation), *see* Tr. 2247-2310; and Frank Best (Penn Mutual Life Insurance companies), *see* Tr. 2177-2233. The Court summarized this testimony at length, finding that STOLI policies varied from typical policies in several critical, economically-sensitive ways: (1) STOLI policies are funded at the minimum level, depriving the insurance company of capital it would otherwise use to generate investment income; (2) STOLI policies lapse at a lower rate than

typical, causing the carriers to ultimately pay more in benefits over the long run; and (3) the issuance of STOLI policies have potential negative consequences for the industry's favorable tax treatment. *See* Verdict at 13-15; *see also* Tr. 1896-1900 (Buckingham); Tr. 2264-70 (Parker); Tr. 2185-92 (Best). The testimony was very similar to the testimony offered by insurance company executives in *Binday*, which prompted the Second Circuit to find that "it suffices to say that the executives' testimony provided a legally sufficient basis for a jury to find that the defendants' misrepresentations exposed the insurers to an unbargained-for risk of economic loss, because the insurers expected STOLI policies to differ economically, to the insurers' detriment, from non-STOLI policies." *Binday*, 804 F.3d at 574. In short, Carpenter's claim that no one "testif[ied] to explain how paying premiums to an insurance carrier could possibly cause the insurance carrier any harm or deprive it of its economic decision-making," Doc. 229 at 18, ignores three days of trial evidence which did just that.

In addition to ignoring the factual record, Carpenter also inaptly attempts to shoehorn this case into the Second Circuit's recent decision in *United States ex rel Edward O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650 (2d Cir. 2016), which Carpenter claims undermines the holding in *Binday*. *See* Doc. 229 at 22-33. *Countrywide* neither undermines *Binday* nor provides guidance in this case.

In *Countrywide*, the Second Circuit held that, in wire and mail fraud cases, "where allegedly fraudulent misrepresentations are promises made in a contract, a party claiming fraud must prove fraudulent intent at the time of contract execution; evidence of a subsequent, willful breach cannot sustain the claim." 822 F.3d at 658. In that case, Countrywide entered into a contract to sell to government-sponsored enterprises ("GSEs") loans of a certain minimum quality, but the evidence showed that at some point Countrywide provided loans of lower quality than required by

the contract. However, the evidence did not show that Countrywide intended to provide substandard loans at the time it entered into the contract, and so wire and mail fraud charges were not appropriate. *Id.* at 666.

*Countrywide* does not apply to Carpenter for several reasons. First, this is not a case where the fraudulent representations occurred as part of a contract, as Carpenter claims, Doc. 229 at 31, and as is required to invoke *Countrywide*. Rather, the core misrepresentations in this case were antecedent to the insurance contracts, and were intended to deceive the insurance companies into entering into the contracts based on fraudulent pretenses. Carpenter's argument that he had a contemporaneous intent to "perform" on the contract—that is, to pay the premiums, Doc. 229 at 31—does not cure the misrepresentations that caused the insurance company to assume an obligation under conditions for which it did not bargain, as described above. In *this* case, where the charged misrepresentations are not part of a contract, the required proof is well settled—the Government must show that "a defendant intend[ed] that his misrepresentations induce a counterparty to enter a transaction without the relevant facts necessary to make an informed economic decision." *Binday*, 804 F.3d at 579.

Second, *Countrywide*'s requirement that the intent to defraud must exist at the time the statements are made—in that case, the time of the entry into the contract, 822 F.3d at 658—is easily satisfied here. As is discussed at length above, there was more than sufficient evidence to show that Carpenter knew of the falsity of the misrepresentations in the insurance applications at the time they were submitted to the carriers and, for that matter, at the time COT entered into the insurance contracts with the carriers. For example, notwithstanding the application questions answered to the contrary, Carpenter knew that there was a third party (Grist Mill Capital and/or Ridgewood) funding the premiums, that there had been discussions (at a minimum) about selling

the policies, that there were life expectancy reports performed, that there were offers of financial inducement, and that the insureds and Charter Oak Trust were not seeking insurance for "estate planning" purposes.   Thus, again, *Countrywide* provides no guidance in this case.

Third, Carpenter's claim that *Binday* and the "right-to-control" theory of wire and mail fraud were undermined by *Countrywide* is unsupportable. *See* Doc. 229 at 32 ("Nowhere in the scholarly history of the mail and wire fraud statutes in *Countrywide* are the words 'deprived of the ability to make an informed economic decisions [sic] about what to do with money or property' or the 'right to control' assets."). The right to control assets was recognized as property for purposes of wire and mail fraud long before *Countrywide* and *Binday*, and has continued to be recognized afterwards. Most recently, in *United States v. Finazzo*, 850 F.3d 94, 111 (2d Cir. 2017), the Second Circuit reaffirmed its holding in *Binday* that the wire and mail fraud statutes are satisfied by a showing that the defendant contemplated depriving the victim of "potentially valuable economic information." *See also Binday*, 804 F.3d at 570 ("[T]he deceit must deprive the victim 'of potentially valuable economic information[.]'") (quoting *United States v. Wallach*, 935 F.2d 445, 463 (2d Cir. 1991)). Notably, nowhere in the *Finazzo* decision, which recounted several of the seminal cases in the Second Circuit's right-to-control jurisprudence, is any reference to *Countrywide*. Similarly, there is no reference in *Countrywide* to *Binday* other than in setting out the elements of wire fraud. Neither of these facts is surprising since, contrary to Carpenter's argument, they deal with different factual scenarios and legal principles.

Finally, Carpenter cites several other cases with similarly no application to the facts here. *Skilling v. United States*, 561 U.S. 358, 400 (2010) does not, as Carpenter seems to claim, mandate symmetry between a victim's loss and a defendant's gain; it merely lists that "mirror image" as one scenario common in certain fraud cases. *See* Doc. 229 at 14. Indeed, the case cited in *Skilling*,

*United States v. Starr*, 816 F.2d 94, 101 (2d Cir. 1987), explicitly says that a defendant's gain may be used as motive evidence, but that the Government must ultimately prove an intent to cause harm to the victim regardless of the actual gain to a defendant.[3] Moreover, both *Binday* and *Finazzo* long post-date *Skilling*, and not surprisingly, neither wrestles with *Skilling* as a contrary precedent. Carpenter also complains that his conduct was at most one of nondisclosure, which he claims is not cognizable as fraud under *Skilling*. Doc. 229 at 14. He misses the mark on two scores. This case is principally about material misrepresentations—the Government charged, and the Court convicted, Carpenter for making affirmative misrepresentations, not withholding material information. Moreover, even to the extent that Carpenter assumed a duty to disclose information through the other misrepresentations he made, that duty is not affected by the Supreme Court's ruling on a different statute, with a different legislative history, under a different factual scenario (non-disclosure of conflicting financial interests).[4]

Nor does the Eleventh Circuit's decision in *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016) augur for a different result, as Carpenter claims. *See* Doc. 229 at 34-39. In fact, it stands for just the opposite proposition—that the law applied by the Court here is the prevailing view not just in the Second Circuit, but elsewhere as well. *Takhalov* followed the Second Circuit's long-held rule, affirmed in *Binday* and *Finazzo*, that intent to defraud requires both intent to deceive and contemplated harm. *Takhalov*, 827 F.3d at 1312-13 ("For this reason, the law in the Eleventh Circuit makes clear that a defendant schemes to defraud only if he schemes to deprive someone of something of value by trick, deceit, chicane, or overreaching. But if a defendant does not intend to

---

[3] In fact, the Government need *only* show contemplated harm; it is not necessary to prove that actual loss or actual gain resulted. *See* Verdict at 5 (citing *United States v. Schwartz*, 924 F.2d 410, 420 (2d Cir. 1991)).

[4] Carpenter offers a quote from *Skilling* that "this type of nondisclosure 'is outside the bounds of the federal fraud statutes.'" Doc. 229 at 20. There is no such quote in *Skilling*.

harm the victim—to obtain, by deceptive means, something to which the defendant is not

entitled—then he has not intended to defraud the victim.") (internal citations omitted). Just like in

the Second Circuit, the Eleventh Circuit also limited its definition of fraud to deceit that goes to

the "nature of the bargain." *Id*. at 1313. While Carpenter may argue that his misrepresentations

failed to meet that bar, he is defeated by *Binday*, which held that STOLI-related misrepresentations

go to the nature of the bargain because the insurance companies received policies that may behave

differently than the ones for which they bargained. 804 F.3d at 579-80 ("On these facts, the jury

reasonably could infer that the defendants intended to withhold information relevant to the

insurers' economic decision-making, and not simply to the insurers' 'general principles.'").

## B.     The Evidence Showed That Carpenter Approved and Caused the Submission of False Insurance Applications

In addition to claiming that he and his co-conspirators did not intend to deceive or harm

the carriers, Carpenter also repeatedly claims that the evidence was insufficient to show his

personal involvement with the the false insurance applications. *See* Doc. 229 at 2, 6, 12, 15, 17,

31-35, 43, 51-52, 73, 122-133. The trial evidence clearly refutes this claim. While Carpenter may

not have personally filled out or signed the false insurance applications, the trial evidence

demonstrated that Carpenter had approved and caused the submissions of the false insurance

applications to the insurance carriers and provided instructions on how to answer the STOLI-

related questions on the applications.

First, the Court specifically found that "[c]ompleted applications were subject to review

and approval by the defendant before they were submitted to the carriers." Verdict at 55. The

evidence at trial was more than sufficient to support the Court's finding. For example, early on,

shortly after the COT was formed, Carpenter sent a memorandum to several Benistar Employees

directing that all application materials for the COT policies be sent and processed through the

Simsbury office, where Carpenter had his office. *See* Verdict at 55 (referencing Gov't Ex. 2033). In the memo, Carpenter further ordered "[a]ll questions regarding the COT . . . be directed to [him.]" Verdict at 53 (quoting Gov't Ex. 2033).

Through email, he instructed Westcott to send him details on all cases. Verdict at 56 (referencing Gov't Ex. 2133). In another email regarding a COT participant, Carpenter requested the premium illustrations, life expectancy reports, and the COT documents. Verdict at 54-55 n.38 (referencing Gov't Ex. 2079). With respect to another participant, Carpenter sent an email to Westcott stating "[d]o everything thru me please. . . . I am privy to all the issues and problems." Verdict at 54 (quoting Gov't Ex. 2077). Westcott further testified that Carpenter was "privy to all issues related to the application process." Tr. 1513-14. When asked if Carpenter was "involved in just the application process or just the funding process or both[,]" Westcott responded, "Everything." *Id.*

The Court also found that "at [Carpenter's] direction and on his behalf, misrepresentations were made in applications in order to thwart the providers' attempts to ensure that STOLI policies would not be issued." Verdict at 3. As the Court noted, "Stefan Cherneski credibly testified that the defendant provided instructions during group meetings in Simsbury. Mr. Cherneski also witnessed a conversation between the defendant and Charles Westcott during which the defendant instructed Mr. Westcott to complete the Lincoln applications in a certain way." Verdict at 50; *see* Tr. 86-88 (Cherneski's testimony describing meetings where Carpenter directed people how to answer STOLI related questions); Tr. 93-95 (Chereneski's testimony describing conversation between Carpenter and Westcott). Westcott also provided "credible testimony" that Carpenter instructed him how to answer STOLI related questions on application and certification forms. Verdict at 51-52; *see* Tr. 1575-80; 1628-35 (Westcott's testimony describing Carpenter's

instructions on how to answer STOLI-related question on insurance application). As the Court noted, there was e-mail evidence that "corroborated" Westcott's testimony. Verdict at 51-52 (discussing Gov't Exs. 2189, 2159-2162). In addition, testimony from Waesche and e-mail evidence showed that Carpenter instructed Bursey and Waesche on how to answer STOLI-related questions on insurance applications and certifications. *See* Verdict at 52-53 (discussing Gov't Exs. 2099, 2101); Tr. 847-57, 862-87 (Waesche's testimony regarding Carpenter's directions on how to answer STOLI related questions).

In short, the evidence showed that Carpenter "played a key role in instructing others how STOLI-related questions should be handled." Verdict at 50. Thus, contrary to Carpenter's claim that he had nothing to do with the false applications, the evidence showed that Carpenter was intimately involved with all aspects of the COT, including the submission of the false applications and related certification forms to the insurance carriers.

## C.    The Interstate Mailings and Wires Were in Furtherance of the Scheme to Defraud

Next, despite the Court's clear findings otherwise, Carpenter claims that the Government's evidence was insufficient to show that the charged wires and mailings were in furtherance of the STOLI scheme. *See* Doc. 229 at 40-45.

As the Court found in its Verdict, the evidence introduced at trial sufficiently satisfied the third and fourth elements of the mail and wire fraud counts: interstate mailings and wires in furtherance of the scheme to defraud. *See* Verdict at 82-83 ("The third element of wire and mail fraud, use of wires and mails in furtherance of the scheme, has also been proven. . . . Finally, the evidence establishes that the wirings crossed state lines."). The mailings and wires charged in the superseding indictment and proven at trial fell into two general categories: the transmissions of false insurance applications and the transmissions of money (or e-mails or mailings directing

money transfers) to fund loans for or pay insurance premiums. *See id.*; Gov't Ex. 4 (summary chart listing each of the mailings and wires introduced at trial). The Court found that each of the mailings and wires was "incident to an essential part of the scheme" and that it was "reasonably foreseeable that the charged transmission[s] would occur in the execution of the scheme," as required under the law. *See* Verdict at 83 (citations omitted).

In his Rule 29 motion, Carpenter does not dispute that each of the mailings and wires occurred, nor does he dispute that they crossed state lines. Rather, with respect to the transmission of the false applications in Counts 20 and 23, Carpenter claims he did not fill out the applications or cause their transmission. *See* Doc. 229 at 42. With respect to the latter category of mailings and wires—transfer of money to fund loans for or pay insurance premiums—Carpenter argues that they were innocent mailings and wires that were not in furtherance of the scheme because the scheme was complete as soon as a policy was procured. *See* Doc. 229 at 40-45. Carpenter's claims are without merit.

In determining whether a mailing or wire is in furtherance of the scheme, the mailing or wire "need not be an essential element of the scheme. It is sufficient for the [mailing or wire] to be incident to an essential part of the scheme or a step in [the] plot." *Schmuck v. United States*, 489 U.S. 705, 710-11 (1989) (internal citations and quotation marks omitted); *see* Verdict at 6 (partly quoting the same). Indeed, "'[i]nnocent' mailings – ones that contain no false information – may supply the mailing element." *Schmuck*, 489 U.S. at 715. Moreover, "[w]here the frauds are not isolated or unrelated swindles, postfraud mailings of invoices, checks, or receipts may further the scheme by, for example, lulling the victims into believing they received the services fraudulently promised, or by helping to keep the scheme in operation by preserving a needed business relationship between a fraud victim and the defendant." *United States v. Slevin*, 106 F.3d 1086,

1089-90 (2d Cir. 1996) (citations omitted). Finally, it is not necessary for the defendant to participate personally in the wire transmission or mailing, "as long as it is reasonably foreseeable that the charged transmission would occur in the execution of the scheme." *United States v. Bahel*, 662 F.3d 610, 641-42 (2d Cir. 2011); Verdict at 6 (quoting the same).

Here, as to the transmission of the false applications in Counts 20 and 23, Carpenter concedes that they can be construed to be "in furtherance" of the alleged fraud. *See* Doc. 229 at 41. Carpenter cannot argue otherwise because even under Carpenter's misguided theory that the fraud was complete when the policies were issued, the applications were necessary to obtain the policies.[5] Nonetheless, Carpenter appears to argue that he cannot be convicted on those counts because he did not fill them out or cause their transmission. *See* Doc. 229 at 42-43. It is irrelevant that Carpenter did not fill out the applications himself. As shown above, the evidence established that the misrepresentations in the applications were made "at [Carpenter's] direction and on his behalf." Verdict at 3. Indeed, he "oversaw the development and execution of a plan to defraud life insurance providers by using misrepresentations to induce them to issue STOLI policies." Verdict at 80. Nor does it matter that Carpenter did not transmit the applications himself. As this Court stated in its Verdict, "[t]hat the defendant did not send the mailings or wirings is of no moment because they were sent by persons acting at his direction or on his behalf and it was 'reasonably foreseeable that the charged transmission[s] would occur in the execution of the scheme.'" Verdict at 83 (quoting *Bahel*, 662 F.3d at 641-42).

---

[5] Carpenter does not address the application at issue in Count 1 of the superseding indictment, which related to the false application for Marvin Carrin. For the same reason that the transmissions of the applications in Counts 20 and 23 are in furtherance of the scheme to defraud, the transmission of the application in Count 1 is also in furtherance of the scheme to defraud.

With respect to the second category of mailings and wires—the transfer of money to funds loans for or pay premiums—the evidence established that premium payments were critical to the success of the scheme. First, the premiums were necessary to keep the policies in force. *See, e.g.* Tr. 319 ([P]olicies that were within the Charter Oak Trust required premium payments to the providers to be kept in force[.]"); Tr. 2186 ("The policy will go out of force if the premium, the required premium, isn't paid[.]"); Verdict at 1 n.1 ("Universal life policies . . . do not expire as long as premiums are paid."); Verdict at 14 ("STOLI policies are funded at the minimum level required to keep them in force.").

Second, commissions that the insurance companies paid to TPG Group—which the Court concluded was controlled by Carpenter (*see* Verdict at 24-25)— and to the agents were based on the amount of premiums paid. *See, e.g.*, Verdict at 13 ("Commissions paid to agents can range between 70 and 130 percent of the 'target' premium for the first year."); Tr. 1875 (testimony that Phoenix paid commissions based on first and second year premium payments); Tr. 2258 (testimony that Lincoln paid commissions based on first and second year premium payments); Gov't Exhibit 3 (summary chart showing first-year commissions on all COT policies).

Carpenter's argument relies on the false premise that the scheme was complete as soon as a policy was issued. Carpenter's premise is incorrect. The scheme in no way was complete after the origination of the policies. To the contrary, the superseding indictment alleges and the Court found that a principal objective of the scheme and the conspiracy was not only to obtain the insurance policies, but to resell them following the expiration of the two-year contestability period. *See* Superseding Indictment ¶ 30; Verdict at 3 ("The evidence establishes beyond a reasonable doubt that from the outset of the conspiracy charged in the indictment, Mr. Carpenter knew the policies were being procured for resale to investors after the two-year contestability period

expired"); Verdict at 30 ("Mr. Robinson wrote that . . . the client would 'hit[] a home run[]' if the policy was sold above 23 percent of its face value.") (quoting Gov't Ex. 2017).

That objective would obviously be defeated if the premiums, which were necessary to keep the policies in force, were not paid and the policies simply lapsed and became worthless. In that way, the scheme to defraud was not complete until the policies were sold or otherwise disposed of and the payment of premiums "help[ed] to keep the scheme in operation by preserving a needed business relationship between a fraud victim and the defendant," *Slevin*, 106 F.3d at 1090; *see United States v. Flemino*, 691 F.2d 1263, 1265–66 (8th Cir. 1982) ("The object of the scheme was not simply to make false application for insurance. The underlying motivation was to obtain the proceeds. Here, the fraud was not completed until [defendant] and his coconspirators received the money. The mailings took place between the filing of the false applications and the receipt of the proceeds. Thus, it is clear the mails were in fact used in furtherance of this scheme prior to fruition.").

Another objective of the scheme was the collection of commissions from the insurance companies. *See* Superseding Indictment ¶ 39; Verdict at 25 (discussing Gov't Ex. 2033 and concluding "defendant mandated that TPG receive 40 percent of the commission"); Gov't Ex. 2220 (email from Carpenter stating, "We should keep 100 percent for house, pay one, get commission, pay second, keep commission"); Tr. 946 (discussing Gov't Ex. 2220). The objective of collecting commissions also would have been defeated if the premiums were not paid.

Moreover, the harm to the insurance carriers—the discrepancy between what they reasonably anticipated to receive from issuing the policies and what they actually received (*see* Verdict at 82)—only came to fruition with the payment of premiums. It was only then the insurance companies allowed insurance coverage at a price that did not accurately reflect the economic

benefits they anticipated.

Finally, the superseding indictment alleges a continuing scheme over many different Straw Insureds; the mass cessation of premiums on some policies would surely have prevented the origination of others within the same scheme and with the same carriers. *See Slevin*, 106 F.3d at 1090. Thus, the payment of premiums was necessary to keep the fraud going and avoid detection by the carriers.

Carpenter's reliance on *United States v. Maze*, 414 U.S. 395, 399 (1974), *Parr v. United States*, 363 U.S. 370 (1960), *United States v. Tavares*, 844 F.3d 46 (1st Cir. 2016); and *United States v. Phillips*, 704 F.3d 754 (9th Cir. 2012) is misplaced. Unlike Carpenter's case, where the mailings and wires were critical for obtaining and maintaining the policies so that they could be sold after two years, which was the object of the scheme and conspiracy, the mailings in *Maze*, *Parr*, and *Phillips* took place after the scheme came to fruition, and the mailings in *Tavares* did not further the perpetration or perpetuation of the fraud.[6]

In *Maze*, the Court simply found that a credit card company's mailings to a victim notifying him of the defendant's improper use of his credit card were not sufficiently related to the scheme to support a charge of mail fraud. *See* 414 U.S. at 403. The sole objective of the defendant's scheme—obtaining hotel rooms—had already been completed, *i.e.*, they were not in furtherance of the scheme. *See id.*

Similarly in *Parr*, the defendants were school district employees who made unauthorized gasoline and oil purchases on credit cards. *See* 363 U.S. at 381–82. To support the mail fraud

---

[6] Carpenter also cites *United States v. Chandler*, 98 F.3d 711 (2d Cir. 1996) for the proposition that monthly mortgage payments are not in furtherance of fraud. *See* Doc. 229 at 41. However, the *Chandler* case has nothing to do with the mail and wire fraud statutes. The defendant in *Chandler* was convicted of possessing false identification documents, making a false statement in a passport application, and bank fraud for obtaining a loan using a false identity. *See* 98 F.3d at 712-13. The Government fails to see how the *Chandler* case has any relevance to the issues in Carpenter's case.

charge, the Government relied on the fact that the oil companies mailed invoices for these unauthorized purchases to the school district, and the school district paid the invoices by mailing checks. *See id*. at 382. The Court found that the mailings were not in furtherance of the fraudulent scheme because the scheme had already reached its fruition at the time the defendants received the gasoline and other service items, and was therefore already complete before the invoices were ever sent through the mail. *Id.* at 392–93.

In *Tavares*, the defendants were part of a hiring scheme in the Massachusetts Probation Department where the defendants would hire candidates based on legislative recommendations, not merit, and would lie on forms certifying the hires were done correctly. *See* 844 F.3d at 50-51. The defendants so acted in order to receive increased funding in addition to legislative favors for the Probation Department. *See id*. Defendants were charged with mail fraud stemming from the mailing of rejection letters to candidates who were ultimately not hired. *See id*. The First Circuit found that these mailings were not in furtherance of the scheme because the Government did not show how the rejection letters furthered the perpetration or perpetuation of the scheme. *See id.* at 61.

Finally, in *Phillips*, the defendant used false invoices to steal money from his company. *See* 704 F.3d at 757. After he obtained the money, he used the money for personal expenses, including purchasing an expensive watch for his girlfriend. *See id.* The only asserted mailing was the mailing of the watch. *See id.* at 763. The Ninth Circuit found that fraudulent scheme did not depend in any way on the use of the mails. *See id*. The fraud was complete as soon as he obtained the funds from the company. The fact that the defendant purchased a watch with the fraudulently obtained funds, instead of using the funds something else, did not in any way affect the scheme to defraud the company. *See id.*

Unlike the defendants in *Maze*, *Parr*, *Tavares*, and *Philips*, in Carpenter's case the use of the mails and wires to fund loans for or pay premiums was a critical step in obtaining and maintaining insurance policies so they could be sold after two years, which was the central object of the conspiracy. *See Schmuck*, 489 U.S. at 710-11 ("It is sufficient for the [mailing or wire communication] to be incident to an essential part of the scheme or a step in [the] plot."). It was crucial to Carpenter's scheme that premiums be paid in order to collect commissions and for the policies to remain in force so that they could be sold after the contestability period. In other words, the alleged scheme, from conception, had to include these premium payments, because without them, the policies would have lapsed and Carpenter would not have had the ability to sell them or collect any commissions.

Accordingly, the Court was correct in determining that the "use of wires and mails in furtherance of the scheme[] has also been proven." Verdict at 82.

**D.     The Conspiracy Charge Was Proven by Sufficient Evidence**

Carpenter also repeatedly claims that the Government failed to prove the existence of a wire and mail fraud conspiracy involving the defendant. *See*, *e.g*, Doc. 229 at 3, 4, 12, 20, 55, 98, 100, 101. Despite this constant, if unsupported, refrain, the same evidence that demonstrates Carpenter's guilt of the substantive wire and mail fraud offenses also supports his conviction for the charged conspiracy.

"To sustain a conspiracy conviction, the government must present some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." *United States v. Anderson*, 747 F.3d 51, 60 (2d Cir. 2014) (citation and quotation marks omitted). "The government need not prove the defendant's familiarity with all of the conspiracy's details[.]" *Id*. It is enough for the Government to simply demonstrate the defendant's awareness of the "general

27

nature and extent" of the conspiracy. *Id.*; *see United States v. Babilonia*, 854 F.3d 163, 175 (2d Cir. 2017) ("The government need not prove that the conspirators 'have agreed on the details of the conspiracy, so long as they agreed on the essential nature of the plan.'") (quoting *United States v. Geibel*, 369 F.3d 682, 689 (2d Cir. 2004)). Moreover, "[a] defendant's participation in a conspiracy can be proven by circumstantial evidence." *Babilonia*, 854 F.3d at 175. "[A] conspiracy need not be shown by proof of an explicit agreement but can be established by showing that the parties have a tacit understanding to carry out the prohibited conduct." *United States v. Samaria*, 239 F.3d 228, 234 (2d Cir. 2001).

Applying these standards here, the evidence introduced at trial is sufficient to sustain Carpenter's conviction of the wire and mail fraud conspiracy.   Not only did Carpenter know of the scheme to defraud the carriers, he "orchestrated [the] scheme" and "oversaw its development and execution." Verdict at 10 n.7, 85. As discussed above, the scheme was his from inception, he participated in all aspects of the COT, and he had the specific intent to defraud the carriers. That alone is sufficient to show his knowledge and participation in order to sustain his conviction. *See Anderson*, 747 F.3d at 60 ("To sustain a conspiracy conviction, the government must present some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it").

Carpenter claims there could not be a conspiracy because there was no agreement or meeting of the minds as to the object of the conspiracy. *See* Doc 229 at 107-108. At a minimum, the trial evidence established that there was a "tacit understanding" among participants, and in some respects that tacit agreement rose to the level of an "express agreement" about the object of the conspiracy.   *See Samaria*, 239 F.3d at 234. Here the testimony and evidence showed that

everyone involved knew that the COT was designed for the purpose of obtaining life insurance policies on elderly individuals with the intent to sell them in two years. *See, e.g.*, Verdict at 28 (describing testimony of Cherneski, Waesche, and Westcott); Tr. 74-75, 705, 1497 (testimony of Cherneski, Waesche, and Wesctcott regarding the purpose of the COT, quoted more specifically above); Gov't Ex. 2067 (email from Westcott to Carpenter discussing Pacini's conversation with potential COT participant); Gov't Ex. 2033 (email from Carpenter to employees setting forth the application, underwriting and compensation process for COT and stating "[w]e do not get paid until if and when the deal is completed satisfactorily 25-30 months from now"). As the Court noted, the evidence showed that even the straw insureds knew the plan was to have their policies sold to third parties after two years. *See* Verdict at 28-29; *see also*, *e.g.*, Tr. 493 (Henry Cooper), Tr. 1264 (Ezekiel Lambert), Tr. 1351 (Beat Zahner).

Carpenter further argues there could not be a conspiracy because there was no evidence that he had any contact with his alleged co-conspirators, namely the outside agents, and the straw insureds. Doc. 229 at 108-111. However, it is well settled that the Government does not need to "prove that the defendant knew the identities of all of the other conspirators. Indeed, a defendant may be a co-conspirator if he knows only one other member of the conspiracy[.]" *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008) (citations omitted).

There can be no dispute that Carpenter spoke directly with some of his co-conspirators, including Cherneski, Waesche, Trudeau and Westcott, about the COT. *See, e.g.*, Verdict at 50-53, 64-68 (describing conversations and emails with Carpenter about COT). While Carpenter may not have personally spoken with most of the straw insureds or other outside agents such as Mactas, Pacini, or Alper, the evidence shows that he was aware of their involvement and what the straw insureds were promised. *See, e.g.*, Gov't Ex. 2067 (email from Westcott to Carpenter discussing

Pacini's conversation with potential COT participant); Tr. 1509-12 (Westcott's testimony regarding Gov't Ex. 2067); Gov't Exs. 2133, 2079 (emails from Carpenter instructing Westcott to send him details on certain cases); Gov't Ex. 2077 (email from Carpenter to Westcott stating "[d]o everything thru me please. . . . I am privy to all the issues and problems"); Gov't Ex. 2155 (email from Carpenter to Westcott instructing him to "get Lambert and Twiggs done as $5MM cases."); Gov't Ex. 2303 (email from Carpenter to Waesche acknowledging that a COT participant received "two years of free insurance"); Gov't Ex. 2065 (emails between Westcott and Carpenter discussing potential COT client who was "thinking after 2yrs to turn over the profit to charity" to which Carpenter responded "go for it.").   As the Court noted, "[t]he record shows that [Carpenter] instructed others about policies that should be sought, approved potential applicants, reviewed materials related to prospective insureds, decided what documents should be sent and when, determined the amount of commissions agents would receive, and even provided funding for some of the policies." Verdict at 54-55. Carpenter participated in all aspects of the conspiracy and his attempts to insulate himself from the acts of his co-conspirators by claiming he had no contact with them rings hollow.

Finally, Carpenter argues that the Government failed to prove an overt act in furtherance of the conspiracy. *See* Doc. 229 at 3-4. But as the Court noted in its Verdict, "[u]nlike other conspiracy statutes, neither § 1349 nor § 1956(h) requires proof of an overt act in furtherance of the conspiracy." Verdict at 9 (citing *Whitfield v. United States*, 543 U.S. 209, 219 (2005) (§ 1956(h)) and *United States v. Roy*, 783 F.3d 418, 421 (2d Cir. 2015) (§ 1349). For non-overt-act conspiracies such as 18 U.S.C. §§ 1349 and 1956(h), so long as the "conspiracy contemplates a continuity of purpose and a continued performance of acts, it is presumed to exist until there has been an affirmative showing that it has been terminated and its members continue to be

conspirators until there has been an affirmative showing that they have withdrawn." *United States v. Spero*, 331 F.3d 57, 60 (2d Cir. 2003).

Thus, the trial evidence was sufficient to sustain the charge of conspiracy to commit mail and wire fraud. *See Anderson*, 747 F.3d at 60 ("To sustain a conspiracy conviction, the government must present some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it").

### E.   There was Sufficient Evidence to Support Carpenter's Conviction on All Counts of Money Laundering and Illegal Monetary Transactions

Carpenter's challenges to his conviction on Counts 34-57, for money laundering and illegal monetary transactions, are based on incorrect statements of the law and a self-serving and misguided assessment of the facts. *See* Doc. 229 at 65-74. Principally, Carpenter claims that the alleged fraud in relation to the COT policies on the life of Sash Spencer did not amount to specified unlawful activity, in large part for the same reasons he claims he did not commit substantive mail and wire fraud—he did not deceive the carriers, the misrepresentations did not contemplate harm to the carriers, and Carpenter acted in good faith. Carpenter also claims that he cannot be convicted of money laundering because the purpose of the financial transactions was not to conceal the origin or nature of the proceeds. *See* Doc. 229 at 71.

There are several different theories upon which a prosecution for money laundering or illegal monetary transactions may be premised. Here, two particular subsections were charged, in addition to conspiracy. 18 U.S.C. § 1956(a)(1)(A)(i) provides: "Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . with the intent to promote the carrying on of specified

unlawful activity [commits a crime]." 18 U.S.C. § 1957 provide, in relevant part that "whoever . . . knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity [commits a crime]." Violations of the mail and wire fraud statutes are recognized as "specified unlawful activities" ("SUA"). *See* 18 U.S.C. §§ 1956(c)(7)(A), 1961(1)(B); Verdict at 8.

Here, after considering all the evidence, the Court found "that the Spencer policies, like the policies underlying the substantive mail and wire fraud counts, were procured by fraud, and that the defendant knew the proceeds he received from Lincoln 'represented the proceeds of some form of unlawful activity,'" Verdict at 85-86 (quoting *United States v. Hassan*, 578 F.3d 108, 127 (2d Cir. 2008), and that "[i]t is beyond dispute that the death benefits paid by Lincoln constitute the proceeds of 'specified unlawful activity,'" Verdict at 86. In finding that the Spencer death benefit constituted proceeds from an SUA, the Court cited the myriad misrepresentations on the application, which were almost identical to the misrepresentations made on other COT policies that were discussed above.   *See* Verdict at 69 n.50, 86 n.62, Gov't Exs. 1301, 1302.   Again, as discussed above, the Court rightly concluded that the misrepresentations were made by co-conspirators, that the mailings and wirings in furtherance of the processing of the Spencer case were made "at the defendant's direction or on his behalf," and that Carpenter knew that the Spencer policies were procured through fraud. Verdict at 86 n.62; *see* Gov't Ex. 1332 (January 3, 2007 e-mail from Trudeau to Carpenter, indicating "Spencer is ready to fund" and "Need approved Collateral Assignment Agreement from COT to Ridgewood"); Gov't Ex. 1333 (January 12, 2007 e-mail to Carpenter indicating they are on the application for Spencer, meaning they will receive commissions); Gov't Ex. 1334 (January 16, 2007 e-mail to Carpenter attaching Spencer policy and application, which—among other things—denies the assignment of the policy). In response,

Carpenter simply repeats his incredible argument, addressed above and rejected by the Court, that he believed that the answers on the applications were answered accurately, that he acted in good faith, and that he did not contemplate harm to the carriers. *See* Doc. 229 at 68-70. The Government relies on its earlier response on this score, except to note that this is an especially specious argument concerning the Spencer policies, where the application denied that it was part of a "split dollar" arrangement, which is otherwise the central cog in Carpenter's good faith defense.

Carpenter also claims that, notwithstanding what is on the Spencer applications, Lincoln learned of the true nature of the COT during its investigation of the Spencer death claim, and therefore was not deceived when it paid the death benefits.  *See* Doc. 229 at 65-66.  Carpenter points to no evidence to support this claim, and the Court rightly rejected it.  *See* Verdict at 71. As the Court notes, the COT provided several documents to Lincoln through the course of its investigation, but nothing that would have revealed the true nature of the COT.  *Id.*   In fact, the claim form itself did not acknowledge any assignment in the policy to Ridgewood or GMC, and did not acknowledge a split-dollar arrangement, as Carpenter now falsely claims existed.  *See* Gov't Ex. 1324.

Finally, Carpenter misunderstands the nature of the money laundering and illegal monetary transaction charges in this case, claiming that he is entitled to a judgment of acquittal because he did not engage in financial transactions "to conceal the nature and origin of the funds as required by the money laundering statutes." Doc. 229 at 73. It is true that 18 U.S.C. § 1956(a)(1)(B)(i) imposes punishment on anyone who, "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity[,] knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location,

the source, the ownership, or the control of the proceeds of specified unlawful activity."
However, none of the substantive charges of money laundering rely on this provision, and thus
concealment is not an element of the indicted offenses. Carpenter was charged under 18 U.S.C. §
1956(a)(1)(A)(i), not 18 U.S.C. § 1956(a)(1)(B)(i). While concealment was charged as one of the
three objects of the § 1956(h) conspiracy, in addition to § 1957 and § 1956(a)(1)(A)(i) (promotion
of specified unlawful activity, namely additional COT policies), it was not one of the objects relied
upon by the Court in its Verdict.   Thus, while the Court could find by circumstantial evidence that
the labyrinth of financial transactions among various Carpenter-controlled accounts was intended
to conceal the origin of the funds, it certainly was not necessary to do so.

### F.    The Aiding and Abetting Counts Were Supported by Sufficient Evidence and Should Not Be Dismissed.

The superseding indictment charged Carpenter in every substantive count as both a
principal and aider and abettor under pursuant to 18 U.S.C. § 2. Carpenter seeks to dismiss the
aiding and abetting charges on the grounds that the superseding indictment failed to allege a crime
and that there was no proof to show that Carpenter aided or abetted anyone. *See* Doc. 299 at 117.

With respect to Carpenter's argument that the superseding indictment failed to allege a
crime, the Court already addressed this argument when it denied Carpenter's pre-trial motions to
dismiss. *See* Doc. 154 at 5-13 (finding that the superseding indictment sufficiently alleged each of
the charged offenses). Carpenter has presented no new arguments why the Court should revisit
that issue again. Indeed, Rule 29 is not the proper vehicle to challenge a defective indictment, as
Rule 29 only authorizes a court to enter a judgment of acquittal if "the evidence is insufficient to
sustain a conviction." *See United States v. al Ghazi*, No. S307-cr-354(JSR), 2009 WL 1605741, at
*2 (S.D.N.Y. June 9, 2009) (denying defendant's Rule 29 argument that repeated argument in his
pre-trial motion to dismiss because it did not challenge sufficiency of the evidence and therefore

"exceed[ed] the proper scope of Rule 29"); *United States v. Naegele*, 537 F. Supp. 2d 36, 40 (D.D.C. 2008) (declining to reconsider defendant's pre-trial argument because "[a] Rule 29 motion is not the proper vehicle through which to raise these legal arguments"); *United States v. Affinito*, 873 F.2d 1261, 1265 (9th Cir. 1989) (district court erred by granting Rule 29 motion for judgment of acquittal on basis of defective indictment). Thus, Carpenter's argument that the superseding indictment failed to state an offense should be rejected.

Turning to sufficiency of the evidence, the evidence introduced at trial was sufficient to find Carpenter guilty for aiding and abetting each of the substantive counts charged in the superseding indictment. "The aiding and abetting statute requires only that the underlying crime was committed by someone other than the defendant and that the defendant [himself] either acted or failed to act with the specific intent of advancing the commission of the underlying crime." *United States v. Litwok*, 678 F.3d 208, 213 (2d Cir. 2012) (internal quotations omitted).

For all of the reasons discussed earlier regarding the sufficiency of the evidence on each of the substantive and conspiracy counts, the Court could easily find that each of the substantive counts was also committed by a number of other individuals, such as Bursey, Waesche, or any one of the other agents who signed the applications, and that Carpenter aided and abetted the crime by authorizing wires for premium payments, signing the various funding documents described in each count of the superseding indictment, and otherwise directing the operation of the Charter Oak Trust and its related entities. The Government has already discussed above that the evidence was sufficient to show that Carpenter had the specific intent of advancing the commission of the underlying crimes. Accordingly, the Court should find that there was sufficient proof adduced at trial to find that Carpenter aided and abetted each of the substantive counts.

As to Carpenter's remaining arguments that no one was identified at trial as a principal and that he cannot be convicted as both a principal and an aider and abettor, these arguments are also without merit. "Where two alternative theories of guilt are charged, the conviction will stand as long as there is sufficient evidence to support a conviction under either theory." *United States v. Fitzgerald*, 542 F. App'x 30, 34 (2d Cir. 2013). Likewise, a jury (or in this case, the Court) need not choose between principal and accomplice liability when returning a guilty verdict. It may find guilt on both theories. *See, e.g.*, *United States v. Offner*, 88 F. App'x 438, 440 (2d Cir. 2004) (affirming convictions where "the jury found Defendants guilty of violating section 1955 both as principals and as aiders and abettors"); *United States v. Peterson*, 768 F.2d 64, 67 (2d Cir. 1985) (conviction valid "even if some jurors believed that [the defendant] and the other jurors believed that [a co-defendant] was the aider or abettor"); *United States v. Gleason*, 616 F.2d 2, 20-21 (2d Cir. 1979) (finding there is no requirement to require jury first to identify principals and then to identify aiders and abettors); *see also United States v. Van Putten*, No. 04-cr-803 (PKL), 2005 WL 1294468, at *2 n.1 (S.D.N.Y. May 31, 2005) (denying Rule 29 motion and rejecting defendant's argument that it was impossible to know whether the jury convicted defendant as a principal or an aider and abettor. Court stated "defendant was charged under both theories and the Court finds that there was sufficient evidence to convict him under either theory. Thus, for purposes of the instant motion, it is not relevant which theory the jury applied."), *aff'd*, 282 F. App'x 950 (2d Cir. 2008).

In light of these precedents, there was nothing improper about the Government proceeding on both theories of guilt. Thus, Carpenter's motion to dismiss the aiding and abetting charges should be denied.

**IV.    The Evidence Supported Venue in Connecticut**

Carpenter's argument that the charges against him were improperly venued in Connecticut must also fail. *See* Doc. 229 at 118-121. The evidence at trial supported a finding of venue far beyond the required preponderance standard, and Carpenter's arguments to the contrary are more a revisiting of his other arguments (that he was not involved in the conspiracy) than they are a proper challenge to venue. *See* Def. Mem at 121 ("Mr. Carpenter was not involved with the Straw Insureds or their brokers, so [v]enue was not proper for most of the counts in this case[.]").

18 U.S.C. § 3237(a) expressly provides that "any offense against the United States . . . committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." Applying that provision, "venue for mail fraud is limited to where the defendant places, deposits, causes to be deposited, takes, or receives mail, or knowingly causes mail to be delivered." *United States v. Ramirez*, 420 F.3d 134, 146 (2d Cir. 2005) (internal citations and quotation marks omitted). Likewise, venue in wire fraud cases includes any district in which a wire in furtherance is transmitted, received, or caused to be transmitted. *United States v. Kim*, 246 F.3d 186, 191-192 (2d Cir. 2001). The defendant need not be the one to undertake the wire or mailing, and the defendant need not intend for the wiring or mailing to occur in the district of venue.   Rather, the Second Circuit has held that "'venue is proper in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue [and it does].'" *United States v. Royer*, 549 F.3d 886, 896 (2d Cir. 2008) (quoting *United States v. Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003)).

Here, with regard to the substantive counts of wire and mail fraud, the evidence showed that Carpenter or one of his co-conspirators caused each of the mailings and wires from Connecticut. Government Exhibit 4 summarizes the evidence as to each of the mailings and wires.

Broadly, the evidence broke down into several categories:

- E-mails of applications from 100 Grist Mill Road to out-of-state insurance carriers. Carpenter stipulated that the e-mails originated from servers in Connecticut. *See* Joint Ex. 5.

- Facsimiles of insurance applications from 100 Grist Mill Road in Simsbury, Connecticut to insurance companies in other states.

- E-mails from co-conspirator Donald Trudeau to Christiana Bank with a COT wire form directing the transfer of money to an insurance company. Again, it was stipulated that the Trudeau e-mails came from a server in Connecticut.

- Wire transfers from bank accounts of one of the 100 Grist Mill Road entities in Connecticut to an out-of-state bank account for an insurance company. Carpenter stipulated that the wires originated in Connecticut. Moreover, the evidence showed the same thing, typically consisting of a wire transfer form, usually signed by Carpenter himself, and a bank record showing the movement of money from a Connecticut bank account. *See*, *e.g.*, Gov't Exs. 417, 418 (wire transfer form for policy on the life of Teresa Martinez).

- The Fedex of COT funding packages and disbursement requests from 100 Grist Mill Road in Simsbury to Christiana Bank. The evidence included the Fedex label showing the origination of the mailing in Connecticut. *See*, *e.g*., Gov't Ex. 716 (Fedex of funding package for COT policy on Henry Cooper's life).

In short, the evidence showed that each of the charged wires and mailings originated in Connecticut, generally from a Connecticut bank or the Connecticut offices of one of the Carpenter-related entities. That it was "foreseeable that such an act would occur" in Connecticut, *see Royer*,

549 F.3d at 896, is self-evident. Carpenter and all of his entities (the COT, Grist Mill Capital, and Avon Capital, to name the most relevant) were located in Connecticut, and much of the evidence of each of the charged wires was taken from the offices at 100 Grist Mill Road or 300 First Stamford Place, either in paper or electronic form. Carpenter even initiated several of the charged wires himself, using his own identification, from a Connecticut bank. Most strikingly, Carpenter essentially acknowledged venue when he e-mailed a memorandum—over servers at his offices in Connecticut—to his employees and associates, instructing them that "[a]ll cases will be sent to Simsbury, processed and underwritten through Simsbury, and the policies delivered through Simsbury." Gov't Ex. 2033 at 2; *see* Verdict at 55 (citing the same).

Nor does the result differ when considering the conspiracy charge under 18 U.S.C. § 1349. For venue to lie in Connecticut, the Government had to prove by a preponderance of the evidence that "an overt act in furtherance of the conspiracy was committed" in Connecticut. *United States v. Tzolov*, 642 F.3d 314, 319-20 (2d Cir. 2011) (internal citations omitted). "An overt act is any act performed by any conspirator for the purpose of accomplishing the objectives of the conspiracy. The act need not be unlawful; it can be any act, innocent or illegal, as long as it is done in furtherance of the object or purpose of the conspiracy." *Id.* at 320. Although 18 U.S.C. § 1349 is not an overt-act conspiracy, and so the superseding indictment does not enumerate them as such and the Government need not prove them beyond a reasonable doubt, the evidence presented at trial showed many acts taking place in Connecticut in furtherance of the object and purpose of the conspiracy, including each of the mailings and wires proven in Counts 1-32. All of those acts, and many others not alleged in the superseding indictment—many of which were referenced in the Court's Verdict—were sufficient to prove venue. *See Tzolov*, 642 F.3d at 316 n.1 (applying overt acts test where Tzolov was convicted under 18 U.S.C. § 1349); *United States v. Magleby*, 420 F.3d

1136, 1145 (10th Cir. 2005) (noting that "venue is proper wherever acts in furtherance of the conspiracy occur, regardless of whether an overt act must be proved" as a requisite element of the conspiracy offense).

Finally, the money laundering counts were also properly venued in Connecticut. The money laundering statute provides that for offenses arising under 18 U.S.C. § 1957 (illegal monetary transactions) or 18 U.S.C. § 1956 (money laundering), venue is proper in "any district in which the financial or monetary transaction is conducted." 18 U.S.C. § 1956(i)(1)(A). The statute further provides that, "[f]or purposes of this section, a transfer of funds from 1 place to another, by wire or any other means, shall constitute a single, continuing transaction. Any person who conducts (as that term is defined in subsection (c)(2)) any portion of the transaction may be charged in any district in which the transaction takes place." 18 U.S.C. § 1956(i)(3).   Under the statute, the term "conducts" includes "initiating, concluding, or participating in initiating, or concluding a transaction." 18 U.S.C. § 1956(c)(2). In addition, for conspiracy to commit money laundering, venue is proper in the district where venue would lie for the completed money laundering offense or in any other district where an act in furtherance of conspiracy took place. 18 U.S.C. § 1956(i)(2).

Here, the evidence supporting the money laundering and illegal monetary transaction counts is summarized by the charts in Government Exhibits 5-9, with Exhibit 10 showing the nature of each of the relevant bank accounts, including signatories. Each of the transactions originated with a Connecticut bank account for one of Carpenter's entities, terminated with such an entity, or did both—that is, passed from the Connecticut account of one Carpenter-related entity to another. This fact alone is sufficient to show venue. On top of that, however, in many cases there was additional evidence that showed that the transaction was caused from Connecticut, that

is, that the relevant check was negotiated or wire initiated from Connecticut. *See*, *e.g.*, Gov't Ex. 1852 (Bursey moves $8.67 million from a COT account to a Grist Mill Capital account, with endorsement stamp indicating Simsbury, CT); Gov't Ex. 1864 (Carpenter moves $2.1 million from a Grist Mill Capital account to a Grist Mill Holdings account, with endorsement stamp indicating Simsbury, CT); Gov't Ex. 1866 (Carpenter issues a funds transfer request form from Connecticut to move $61,925 from a Grist Mill Holdings account to PNC Bank to pay a COT insurance premium). In short, Connecticut was the obvious venue for all of the money laundering counts.

In his memorandum, Carpenter does not confront any of the evidence in support of venue, or any of the case law that relates to venue for the charged offenses.   Rather, he employs inapt precedent and, essentially, attempts to pass off his sufficiency-of-the-evidence and motion to dismiss arguments as applying to venue as well.   *See* Doc. 229 at 118 ("Nowhere in the Indictment does the government allege the facts sufficient to show **any** criminal activity by Mr. Carpenter anywhere[.]")[7]; 119 ("Mr. Carpenter did nothing wrong, illegal, or criminal in the district of Connecticut[.]").

Carpenter principally, and incorrectly, relies on *United States v. Geibel*. *Geibel* was an insider trading case in which the defendants were charged with securities fraud violations and conspiracy to violate the securities fraud laws. The court first found that there could not have been only one conspiracy—as was charged in the indictment—involving a Goldman Sachs employee who originally misappropriated inside information, certain direct and intermediate tippees, and the defendants who were tippees several levels removed from the original theft. 369 F.3d at 689-92. The court, however, did not vacate the conspiracy convictions because there was no prejudice to

---

[7] Carpenter makes repeated reference to failures of pleading. The Government responded to those arguments fully in its response to Carpenter's motion to dismiss and focuses here on Rule 29 issues, that is, the question of sufficiency of the evidence.

the variance. *Id*. at 692-95. In considering the issue of venue for the conspiracy, the court found sufficient foreseeable activity in New York, specifically that a defendant sent a letter to the AMEX exchange giving false reasons for a trade ahead of an acquisition announcement, and a defendant posed as the Goldman Sachs employee in a call with an undercover agent in New York. *Id*. at 696. Then, applying the statutory venue provision to the substantive counts of securities fraud, the court found venue over only the trades that had occurred over the New York-based AMEX exchange. *Id*. at 696-97. Otherwise, there was no evidence that the New York court had venue over the Nashville-based defendants, who did not trade in New York, and who were not (the court had found) engaged in a conspiracy with the Goldman Sachs employee in New York.   *Id*. at 697-98.

*Geibel* neither applies to, nor is inconsistent with, a finding of venue in this case.   First, securities fraud has its own venue provision, found at Section 78aa of Title 15, which does not apply to wire and mail fraud. *See id*. at 696. In a securities fraud case, a court is required to find the "locus delicti" of the conduct "from the nature of the crime alleged and the location of the act or acts constituting it . . . . not the anterior criminal conduct." *Id*. at 697 (quoting *United States v. Cabrales*, 524 U.S. 1, 6-7 (1998)).   In the context of wire and mail fraud, the inquiry is much simpler, looking at "where the defendant places, deposits, causes to be deposited, takes, or receives mail, or knowingly causes mail to be delivered," *Ramirez*, 420 F.3d at 146, or where a wire is transmitted, received, or caused to be transmitted or received, *Kim*, 246 F.3d at 191-92. "It is sufficient for the [mailing or wire communication] to be incident to an essential part of the scheme or a step in [the] plot." *Schmuck*, 489 U.S. at 710-11 (1989) (internal citations and quotation marks omitted). "'Innocent' mailings – ones that contain no false information – may supply the mailing element." *Id*. at 715.

In *Geibel*, the court found venue only where the trade occurred or was caused to occur, which did not include New York except for the trades done through AMEX. Presumably if the defendants had been located in New York and initiated their trades from New York, or otherwise caused the non-AMEX trades to go through New York, that would have been sufficient for venue. *See* 369 F.3d at 697 ("Aside from two specific deals, the government submits no evidence showing that defendants directly contacted New York when they engaged in insider trading."). Here, as discussed above, it is beyond debate that (1) the wires and mailings initiated and/or terminated in Connecticut and (2) Carpenter was well aware that all of his business passed through Connecticut.

Finally, Carpenter's denials that he was involved in any of the criminal activity proven at trial is belied by the evidence, as discussed at length above.

## V.   Each Of The Counts Was Within The Statute Of Limitations

Carpenter argues that Counts 1 through 33 are not within the statute of limitations. *See* Doc. 229 at 46-55. Significantly, Carpenter does not challenge the timeliness of Counts 34 to 57, *i.e.* the money laundering counts. As such, the Government only addresses the timeliness of Counts 1 through 33.

Carpenter's statute of limitations argument is essentially the same as the argument he made in his pre-trial motion to dismiss. *See* Doc. 229 at 46-55; *see also* Docs. 64, 65 (Carpenter's pre-trial motion to dismiss based on statute of limitations). The Court rejected Carpenter's arguments when he made them before trial, and it should do so again. *See* Doc. 154 (denying motion to dismiss and finding each of the counts was timely).

As the Court determined in its prior ruling, each of the counts carries a five-year statute of limitations. *See* Doc. 154 at 14-15. The Court rejected Carpenter's argument, which he repeats again in his current motion, that the superseding indictment broadened or substantially amended the charges. Rather, the Court held "that Counts 1 through 33 of the superseding indictment are

nearly identical to Counts 1 through 33 of the original indictment and therefore retain its limitations period."[8] Doc. 154 at 15. Carpenter has presented no new arguments to alter that conclusion.[9] Accordingly, as the Court held before trial, "to be timely, [Counts 1 through 33] must allege conduct that occurred on or after August 9, 2008."[10] Doc. 154 at 15.

Here, each of the mailings and wires underlying Counts 1 through 32 (the substantive mail and wire fraud counts) occurred on or after August 29, 2008. *See* Gov't Ex. 4 (summary chart listing the trial evidence in support of each of the charged mailings and wires). Thus, each of these counts is timely.

Count 33 charged conspiracy to commit mail and wire fraud from 2006 to 2013. Such a conspiracy does not require proof of an overt act. *See Roy*, 783 F.3d at 421; Verdict at 9 (citing the same). So long as the "conspiracy contemplates a continuity of purpose and a continued performance of acts, it is presumed to exist until there has been an affirmative showing that it has been terminated and its members continue to be conspirators until there has been an affirmative showing that they have withdrawn." *Spero*, 331 F.3d at 60; Doc. 154 at 15 n.3 (quoting the same). Each of the mailings and wires discussed above were acts that were performed as part of the conspiracy. Since at least one those mailings and wires occurred after August 9, 2008, the conspiracy alleged in Count 33 is also timely.

---

[8] The sole difference, which the Court noted, was "one additional sentence in Paragraph 6, which was added for background purposes and does not broaden or amend the substance of the charges." Doc. 154 at 15 n.4.

[9] To the extent the Court wishes to revisit Carpenter's argument that the superseding indictment broadened or substantially amended the charges in the original indictment, the Government incorporates by reference its memorandum in opposition to Carpenter's motion to dismiss the indictment on statute of limitations grounds wherein it addressed this argument. *See* Doc. 84 at 38-47.

[10] As the Court noted in its prior ruling, "[t]he original indictment was returned on December 12, 2013. But Carpenter waived the limitations period from August 9, 2013 through December 11, 2013." Doc. 154 at 15 n.5

Carpenter does not dispute that each of the mailings and wires occurred after August 9, 2008. Instead, as discussed, he argues that the superseding indictment broadened or substantially amended the charges, and therefore, he believes the statute of limitations should run from May 14, 2009. As discussed above, the Court already rejected this argument and held that the statute of limitations runs from August 9, 2008. *See* Doc. 154 at 15.

The remainder of Carpenter's argument is simply a variation of his earlier contention that the mailings and interstate wires were not in furtherance of the crime. Principally, Carpenter repeats his argument that the scheme was completed once the insurance policies were issued. See Doc. 229 at 47-51. He believes that wires and mailings that relate to the payment of premiums were not acts in furtherance of the fraud, and thus, he claims that the statute of limitation should run from the date the insurance application was submitted. Doc. 229 at 54.

Throughout his argument, Carpenter conflates "overt acts" with substantive counts of wire and mail fraud. *See, e.g.*, Doc. 229 at 50-51 ("[T]he subsequent 'alleged' misconduct cited in the respective counts…cannot and do not represent 'overt' acts. [They] cannot save the respective counts from the effects of 18 U.S.C. § 3282 because the alleged 'overt' acts where not 'in furtherance' of any fraud or conspiracy[.]"); *id.* at 53 ("[S]ince virtually none of the acts described in Counts 1-33 are 'in furtherance' of the scheme to defraud, they do not constitute 'overt acts' for the purposes of falling within the statute of limitations[.]"). The counts to which Carpenter refers represent individual substantive executions of the mail and wire fraud scheme; those charges' limitations periods begin on the date of the mailing or wire. To the extent that Carpenter believes that those executions were not in furtherance of the scheme, those arguments are without merit. As the Government has shown above, each of the mailings and wires proven at trial were "in furtherance" of the scheme to defraud.

45

Similarly, Carpenter's argument does not apply to Count 33, the conspiracy count. *United States v. Grimm*, 738 F.3d 498, 501 (2d Cir. 2013) and *United States v. Salmonese*, 352 F.3d 608, 614 (2d Cir. 2003), on which Carpenter relies, consider only the timeliness of an overt-act conspiracy, which requires the Government to "establish that a conspirator knowingly committed at least one overt act in furtherance" within the limitations period. Here, the superseding indictment charges a mail and wire fraud conspiracy under 18 U.S.C. § 1349, which does not require overt acts. *See Roy*, 783 F.3d at 421; Verdict at 9 (citing the same). Absent an overt-act requirement, so long as the "conspiracy contemplates a continuity of purpose and a continued performance of acts, it is presumed to exist until there has been an affirmative showing that it has been terminated and its members continue to be conspirators until there has been an affirmative showing that they have withdrawn." *Spero*, 331 F.3d at 60.

Finally, even on its facts, *Grimm* does not support Carpenter's argument. In *Grimm*, the defendants fraudulently obtained guaranteed investment contracts for General Electric at below-regulation interest rates. 738 F.3d at 499. The court held that indefinite payments on those contracts at depressed rates, each of which represented a profit to GE (who would otherwise pay more interest), could not serve as overt acts in furtherance of the scheme because they were "lengthy, indefinite, ordinary, typically noncriminal and unilateral." *Id.* at 503. Here, the exact opposite is true—the premium payments were necessary to effectuate the goal of the scheme, that is, to sell or take over insurance policies on the lives of third parties; the insurance policies would have lapsed and been worthless without the payment of premiums; the premium payments were not indefinite, but contemplated to end as soon as Carpenter and his co-conspirators could sell the policies; the payments were not unilateral, but involved the coordinated effort of several co-conspirators and funding entities; and the third-party funding of payments was not "typically

noncriminal," but rather the very thing that Carpenter's misrepresentations intended to hide.

The facts in *Salmonese* do not help Carpenter either. Indeed, the case supports the Government's position. In that case, the defendants engaged in the ongoing sales of securities whose value the conspirators had fraudulently inflated through a "pump and dump" scheme. *See Salmonese*, 352 F.3d at 612-13. The defendants engaged in a scheme and conspiracy to strip warrants offered to investors as part of a stock offering. The defendants kept the warrants for themselves and then fraudulently manipulated the market price of the stock to inflate the value of their warrants. *See id.* On appeal, one of the defendants argued that the conspiracy was complete when the conspirators received the warrants, or at the latest when their market manipulation ended, but he argued the conspiracy did not extend to the later sale of the warrants. *See id.* at 613. The Second Circuit disagreed and held the scheme was not complete until the conspirators completed the dumping action for the warrants. *See id*. at 615-16. Importantly, and relevant to Carpenter's case here, the Second Circuit concluded that those sales constituted overt acts in furtherance of the conspiracy because the sales "were hardly 'indefinite' in number or 'lengthy' in duration." *Id*. at 616. The Court held that, "where a conspiracy's purpose is economic enrichment, the jointly undertaken scheme continues through the conspirators' receipt of their anticipated economic benefits." *Id*. at 615 (internal quotations omitted). Just like in *Salomense*, the conspiracy here only contemplated the payment of premiums for a finite period, two years, until the contestability period was over, when Carpenter hoped to sell the fraudulently obtained policies for a profit.

Accordingly, Carpenter's statute of limitations argument should be rejected.[11]

---

[11] Carpenter also cites *Finkel v. Stratton Corp*., 962 F.2d 169 (2d Cir. 1992) and states, "In *Finkel*, once the sale had been made, the wrongful conspiracy was completed[.]" This conclusion is patently inaccurate, as there was no conspiracy alleged in that case. *Finkel* was a civil case where investors in a condominium project brought a securities action against the developer, its officers and directors, its parent company, and its investment advisor. The case had nothing to do with conspiracies. Indeed, the words "conspiracy" or "conspire" appear nowhere in that case.

**VI.**   **Carpenter's Fair Warning, Due Process, *Ex Post Facto* Clause, And Rule of Lenity Claims Should Be Denied**

Carpenter contends that he did not receive fair warning or notice that he could be criminally liable for his conduct, and as such, he claims his prosecution violates the due process and *ex post facto* clauses of the Constitution. *See* Doc. 229 at 75-83. He further argues that the statutes on which he was convicted are vague and ambiguous because they did not give him fair warning that his conduct was criminal, and he therefore believes he should be acquitted under the rule of lenity. *See* Doc. 229 at 86-102. The common thread among all of his claims is the same: Carpenter argues that misrepresentations depriving someone of information necessary to his or her economic decision making, and thereby the right to control one's assets, is a judicial expansion of the mail and wire fraud statute for which Carpenter received no fair warning. *See* Doc. 229 at 76-80, 88-89, 96-99, 101-102. Although Carpenter concedes that this right-to-control theory has been used in other contexts for over 30 years (securities fraud, loan fees, mortgage fraud, loan fraud, and insurance claim fraud), he nonetheless argues that he did not receive fair warning because the Government "cannot point to a single case predating *Binday* wherein a conviction [was] based solely on misrepresentations on an insurance application." Doc. 229 at 76. Carpenter suggests that prior to *Binday*, there was "no precedent for criminal liability based on non-disclosures and misrepresentation between sophisticated parties in insurance contract negotiations." Doc. 229 at 76-77, 83; *see id*. at 87, 96, 101-102. Therefore, he believes that because he committed his conduct before *Binday* was decided, he should be acquitted. As explained below, Carpenter's claims are without merit and should be rejected.

### A.       A Rule 29 Motion Is Not the Proper Forum for These Claims

As a preliminary matter, a Rule 29 motion for judgment of acquittal is not a proper forum to raise these constitutional and legal issues because under the plain language of Rule 29, the only ground on which the Court may order the entry of a judgment of acquittal is if "the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29; *see, e.g.*, *United States v. Wamiq*, No. 12-cr-88, 2013 WL 3773377, at *3 (E.D. Wis. July 17, 2013) ("Rule 29 is not the proper vehicle for making a constitutional due process challenge to a federal statute[.]"); *al Ghazi*, 2009 WL 1605741, at *2 (denying defendant's Rule 29 argument that "he lacked 'fair warning' that his conduct violated United States law" because his argument "exceed[ed] the proper scope of Rule 29, and his motion is properly denied on that basis alone"); *Naegele*, 537 F. Supp. 2d at 40 (declining to consider defendant's "fair warning" argument because "[a] Rule 29 motion is not the proper vehicle through which to raise these legal arguments").

The courts have made clear that Rule 29 "only authorizes motions challenging the sufficiency of the evidence presented at trial" and challenges on any other grounds must be dismissed. *al Ghazi*, 2009 WL 1605741, at *2; *see United States v. Torkington*, 874 F.2d 1441, 1444-45 (11th Cir. 1989) (holding that district court erred in granting a Rule 29 motion on grounds other than the sufficiency of the evidence); *Affinito*, 873 F.2d at 1265 (holding that the district court erred by granting Rule 29 motion for judgment of acquittal on basis of defective indictment); *United States v. Gant*, No. CR-11-140-BLG-RFC, 2013 WL 458307, at *2 (D. Mont. Feb. 6, 2013) ("A judgment of acquittal should not be granted on any other grounds" except for sufficiency of the evidence); *United States v. Villarreal*, No. CR 10-50082-JLV, 2012 WL 683356, at *5 (D.S.D. Mar. 2, 2012) ("[Defendant] does not challenge the sufficiency of the evidence with respect to Count II. Therefore, judgment of acquittal is not the proper vehicle to remedy the error alleged by [defendant.]"); *United States v. McDaniel*, No. 03 CR. 550 (LTS), 2004 WL 1057627, at *1

(S.D.N.Y. May 10, 2004) (denying Rule 29 motion that challenged conviction on grounds other than sufficiency of the evidence).

In short, a Rule 29 motion is an improper vehicle to raise Carpenter's fair warning and constitutional arguments, and those arguments should therefore be rejected.

### B.       The Fair Warning and Due Process Claims Lack Merit

Even if Rule 29 is a proper forum to make these constitutional claims, Carpenter's arguments lack merit. The Government does not dispute that due process requires that "no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *See* Doc. 229 at 80 (quoting *United States v. Harriss*, 347 U.S. 612, 617 (1954)). It is long settled that "[d]ue process provides a criminal defendant with the right to 'fair warning . . . in language that the common world will understand, of what the law intends to do if a certain line is passed.'" *United States v. Desposito*, 704 F.3d 221, 229 (2d Cir. 2013) (quoting *McBoyle v. United States*, 283 U.S. 25, 27 (1931) (Holmes, J.)). The Fifth Amendment does not permit the conviction of a defendant under a criminal statute "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015) (internal citations omitted). However, "it is not only the language of a statute that can provide the requisite fair notice; judicial decisions interpreting that statute can do so as well." *United States v. Smith*, 985 F. Supp. 2d 547, 588 (S.D.N.Y. 2014) (citations omitted).

Here, the statutes and judicial decisions interpreting the relevant statutes provided fair warning that Carpenter could be held criminally responsible for his conduct. As discussed earlier, the Second Circuit has consistently affirmed the right-to-control theory of wire and mail fraud for over 25 years, and interpreted the mail and wire fraud statutes to protect against the deprivation of potentially valuable economic information, as the Government charged here. *See Finazzo*, 850

F.3d at 107-113 (collecting cases dating back to 1991). As such, there was fair warning that the mail and wire fraud statutes could be used to prosecute Carpenter on that basis.

Although none of those prior Second Circuit right-to-control cases dealt with misrepresentations in insurance applications until *Binday*, there need not be any case law directly on point covering the factual situation presented in order to provide a defendant with fair warning. Indeed, "it is immaterial that there is no litigated fact pattern precisely in point." *United States v. Kinzler*, 55 F.3d 70, 74 (2d Cir. 1995) (rejecting defendant's due process and fair notice claim that his money laundering prosecution for third-party processing of merchant accounts was "totally unprecedented") (internal citations and quotations omitted); *see also United States v. Lanier*, 520 U.S. 259, 269-72 (1997) (holding that the "fair warning" requirement is not dependent upon "fundamentally similar" prior case law); *United States v. Brumley*, 116 F.3d 728, 732 (5th Cir. 1997) ("Constructions of a statute announced by the Supreme Court or lower courts can give citizens fair warning, even if the cases are not fundamentally similar" (citing *Lanier*, 520 U.S. at 268-72) (internal quotations omitted)).

Carpenter attempts to justify his fair warning claim by making the false and outrageous claim that "no one in America . . . was ever accused of criminal charges just for making misrepresentations on an insurance application before the indictment in *Binday* in February 2012." Doc. 229 at 96. Carpenter is wrong.

For decades—and well before Carpenter's conduct in this case—the federal circuit courts, including the Second Circuit, have repeatedly upheld mail fraud convictions premised on misrepresentations contained in various types of insurance applications. *See, e.g.*, *United States v. Anzalone*, 783 F.2d 10, 11 (1st Cir. 1986); *United States v. Stevens*, 210 F.3d 356 (table decision), 2000 WL 419938, at *2 (2d Cir. Apr. 7, 2000); *United States v. Mancuso*, 444 F.2d 691, 693 (5th

Cir. 1971); *United States v. Ware*, 282 F.3d 902, 904-905 (6th Cir. 2002); *United States v. Williams*, 545 F.2d 47, 49 (8th Cir. 1976); *United States v. Minkin*, 504 F.2d 350, 351 (8th Cir. 1974); *United States v. Sanders*, 187 F.3d 650 (table decision), 1999 WL 439415, at *1 (9th Cir. Jun. 22, 1999); *United States v. Wardwell*, 56 F.3d 78 (table decision), 1995 WL 330756, at *1 (10th Cir. May 25, 1995); *United States v. Colwell*, 140 F. App'x 64, 65, 71 (11th Cir. 2005); *see also United States v. Corey*, No. 3:04-cr-349(EBB), 2006 WL 1281824, at *1 (D. Conn. May 9, 2006) (noting that defendant pleaded guilty to mail fraud for causing the preparation of 28 insurance applications that contained material misrepresentations, and insurance companies relied on those misstatements in issuing policies that they would not have otherwise issued).[12]

In fact, courts have even affirmed mail fraud convictions where a defendant, like Carpenter here, did not sign the false applications himself, but set in motion a scheme to defraud based upon materially false insurance applications. *See United States v. Pisciotta*, 469 F.2d 329, 331 (10th Cir. 1972) (affirming mail fraud conviction charging defendant with conceiving, organizing and executing a scheme to defraud by causing submission of fraudulent applications for insurance coverage, noting "[t]he government did not have to link appellant directly with the fraudulent statements contained in the applications. Consequently, instead of proving the appellant directed the other participants to make false statements on their applications, the government need only establish that appellant did acts or set forces in motion which foreseeably would involve mail uses.").

Carpenter also erroneously relies on *United States v. Brennan*, 183 F.3d 139, 150 (2d Cir. 1999), for the proposition that there is no precedent for criminal liability based on nondisclosures

---

[12] Carpenter's counsel in this case also represented the defendant in *Corey*, who pleaded guilty in 2006. Thus, it is quite surprising that the defense made the claim that prior to *Binday* "no one in America . . . was ever accused of criminal charges just for making misrepresentations on an insurance application[.]" Doc. 229 at 96.

and misrepresentations between sophisticated parties in insurance contract negotiations. *See* Doc. 229 at 77.

As an initial matter, the Second Circuit in *Brennan* found that the venue was improper and reversed the conviction on those grounds. 183 F.3d at 149. The rest of the discussion was simply *dicta*. In addition, it bears noting that the Second Circuit limited the statement that Carpenter quotes to the factual scenario in *Brennan*, stating there was "no precedent for criminal liability based on nondisclosures to sophisticated corporations in arms-length contractual insurance relationships, *in circumstances like those presented here*." *Id.* at 150 (emphasis added).

The *Brennan* case is remarkably distinguishable from Carpenter's case. The district court in the Southern District of New York engaged in a lengthy discussion of the *Brennan* case in *United States v. Falkowitz*, 214 F. Supp. 2d 365, 375 (S.D.N.Y. 2002). In *Falkowitz*, the defendants were charged with mail and wire fraud based on a scheme to defraud insurance companies by procuring individuals to file applications that misrepresented the state of their health and by arranging viatical settlements for investors. *Id.* at 369. The defendant cited *Brennan* in support of his motion to dismiss. In denying the motion, the court summarized *Brennan* as follows:

> [i]n *Brennan*, defendants were executives for an unincorporated entity organized to manage a consortium of insurance companies. The company, acting on behalf of parties potentially liable for injuries arising out of airline accidents, was responsible for assessing claims and preparing for litigation. In connection with the particular accident at issue, defendants served as agents for two parties whose interests in the underlying litigation did not coincide. The prosecution argued that defendants did not disclose the conflict of interest and thereby breached fiduciary duties; further, the defendants made affirmative misrepresentations by sending letters "that led the victims to accept, rather than question, [the company's] handling of the ... claims and litigation and its allocation of all responsibility to" only one party.

*Id. at* 375. The court went on to state the following about the Second Circuit's concerns in *Brennan*:

> In this context, valid questions could be raised as to whether the evidence could

53

support a finding beyond a reasonable doubt that the conduct for which defendants were convicted manifested elements of a "scheme to defraud". Unlike the more prototypical case, defendants were engaged in a legitimate business of managing aviation insurance coverage and coordinating the settlement of accident claims. Nothing in the facts suggested that defendants' business was organized with a specific design to commit fraud by taking advantage of their unique business relationships or that the conflict of duties created by the intricate business connections was specifically planned and calculated to defraud the insurers they served. All the participating corporations in the insurance venture were aware of the different relationships among defendants and the consortium and, as a consequential aspect of their agreements, presumably accepted those potentially varying duties and loyalties. The outcome that one entity within the consortium may have benefitted at the expense of others by reason of defendants' conflicts was perhaps an unforeseeable by-product of the arrangement, as opposed to a result calculated by defendants as an object of a scheme designed with fraud upon the consortium members as an end. In other words, rather than indisputably manifesting a pre-planned device, the conflict appeared as a situation defendants backed into as events unfolded in connection with the one particular transaction at issue. Consequently, one reading of the evidence, perhaps the one that troubled the Second Circuit, may suggest that defendants' conduct did not evince an enterprise conducting an ongoing scheme that contemplated a fraudulent purpose in the charged transactions. . . .

Turning to the facts the Government alleges in the instant case, the charges sufficiently detail the elements of Defendants' scheme to defraud the insurance companies by procuring the viators to file applications that misrepresented the state of their health and by arranging viatical settlements for investors, knowing that the underlying insurance contracts were obtained by fraud.

*Id.* at 383.

The court in *Falkowitz* then denied the motion to dismiss. *See id.* at 386. The defendants ultimately pleaded guilty to conspiracy and mail fraud and were sentenced to terms of imprisonment. *See United States v. Falkowitz*, Case No. 1:01-cr-00852-VM (S.D.N.Y. 2003).

Unlike the defendants in *Brennan*, where there may have been a sufficiency of evidence concern as to whether the defendants were engaged in a pre-planned scheme, in Carpenter's case there was "overwhelming evidence" that Carpenter orchestrated a scheme to defraud the carriers into issuing policies based on misrepresentations in insurance applications. Verdict at 10 n.7.

Moreover, notwithstanding the Second Circuit's statements in *Brennan*, in the year after *Brennan*, and before Carpenter's conduct in this case, the Second Circuit upheld a mail fraud prosecution where a defendant made material misrepresentations in insurance applications submitted to various insurance companies in order to obtain insurance for employees. *See Stevens*, 210 F.3d 356, 2000 WL 419938, at *2.

Both *Stevens* and *Falkowitz*, which predate *Binday* and Carpenter's offense conduct, serve as an additional basis that there was fair warning that Carpenter could be criminally responsible for his conduct.

In short, given the long line of cases supporting the right to control theory and the long history of criminal prosecutions for making material misrepresentations in insurance applications, Carpenter's fair warning and due process arguments lack merit and should be rejected.

## C.     Carpenter's *Ex Post Facto* Clause Claim Lacks Merit

Carpenter's argument that his conviction violates the *ex post facto* clause similarly lacks merit and should be denied. In a variant of his due process argument, Carpenter essentially argues that this prosecution violates the *ex post facto* clause because his conduct was innocent before what he claims was a judicial expansion of the mail and wire fraud states in *Binday*. *See* Doc. 229 at 78-80. As such, he claims he did not have fair warning that his conduct would give rise to criminal penalties. *See id.*

Carpenter's argument relies on the false premise that his conduct was innocent before *Binday*. It was not. As discussed above, the right-to-control theory has been applied to criminal prosecutions for at least 25 years, and individuals have been prosecuted under the mail and wire fraud statutes for making misrepresentations in insurance applications for even longer. Thus, *Binday* did not judicially expand the mail and wire fraud statutes to criminalize conduct that was previously innocent. Rather, *Binday* reaffirmed what was already well-settled law in the Second

Circuit. *See Finazzo*, 850 F.3d at 107-113 (collecting cases).

Moreover, even if the Court were to find that *Binday* did judicially expand the mail and wire fraud statutes, the *Ex Post Facto* Clause of the Constitution does not warrant an acquittal in this case. "The *Ex Post Facto* Clause is a limitation upon the powers of the Legislature, and does not of its own force apply to the Judicial Branch of government." *Marks v. United States*, 430 U.S. 188, 191 (1977) (citation omitted). "The 'due process limitations on the retroactive application of judicial decisions' . . . are not coextensive with the limitations placed on legislatures by the Constitution's *Ex Post Facto* Clauses." *Metrish v. Lancaster*, 133 S. Ct. 1781, 1788 (2013) (citing *Rogers v. Tennessee*, 532 U.S. 451, 459 (2001)). The Court has recognized that "[s]trictly applying *ex post facto* principles to judicial decisionmaking . . . 'would place an unworkable and unacceptable restraint on normal judicial processes and would be incompatible with the resolution of uncertainty that marks any evolving legal system.'" *Id*. (citing *Rogers*, 532 U.S. at 461).

Under the test laid down by the Supreme Court, *ex post facto* analysis of judicial decisions must be conducted under the due process clause and "retroactive application of judicial interpretation of criminal statutes" does not violate due process unless the interpretation is "*unexpected and indefensible* by reference to the law which had been expressed prior to the conduct in issue" *Rogers*, 532 U.S. at 462 (emphasis added); *see United States v. Lopez*, 250 F. App'x 381, 384 (2d Cir. 2007) (citing the same). As explained above, even though *Binday* had not been decided when Carpenter began the conduct for which he was convicted, cases as early as 1991 had recognized the right-to-control theory in mail and wire fraud cases. Thus, the application of this theory in Mr. Carpenter's case is not an "unexpected and indefensible" construction of the law, and his *ex post facto* claims should be denied.

### D.      The Rule of Lenity Claim Lacks Merit

Carpenter's attempt to escape conviction based on the rule of lenity fares no better. *See* Doc. 229 at 86-102. The rule of lenity is a rule of statutory construction only applicable to ambiguous statutes. It "requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." *United States v. Santos*, 553 U.S. 507, 514 (2008). Carpenter's argument on the rule of lenity spans 17 pages and cites numerous cases setting forth the legal standard, but at the end of the day, the rule of lenity applies only where there is "grievous ambiguity or uncertainty in the language and structure of the statute." *See United States v. Shellef*, 507 F.3d 82, 106 (2d Cir. 2007) (internal quotation marks omitted). The rule is one "of last resort" to cover circumstances in which a court has "read the plain language of [the statute], considered the traditional canons of statutory construction, looked for legislative history, and canvassed potentially relevant case law," and yet "the statute's ambiguity makes it impossible" to interpret the provision at issue "without simply guessing about congressional intent." *United States v. Dauray*, 215 F.3d 257, 264–65 (2d Cir. 2000).

This case does not present such circumstances. There is nothing ambiguous about the application of the mail and wire fraud statutes to Carpenter. Although Carpenter seems to suggest that he is being prosecuted for innocent conduct and he could not have known that his conduct was illegal because there is no law or judicial opinion that makes STOLI illegal, *see* Doc. 229 at 88-89, 96, this case is not about whether or not STOLI is legal. Carpenter is charged with devising and executing a scheme to defraud life insurance companies through material misrepresentations in insurance applications in order to induce the companies to issue high-face-value universal life insurance policies that they would not have issued had the applications been filled out truthfully. The mail and wire fraud statutes are not ambiguous in their application to such conduct.

As the Government has repeated throughout this memorandum, well before Carpenter's conduct in this case, the Second Circuit has consistently held that the mail and wire fraud statutes protect against the deprivation of potentially valuable economic information and a company's right to control its assets. *See Finazzo*, 850 F.3d at 107-113 (collecting cases); *Binday*, 804 F.3d at 570-71; *Wallach*, 935 F.2d at 463. The Second Circuit already resolved any potential ambiguity in those statutes long ago, thus providing fair warning that Carpenter could be criminally liable for his conduct. *See Shellef*, 507 F.3d at 106 (finding rule of lenity inapplicable because case law clarified statutory meaning); *United States v. Reinoso*, 350 F.3d 51, 56 (2d Cir. 2003) (same).

Despite Carpenter's lengthy exposition on the rule of lenity, Carpenter principally compares his case to five other cases to demonstrate why the rule of lenity warrants acquittal in his case. Those cases, however, are factually inapposite and do nothing to explain why the rule of lenity is applicable here.

Carpenter first cites *Brennan* and *United States v. $52,037.96*, No. 3:14-cv-00591-WWE, 2015 WL 5601848 (D. Conn. Sept. 23, 2015), for what he argues are "[t]wo good examples" of the "Rule of Lenity in action." Doc. 229 at 87. However, *Brennan* was not decided on the rule of lenity. Although the Second Circuit discussed the rule of lenity in *dicta*, it did not decide the issue. *See Brennan*, 183 F.3d at 149-151. Rather, it dismissed the indictment, without prejudice, based on improper venue. *Id.* at 149. More importantly, as discussed at length above, *Brennan* is factually distinguishable from circumstances in Carpenter's case. Finally, although the Second Circuit stated there was no precedent for criminal liability in the insurance context "in circumstances like those presented [in *Brennan,*]" *id.* at 150, one year later, the Second Circuit affirmed a mail fraud prosecution based on material misrepresentations in insurance applications submitted to various insurance companies. *See Stevens*, 210 F.3d 356, 2000 WL 419938, at *2.

Carpenter's reliance on Judge Eginton's decision in *$52,037.96* is also misplaced. Contrary to Carpenter's claim that Judge Eginton dismissed criminal charges against a corporation in that case, *see* Doc. 229 at 87, that case was a civil *in rem* forfeiture case where the Government was seeking forfeiture of proceeds traceable to wire fraud. *See $52,037.96*, 2015 WL 5601848, at *1, *5. It was not a criminal case. *See id*. Moreover, the court did not base its decision on the rule of lenity. Indeed, the phrase "rule of lenity" is mentioned only once, where the court was quoting a passage from another case discussing the rule of lenity in the context of an honest services fraud prosecution. *See id.* at *7 (quoting *United States v. Bruchhausen*, 977 F.2d 464, 468 (9th Cir. 1992)). Carpenter's case, in contrast, is not premised on honest services fraud. Finally, the court determined that there was no "property right" being deprived because the alleged "property" at issue was the risk of future penalties, which the court determined was "illusory" because the penalties could not have ever materialized given the facts. *See id.* at *6. The alternate "property right" that was asserted was the company's interest in controlling future market conditions, which the court stated is not a property right protected by the wire fraud statute. *See id.* at 7. Again, these property rights are not at issue in Carpenter, whose charges were based on a right-to-control theory and misrepresentations that affected the insurance carriers' economic decision making—a property right that the Second Circuit has repeatedly affirmed is protected by the mail and wire fraud statutes.

Carpenter then compares himself to the defendants in *Lanier*, *Duray*, and *United States v. Valle*, 807 F.3d 508 (2d Cir. 2015), and argues that if the rule of lenity can be used to protect them, it should also be used to protect him. *See* Doc. 229 at 99-101. None of those cases helps Carpenter.

In *Lanier*, the Supreme Court did not acquit the defendant, who had been convicted of violating the constitutional rights of five women by assaulting them sexually while the defendant

served as a state judge. *See* 520 U.S at 261, 272. Rather, the Court found that the Sixth Circuit applied the wrong standard in deciding whether prior judicial decisions gave fair warning to the defendant that his conduct was criminal. *See id.* Indeed, the Court stated that prior decisions do not have to be fundamentally similar to the defendant's conduct to give him or her fair warning. *See id.* at 269 (stating that there can be "notable factual distinctions" between prior decisions and the case at hand, "so long as the prior decisions gave reasonable warning that the conduct" violated the law). The Court did not acquit the defendant but remanded the case to the Sixth Circuit to apply the correct standard. *See id.* at 272. Significantly, after remand, the defendant fled to Mexico, and his appeal was dismissed. *See United States v. Lanier*, 173 F. Supp. 2d 779, 781 (W.D. Tenn. 2001).   After he was apprehended, he was ordered to serve his original 25-year sentence of imprisonment. *See id.*

In *Dauray*, the defendant was convicted of possessing three or more "books, magazines, periodicals, films, video tapes, or other matter" depicting child pornography, and in "a question of first impression[,]" the Second Circuit was asked to consider whether multiple pictures cut from a single magazine constituted separate pieces of "other matter." *See* 215 F.3d at 259-61. Finally, in *Valle*, "in an issue of first impression that has sharply divided our sister circuits," the Second Circuit had to decide the meaning of "exceeds authorized access" under the Computer Fraud and Abuse Act. 807 F.3d at 511.

None of these cases is similar to Carpenter's case. In *Lanier*, the Supreme Court only set forth the correct standard for applying the rule of lenity, but the defendant was not acquitted under the rule. And unlike *Dauray* and *Valle*, there is no question of first impression in Carpenter's case.

In sum, there is no ambiguity in the statutes on which Carpenter was prosecuted and there was fair warning based on longstanding case law that Carpenter could be held criminally liable for

his conduct. Accordingly, his motion for acquittal under the rule of lenity lacks merit and should be denied.[13]

## VII. **Carpenter's Sixth Amendment Claim Should Be Denied**

Carpenter repeats the claim he made in his pre-trial motion to dismiss and argues that his Sixth Amendment rights were violated because the superseding indictment was defective and failed to sufficiently allege the offenses against him. *See* Doc. 229 at 83-85. Specifically, he argues that the superseding indictment failed to sufficiently allege that anyone was deprived of property, failed to sufficiently allege that he intended to defraud anyone, and failed to sufficiently allege that any mailing or wiring was in furtherance of the scheme to defraud. *See* Doc. 229 at 84. He further alleges that the superseding indictment fails to allege any knowledge or that he willfully participated in the scheme to defraud and the conspiracy. *See id.* Carpenter's Sixth Amendment claims are without merit and should be denied.

As an initial matter, Carpenter merely repeats, almost verbatim, the argument he made in his pre-trial motion to dismiss, which the Court already denied. *See* Doc. 63 at 8, 22; Doc. 154 at 18. Although now couched in a Rule 29 motion, he essentially seeks reconsideration of this Court's pre-trial ruling denying his motion to dismiss. Significantly, his Sixth Amendment claim does not challenge the sufficiency of the evidence. Therefore, his argument is not properly before the Court in the context of a Rule 29 motion and should be denied. *See al Ghazi*, 2009 WL 1605741, at *2 (denying defendant's Rule 29 argument that repeated argument in his pre-trial motion to dismiss because it did not challenge sufficiency of the evidence and therefore "exceed[ed] the proper scope

---

[13] Throughout his argument about fair warning, due process, the *Ex Post Facto* Clause, and the rule of lenity, Carpenter repeats his arguments that he should be acquitted based on the sufficiency of the evidence and based on Second Circuit's decisions in *Countrywide* and the Supreme Court's decision in *Skilling*. Because the Government already addressed these arguments in other parts of this memorandum, the Government does not repeat them here in this section.

of Rule 29, and his motion is properly denied on that basis alone"); *Naegele*, 537 F. Supp. 2d at 40 (declining to reconsider defendant's pre-trial argument because "[a] Rule 29 motion is not the proper vehicle through which to raise these legal arguments"); *Affinito*, 873 F.2d at 1265 (holding district court erred by granting Rule 29 motion for judgment of acquittal on basis of defective indictment).

Even on the merits, Carpenter's arguments, at most, amount to a motion for reconsideration of the Court's pre-trial ruling denying his motion to dismiss the indictment. Such motions "will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir.1995); *see* D. Conn. Local Civ. Rule 7(c) (motions for reconsideration "will generally be denied unless the movant can point to controlling decisions or data that the court overlooked in the initial decision or order"); D. Conn. Local Cr. Rule 1(c) (incorporating Local Rule 7(c) in criminal proceedings). Moreover, at this stage of the proceedings, where a defendant challenges the sufficiency of the indictment "after a verdict has been rendered . . . an indictment should be interpreted liberally, in favor of sufficiency." *United States v. Sabbeth*, 262 F.3d 207, 218 (2d Cir. 2001); *United States v. De La Pava*, 268 F.3d 157, 162 (2d Cir. 2001) (same).

Here, Carpenter has failed to point to any controlling decision or data that merits reconsideration of the Court's prior ruling. Accordingly, Carpenter's Sixth Amendment claim should be denied.

## VIII.   Conclusion

For the reasons stated herein, the Government respectfully requests that the defendant's motion for judgement of acquittal be denied.

Respectfully submitted,

DEIRDRE M. DALY
UNITED STATES ATTORNEY

/s/ *David E. Novick*

_____

DAVID E. NOVICK
ASSISTANT U.S. ATTORNEY
Federal Bar No. phv02874
157 Church Street, 25th Floor
New Haven, CT 06510
Tel: 203-821-3700
Email: David.Novick@usdoj.gov

/s/ *Neeraj N. Patel*

_____

NEERAJ N. PATEL
ASSISTANT U.S. ATTORNEY
Federal Bar No. phv04499
157 Church Street, 25th Floor
New Haven, CT 06510
Tel: 203-821-3700
Email: Neeraj.Patel@usdoj.gov

<u>CERTIFICATION OF SERVICE</u>

     This is to certify that on July 28, 2017, a copy of the foregoing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing.   Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.   Parties may access this filing through the Court's CM/ECF System.


                    */s/ Neeraj N. Patel*

                    ———————————————————

                    NEERAJ N. PATEL

                    ASSISTANT UNITED STATES ATTORNEY