**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 3:13CR226(RNC) |
| v. | ) | |
| DANIEL E. CARPENTER | ) | NOVEMBER 13, 2017 |

# MR. CARPENTER'S MOTION FOR RECONSIDERATION OF THE COURT'S DENIAL OF MR. CARPENTER'S MOTION TO SUPPRESS BASED ON *UNITED STATES v. WEY*

## PRELIMINARY STATEMENT

Mr. Carpenter respectfully asks this Court to reconsider its ruling of November 6, 2017 denying Mr. Carpenter's Motion for Reconsideration of the denial of his Motion to Suppress (Doc. 247), based on the decision in *United States v. Benjamin Wey, et al.,* 15-CR-0611 (AJN), where Judge Nathan granted the defendant's motion to suppress in its entirety. Please see the Forbes article describing Benjamin Wey's legal victory attached as Exhibit One.

Judge Nathan pointed out six separate violations of the Fourth Amendment in her 96 page opinion, and she felt that the agents executing the raid were not entitled to the "good faith" exception of *United States v. Leon,* 104 S.Ct. 3405 (1984) because the search warrant affidavit was not attached to the search warrant as required by law in the Second Circuit. Therefore, Mr. Carpenter respectfully asserts that all of the constitutional defects in the search and seizure of Benjamin Wey's office are all present in both raids of 100 Grist Mill Road, on April 20, 2010 and May 26, 2011. Neither Search Warrant lists any crime on the face of the warrant and therefore each warrant is constitutionally defective on its face according to both Second Circuit precedent and the Supreme Court's decision in *Groh v. Ramirez,* 124 S.Ct. 1284 (2004). (See

**ORAL ARGUMENT REQUESTED**

Search Warrant from Raid of April 20, 2010 attached as Exhibit Two and Search and Seizure Warrant from May 26, 2011 attached as Exhibit Three). This is why Judge Nathan ruled that the "good faith" exception in *Leon* did not apply and the balance of making sure the government does not do this again outweighed the loss to the government of the evidence in Mr. Wey's prosecution under the balancing test of *Herring v. United States,* 129 S.Ct. 695 (2009). Therefore, since each factor listed by Judge Nathan in *Wey* is present in the two unlawful seizures of 100 Grist Mill Road – and Mr. Carpenter would say that the infractions in *Wey* are nothing compared to the violations in his case – Mr. Carpenter respectfully asks that the Court acknowledge the constitutional defects of both warrants in light of the *Wey* decision explaining Second Circuit precedent and grant this Motion for Reconsideration pursuant to Local Rule 7(c).

## I. LEGAL STANDARD

Unlike the Federal Rules of Civil Procedure, the Federal Rules of Criminal Procedure do not expressly provide for reconsideration. Nonetheless, the District of Connecticut's Local Rules of Criminal Procedure do contemplate the use of motions for reconsideration in criminal cases. *See* D. Conn. L. Crim. R. 1(c) ("The following Local Civil Rules shall apply in criminal proceedings: … 7(c) (Motions for Reconsideration)."). The Local Criminal Rules in the District of Connecticut specifically provide for Motions for Reconsideration pursuant to Rule 7(c).

Federal Rule of Criminal Procedure 57(b), which is entitled "Procedure When There Is No Controlling Law", provides in part that "[a] judge may regulate practice in any manner consistent with federal law, these rules, and the local rules of the district." Fed.R.Crim.P. 57(b). "Where the Rules of Criminal Procedure do not speak specifically to a matter, a court conducting a criminal case is permitted to draw from and mirror a practice that is sanctioned by the Federal Rules of Civil Procedure." *Morrison* at 252, *quoting United States v. James,* 2007 WL 914242, at

*3 (E.D.N.Y. Mar. 21, 2007). "Thus, when deciding motions for reconsideration in criminal matters, courts in this district have resolved such motions according to the same principles that apply in the civil context." *James* at *3.

## II. THE SEARCH WARRANTS IN THIS CASE LACKED PARTICULARITY

Unlike the search warrants in *Wey*, neither of the Search Warrants in this case named Mr. Carpenter on the face of the Warrant, nor is there any crime mentioned on the face of either Warrant. At least the search warrant in *Wey* mentioned his name, i.e., Benjamin Wey. There is no such mention of Mr. Carpenter's name on the face of either Warrant in this case, and the Search Warrant Affidavit was not attached as required by law, not just in the Second Circuit, but in every circuit in America after *Groh*. *See* IRS Chief Counsel Memorandum attached as Exhibit Four. As such, both Search Warrants here lacked particularity as a matter of law.

Moreover, in this case, as opposed to *Wey*, Mr. Carpenter's name is nowhere to be found in the Synopsis of the Case that was sent to IRS headquarters in Washington, D.C. to get approval for the unlawful raid on 100 Grist Mill Road. This document was just turned over to Mr. Carpenter in civil discovery this summer in the *Bivens* action in front of Judge Underhill titled *Carpenter v. Koskinen*, No. 13-cv-00563 (SRU). *See* Synopsis of the Case attached as Exhibit Five.

As Judge Nathan stated in *Wey,* the Second Circuit has recognized that to comport with Fourth Amendment's particularity requirement, the **search warrant itself**, and not the Application or the Agent's Affidavit which were not attached in either raid in this case, must satisfy three specific criteria:

> First, it must "identify the specific offense for which the police have established probable cause." *Galpin*, 720 F.3d at 445; ("[F]or a warrant to meet the particularity requirement, it must identify the alleged crime for which evidence is sought."); *United States v. George*, 975 F.2d 72, 75–76 (2d Cir. 1992) (warrant permitting seizure of evidence "relating to the

commission of a crime" was constitutionality infirm because "[n]othing on the face of the warrant tells the searching officer for what crimes the search is being undertaken"). Second, the warrant is required to "describe the place to be searched." *Galpin,* 720 F.3d at 445–46. And third, it must "specify the items to be seized by their relation to designated crimes." *Id.* at 446 (internal quotation marks omitted) (citing, inter alia, *United States v. Buck,* 813 F.2d 588, 590–92 (2d Cir. 1987) (warrant authorizing seizure of "any papers, things or property of any kind relating to [the] previously described crime" was insufficiently particularized insofar as it "only described the crimes—and gave no limitation whatsoever on the kind of evidence sought")); *United States v. Rosa*, 626 F.3d 56, 62 (2d Cir. 2010) (warrant "defective in failing to link the items to be searched and seized to the suspected criminal activity" *United States v. Wey*, --- F.Supp.3d ---- (2017) citing *United States v. Ulbricht,* 858 F.3d 71, 98-99 (2d Cir. 2017).

Judge Nathan had no problem finding that the warrants in *Wey* failed the "particularity" test because no suspected crimes were listed on the face of the warrant – just as both Warrants in this case were constitutionally defective:

> Under the settled Circuit law set forth above, failure to reference the suspected crimes would alone be enough to render the Warrants insufficiently particularized. *See 650 Fifth Ave.*, 830 F.3d at 99 ("for a warrant to meet the particularity requirement, it must identify the alleged crime for which evidence is sought"); *George*, 975 F.2d at 76 (warrant permitting search of evidence "relating to the commission of a crime" lacked particularity because "[n]othing on the face of the warrant tells the searching officer for what crime the search is being undertaken"); see also *United States v. Romain*, —— Fed. Appx. ——, ——, 2017 WL 442175, at *1 (2d Cir. 2017) (Summary Order) ("[T]he government concedes that the warrant was facially deficient for failing to reference the criminal statutes that [defendant] was accused of violating even though the supporting document did contain that information.").

Therefore, because neither Warrant in this case states or even suggests a crime or the violation of any statute on the face of the Warrant, each Warrant in this case is constitutionally defective.

## III. THE SEARCH WARRANTS IN THIS CASE WERE BOTH OVERBROAD

Judge Nathan in *Wey* recognizes that the doctrine of overbreadth represents the intersection of the principles of particularity and probable cause. There must be "probable cause" for each and every document taken in a search. In *Wey,* the officers took medical records and school report cards. In this case, agents took Attorney-Client Privileged documents from

Mr. Carpenter's Boston case, his homeowner's policy, and all of his personal tax returns – none of which were related to the allegations supporting the two Search Warrants in this case:

> Thus, "a warrant is overbroad if its 'description of the objects to be seized ... is broader than can be justified by the probable cause upon which the warrant is based.'" *United States v. Lustyik*, 57 F.Supp.3d 213, 228 (S.D.N.Y. 2014) (quoting *Galpin*, 720 F.3d at 446); see also *Ulbricht,* 858 F.3d at 102 ("breadth and particularity are related but distinct concepts" and a "warrant may be broad, in that it authorizes the government to search an identified location or object for a wide range of potentially relevant material," without necessarily "violating the particularity requirement"); *Zemlyansky*, 945 F.Supp.2d at 464 ("In determining whether a warrant is overbroad, courts must focus on 'whether there exists probable cause to support the breadth of the search that was authorized.' ") (quoting *Hernandez*, 2010 WL 26544, *8). See *United States v. Wey*, --- F.Supp.3d ---- (2017).

Because both Warrants in this case allowed the seizure of hundreds of boxes of documents, personal computers and cellphones, without linkage to any crime, and without linkage to any suspected criminal conduct, in this case the warrant was overbroad because, just as in *Wey,* the Warrants here broadly authorized the seizure of all "financial records, notes, memorandums, records of communications, correspondence…" See *Wey* at 7.

> As noted above, "breadth and particularity are related but distinct concepts." *Ulbricht*, 858 F.3d at 102. The former issue is "whether the items listed as 'to be seized' in the warrant were overboard because they lacked probable cause" and the second is "whether the warrant was sufficiently particularized on its face to provide the necessary guidelines for the search by the executing officers." *Hernandez*, 2010 WL 26544, at *7 (citations omitted); see also Cohan, 628 F.Supp.2d at 359 ("A warrant ... can be unconstitutionally infirm in two conceptually distinct but related ways: either by seeking specific material as to which no probable cause exists, or by giving so vague a description of the material sought as to impose no meaningful boundaries."). For many of the same reasons set forth above, the NYGG Warrant and the Apartment Warrant are constitutionally overbroad. Specifically, owing in large measure to their failure to impart meaningful guidelines to the searching agents (a particularity problem), the Warrants purport to authorize the seizure of, essentially, all documents from NYGG and the Wey Apartment. As demonstrated in the foregoing discussion of the all-records exception, however, such authorization exceeds the scope of the probable cause showing submitted to the Magistrate Judge. That is an independent (if related) overbreadth problem.

Thus because there were hundreds of boxes taken in each raid that had absolutely no relation to even the suggestions of criminal conduct, the Warrants in this case were even more "overbroad" than the warrants in *Wey*.

## IV. THE WARRANTS IN THIS CASE DID NOT LIMIT WHAT ELECTRONICALLY STORED INFORMATION WAS TO BE SEIZED

Both Warrants in this case targeted the servers at 100 Grist Mill Road despite the fact that there were a number of different businesses not targeted or named in the Warrants. When electronically stored information (ESI) is involved, the particularity requirement is enhanced not diminished as it was in this case. As Judge Nathan described it in *Wey,* when a warrant authorizes the seizure of ESI, it implicates at least two additional considerations for the government to meet:

> First, as the Second Circuit has recognized, "[w]here ... the property to be searched is a computer hard drive, the particularity requirement assumes even greater importance." *Galpin*, 720 F.3d at 446. That is because the "seizure of a computer hard drive, and its subsequent retention by the government, can give the government possession of a vast trove of personal information about the person to whom the drive belongs, much of which may be entirely irrelevant to the criminal investigation that led to the seizure." *United States v. Ganias*, 824 F.3d 199, 217 (2d Cir. 2016) (en banc). As such, "[t]he potential for privacy violations occasioned by an unbridled, exploratory search of a hard drive is enormous"—a "threat [that] is compounded by the nature of digital storage." *Galpin*, 720 F.3d at 447. Indeed, the Government, once it has obtained authorization to search a hard drive, may in theory "claim that the contents of every file it chose to open were in plain view and, therefore, admissible even if they implicate the defendant in a crime not contemplated by the warrant," thus presenting a "'serious risk that every warrant for electronic information will become, in effect, a general warrant, rendering the Fourth Amendment irrelevant.'" *Id.* (*quoting United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1176 (9th Cir. 2010)) (en banc) (per curiam); cf. *Riley v. California*, —— U.S. ——, 134 S.Ct. 2473, 2489–91, 189 L.Ed.2d 430 (2014) (recognizing that cell phones "differ in both a quantitative and a qualitative sense from other objects that might be kept on an arrestee's person" owing to their "immense storage capacity" and their ability to "contain[ ] in digital form" both "many sensitive records previously found in the home" and "a broad array of private information never found in a home in any form—unless the phone is"); *Ganias*, 824 F.3d at 231 (Chin, J., dissenting) (noting that "[v]irtually the entirety of a person's life may be captured as data" on a computer or smartphone). Accordingly, a "heightened sensitivity to the particularity requirement in the context of digital searches" is necessary. *Galpin*, 720 F.3d at 447. There is also the matter of the execution of a warrant targeting electronically stored information.

> Under Federal Rule of Criminal Procedure 41(e)(2)(B), a warrant may—as the Warrants at issue did here—"authorize the seizure of electronic storage media or the seizure or copying of electronically stored information." Fed. R. Crim. P. 41(e)(2)(B). The Rule provides that "[u]nless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant." Id. Although "there is no established upper limit as to when the government must review seized electronic data to determine whether the evidence falls within the scope of a warrant," courts have recognized that "the Fourth Amendment requires the government to complete its review, i.e., execute the warrant, within a 'reasonable' period of time." *Metter*, 860 F.Supp.2d at 215 (collecting cases); see also *United States v. Alston*, 15–cr–435, 2016 WL, at *3 (S.D.N.Y. Apr. 29, 2016) ("While Rule 41 prescribes no particular time period for data extraction in these circumstances, the time needed to complete off-site copying or review is subject to the rule of reasonableness."); *Lustyik*, 57 F.Supp.3d at 230 ("[l]ike all activities governed by the Fourth Amendment, the execution of a search warrant must be reasonable" and "[l]aw enforcement officers therefore must execute a search warrant," including when applicable review of recovered electronic communications, "within a reasonable time")
>
> This deficiency, while concerning under any circumstances, is only exacerbated by the fact that the Warrants target, in significant measure, the contents of electronic devices, such as computers, internal and external hard drives, and smartphones. As the Court of Appeals observed just days ago, especially given the practical risk that "every warrant for electronic information will become, in effect, a general warrant," a warrant that "lack[s] meaningful parameters on an otherwise limitless search of a defendant's electronic media"—including in its "fail[ure] to link the evidence sought to the criminal activity supported by probable cause"—does "not satisfy the particularity requirement." Ulbricht, 858 F.3d at 99–100 (internal quotation marks and alterations omitted) (quoting *Galpin*, 720 F.3d at 447; Rosa, 626 F.3d at 62)
>
> In sum, the Warrants authorize the seizure of sweeping categories of materials, regardless of their potential connection (or lack thereof) to any suspected criminal activities and limited only by the requirement that they relate in some generalized way to the owner/occupant of the very premises subject to search. The conferral of such unfettered discretion on the executing officers, particularly in light of the Warrants' independent failure to identify any crime under investigation, is inconsistent with the Fourth Amendment's particularity requirement

Thus, Judge Nathan does an excellent summation of all of the separate and distinct constitutional violations in this case by the government's unreasonable and non-particularized seizure of ESI evidence from 100 Grist Mill Road not once, but twice. Once again, Mr. Carpenter's personal cellphones and computers were seized in 2010 and again in 2011, and yet the Court's decision, it is respectfully submitted, is contrary to the decisions of the Supreme

Court's in *Riley v. California*, 134 S. Ct. 2473 (2014) and *United States v. Wurie*, 134 S. Ct. 999 (2014), both of which were after Mr. Carpenter's indictment in 2013.

## V. THE SEARCH WARRANTS IN THIS CASE LACKED ANY TEMPORAL LIMITATION

Judge Nathan also had no problem finding that the warrants in *Wey* were also constitutionally defective because they lacked any "temporal limitation" or in other words, the search warrants themselves did not state any time frame limiting the investigation or search on the face of the warrant. Similarly, in this case, despite the fact that Search Warrant Affidavits listed specific dates, times, and places, the Search Warrant Affidavits were not attached to the Warrants so both raids on 100 Grist Mill Road suffered from the fact that documents were taken during both raids dealing with innocent conduct in the 1990's or even the 1980's when there should have been a "temporal limitation" or time frame of 2007-2009, for example, as to the Charter Oak Trust. As Judge Nathan stated in *Wey*:

> Still, the "absence of such a limit reinforces" the Court's conclusion that the Warrants are insufficiently particularized. *Zemlyansky*, 945 F.Supp.2d at 459–60; *Vilar*, 2007 WL 1075041, at *23 (the "lack of particularity is only compounded by the absence of any date restriction on the items to be seized"); *United States v. Triumph Capital Grp., Inc.*, 211 F.R.D. 31, 58 (D. Conn. 2002) (recognizing a "temporal limitation" as "one indicia of particularity").

Once again, a review of the Warrants in this case attached as Exhibit Two and Exhibit Three proves that the Search Warrants in this case not only fail to state a crime, but they also fail to state any time period or time frame to limit the search for evidence pertaining to any alleged criminal activity that was the subject of the search and seizure in the first place. This is plain error and clearly erroneous; if necessary the Court could hold a hearing on these issues, but both Warrants were constitutionally facially defective and it is respectfully submitted that the Court should reconsider its November 6 denial of the Motion to Suppress.

## VI. THE CONDUCT OF BOTH RAIDS WAS CONSTITUTIONALLY UNREASONABLE

The Court may be aware that Mr. Carpenter has two substantial *Bivens* actions in process against the government for unreasonable conduct in the raid of April 20, 2010 in front of Judge Underhill and for the raid of May 26, 2011 in front of Judge Bolden. There is no *Bivens* action described in the *Wey* case, yet in addressing the "matter of overseizure" and claiming that the agents in *Wey* clearly overseized many documents that were personal in nature that should not have been seized but by doing so also rendered the search and seizure in *Wey* unreasonable, Judge Nathan states the following in *Wey*:

> Finally, there is the matter of overseizure. The Rosa Court took care to emphasize that there was "no evidence that the team of officers searched for, or seized, any items that were unrelated to the crimes for which probable cause had been shown." 626 F.3d at 65. Notwithstanding the Government's zealous efforts to persuade the Court otherwise, the same simply cannot be said here.
>
> The agents seized, between the two search locations, a variety of hard-copy materials purely personal in nature, or otherwise plainly outside the scope of the suspected securities and wire fraud scheme described in the Affidavits. As discussed above, these included medical records, prescription documents, X-rays, health care directives, educational records and scholastic mementos, divorce records, resumes, family photographs, recreational schedules, and other things. To be sure, and as the Government emphasizes, several such items do appear to have been seized as part of larger sets of materials that could have been impractical to sort onsite (for example, the trash bag referenced above, which took something of a star turn in the Government's Hearing presentation) and thus were removed wholesale for offsite inspection. Gov't Supp. Opp. at 17. Even crediting such asserted logistical necessity as an explanation for some of these seizures, however, the record reflects that it does not apply to many others. See, e.g., Def. Supp. Br. Ex. A (identifying examples); see also Gov't Ex. 14 (Evidence Recovery Log from Apartment Search noting seizure of multiple sets of materials identified onsite as "personal" documents, such as "school" and "immigration" records and "estate planning" documents).

Suffice it to say, that between the previous Rule 41(g) Motions and the two major *Bivens* actions, Mr. Carpenter has clearly gone on record that the overseizure in this case was far more egregious than the overseizure in *Wey* and the conduct in the commando raids in this case were far more unconstitutional and unreasonable than the conduct by the agents in *Wey*. Should the

Court require detailed examples from the Inventory List of both raids, Mr. Carpenter would be happy to provide the Court with concrete examples, but the overseizures and unreasonable conduct in the searches in this case dwarf the "unreasonableness" found by Judge Nathan in *Wey* or any other suppression case mentioned in *Wey*. It is submitted that a full and public hearing to address the government's violation of the Fourth and Fifth Amendments would be in order to address the unreasonable search used against him in violation of federal law and the fundamental guarantees of the Constitution.

## VII. THE GOVERNMENT FAILED TO REVIEW OR RETURN THE PROPERTY TAKEN IN A TIMELY MANNER

Judge Nathan also criticizes the government for not returning any of the documents despite completion of the pertinence review shortly after the initial seizure and this is also a potential constitutional violation in and of itself:

> To date, however, essentially none of the originals have been returned to NYGG or the Weys, Hearing Tr. 335:4–11, despite the requests of counsel—a potential constitutional violation in and of itself. See, e.g., *United States v. Tamura*, 694 F.2d 591, 596–97 (9th Cir. 1982) ("We likewise doubt whether the Government's refusal to return the seized documents not described in the warrant was proper."); see also *Ganias*, 824 F.3d at 230 (Chin, J., dissenting) (in cases where offsite review was required because "potentially relevant documents [were] interspersed through a large number of boxes or file cabinets," generally "non-responsive documents were to be returned after the relevant items were identified").
>
> Perhaps more troubling than either the initial seizure or the continuing retention, however, are the efforts of the Government and its Hearing witnesses to leverage the inappropriately expansive terms of the Warrants into strained explanations of why these materials were in fact properly seized. See, e.g., Hearing Tr. 56:17–57:7, 58:24–59:5, 59:25– 60:7, 167:10–18, 304:24–305:3; Opp. at 40. Indeed, in maintaining, as discussed above, that children's school records, medical prescriptions, divorce records, and decade-old clippings from the sports section of the college newspaper among other things fell within the scope of the Warrants because they purportedly bore vague connections to the Weys' personal histories and finances, the Government and its agents leave the Court to find that much—perhaps even most—of the overseizure was not the result of expediency, mistake, or even simple negligence. To the contrary, it seems, this material was reviewed, and a conscious effort was made to deem patently unresponsive materials responsive to the Warrants. Its presence in the Search fruits thus suggests that the execution teams affirmatively wielded the nearly unfettered discretion afforded them by the Warrants' expansive terms to appropriate

documents that were perhaps of interest to some broader investigation of the Weys' lives and finances but that bore little or no discernible connection to the securities fraud probable cause showing actually submitted to the Magistrate Judge. See, e.g., Hearing Tr. 276:14–20 (Agent McGuire testifying that it was "very important" that the FBI gain a better of understanding through the Searches of the Wey family's "very complex" "financial arrangements"). Put another way, it appears to be, as much as anything else, a product of the intentional execution of what amounted to general warrants.

As the Court is well aware in this case, Mr. Carpenter believes that the "unreasonableness" of the searches and seizures in *Wey* pale in comparison to the armed commando raids and overseizures of 100 Grist Mill Road in this case. Moreover, if the delay in *Wey* was unconstitutionally unreasonable, then Mr. Carpenter respectfully asserts that the seven year delay in the IRS raid and the six year delay in the DOL Raid of 100 Grist Mill Road constitutes separate and distinct Fourth Amendment violations in and of themselves even assuming that the Warrants in this case were not constitutionally defective on their face. At this late date, there are still 39 boxes from the Raid of 2010 that have yet to be returned, and nothing has been returned from the unlawful Raid of 2011 that is still stalled by the government in Judge Bolden's Courtroom.

Mr. Carpenter wants to make it clear that Judge Nathan found six separate constitutional violations in *Wey,* which are all dramatically apparent in both unreasonable raids in this case. Therefore, if the Court were to conclude that individually each of these separate Fourth Amendment violations was not enough to require suppression of the evidence on its own, it must be said that cumulatively these **twelve separate constitutional violations** require that all of the evidence that was seized must be subject to suppression. At the very least, the Court should grant this Motion to Reconsider so as to hold a public hearing so that Mr. Carpenter can prove the constitutional violations contained in both raids. It is also of note that following Judge

Nathan's decision in *Wey*, the government voluntarily dropped all charges against Mr. Wey. *See* Government's *Nolle Prosequi* in *Wey* attached as Exhibit Six.

## VIII. THE GOVERNMENT'S FAILURE TO RETURN THE ELECTRONICALLY STORED INFORMATION IS COMPOUNDED BY THE GOVERNMENT'S CONTINUING SEARCHES OF THE DATA

In reading Judge Nathan's decision in *Wey* where she cites heavily to the Second Circuit's decisions in *Rosa, Galpin, Ganias,* and most recently *Ulbricht,* it becomes clear that perhaps the most disturbing aspect of the *Wey* case (not to mention **this** case) is that the government was still doing electronic searches of Wey's office computers long after the search was completed. As the Court knows very well, even during Mr. Carpenter's trial the government was doing electronic searches of the database six years after the raid of 2010. Of the 115 Exhibits mentioned in the Court's June 6, 2016 Opinion, more than 60 Exhibits are emails unlawfully seized in the unreasonable commando raids of 100 Grist Mill Road. The government most recently argued in July of 2017 to the Second Circuit that they still need to hold onto all of this material in case there is a new trial in the Carpenter case.

Significantly, and even seven years after the Raid of 2010, in 2017 the government in this case "mined" the unlawfully-seized electronic data unlawfully-seized to come up with the "Mactas emails" that prove that Mr. Carpenter did not commit any crime here because Bruce Mactas, the agent on the Sash Spencer case, stated that all of the STOLI questions on the application were answered correctly. This data-mining seven years after the original "unreasonable" search and seizure is a separate and distinct Fourth Amendment violation described above.

This is what Judge Nathan had to say about not just delaying the return of property in the *Wey* case, but the government's continuing search of electronically stored evidence years after the initial search and seizure:

> This case presents still another factor, outside of the Rosa quartet, for evaluation in determining the Government's level of culpability and, correspondingly, its susceptibility in this context to deterrence. And it is one worth emphasizing: belying any argument that it sought to limit execution of the Warrants according to the parameters of the applications, the Government evinced no hesitation to subject the electronic Search fruits to continuing and, at least to some extent, expanding searches as its investigation and charging theories developed over the months and years following the initial Searches and preceding Wey's indictment.
>
> Furthermore, the Government cites, and the Court is aware of, no authority suggesting that simply because it has retained all originally searchable electronic materials, the Government is permitted to return to the proverbial well months or years after the relevant Warrant has expired to make another sweep for relevant evidence, armed with newly refined search criteria and novel case theories.
>
> Perhaps most plainly problematic on this score are Agent Miller's 2015 searches which, as noted, covered all documents in the FBI databases, including those materials already sorted out as impertinent two years earlier. Clearly, as the defense urged at oral argument, additional physical searches in 2013 or 2015 of hard-copy documents judged irrelevant and left behind during the NYGG Search or the Apartment Search would have been presumptively impermissible—new search terms or not—in the absence of a fresh warrant. Cf. *Ganias*, 824 F.3d at 212–213 (recognizing that, though perhaps "imperfect," the analogy between searches of physical files and electronic files "has some force, particularly as seen from the perspective of the affected computer user," and "ha[s] some relevance" to the Fourth Amendment inquiry"). Indeed, the proper analogy to help appreciate the nature of the agents' conduct here is not the Government seizing, for example, a hard-copy notebook deemed responsive to a warrant, retaining it, and later returning to that notebook for follow-up searches as its investigation developed. Instead, Agent Miller's searches are akin to the Government seizing some hardcopy notebooks while leaving others it deemed unresponsive behind, and then returning to the premises two years later to seize the left-behind notebooks based on investigative developments but without seeking a new warrant.

Clearly the delays in this case are more egregious than the delays in *Wey* and the government has made it clear that they will continue to mine the 100 Grist Mill Road servers even though it is seven years after the initial raid of April 2010, and Mr. Carpenter's name was not even mentioned in the Synopsis of the Case for that raid.

## IX. EACH OF THE CONSTITUTIONAL VIOLATIONS IN THIS CASE REQUIRES THAT THE MOTION TO RECONSIDER BE GRANTED AND THAT THE MOTION TO SUPPRESS BE REVIEWED AND GRANTED

In her *Wey* opinion, Judge Nathan does a brilliant job in parsing *Rosa, Leon,* and *Herring* to determine that the "good faith" exception of *Leon* does not apply citing *Groh v. Ramirez,* 124 S.Ct. 1284 (2004) because the search warrant affidavits were not attached to the warrants in *Wey* as required by Second Circuit law. She goes on to state that none of the *Rosa* exceptions applied because just as in this case, different agents conducted the search and there were no expedient circumstances. Finally Judge Nathan does the balancing as required under *Herring* and finds that it is necessary to deter the government from this type of conduct in the future and the loss of the evidence is this case is well worth the cost.

Unlike in *Wey,* the Court knows that Mr. Carpenter filed several Rule 41(g) Motions for the return of property and two major *Bivens* actions that are still pending with the action against Agent Allen and other DOL Agents stayed pending this Court's final decision on the Motion to Suppress and the Motion for Reconsideration of the Court's June 6, 2016 decision. Therefore, Mr. Carpenter respectfully submits this Motion to Reconsider so the Court can review both the *Wey* decision and the Second Circuit's recent decision in *Ulbricht* that is referenced by Judge Nathan in *Wey* as to the constitutional defects in the unlawful search and seizure of 100 Grist Mill Road to aid the Court in reviewing its previous decisions. Respectfully, it is submitted that this case presents a number of separate and distinct constitutional violations from two unlawful raids, in violation of both binding precedents from the Second Circuit and the Supreme Court.

Accordingly it is respectfully moved that the Court reconsider its decision to deny Mr. Carpenter's Motion to Suppress in the interests of justice.

Wherefore, it is so moved.

**Respectfully submitted,**
Defendant, Daniel Carpenter

By______________________________

Richard Brown, Esq.
Brown Paindiris & Scott, LLP
100 Pearl Street, 2nd Floor
Hartford, CT 06103
Tel 860.522.3343
Fax 860.522.2490
Fed Bar No. ct00009
rbrown@bpslawyers.com

**ORAL ARGUMENT REQUESTED**

# EXHIBIT ONE

## BENJAMIN WEY <u>FORBES</u> ARTICLE

Forbes / Investing / #TheVerdict

JUN 19, 2017 @ 03:31 PM

# FBI Searches Of Benjamin Wey Ruled A 4th Amendment Violation

**Walter Pavlo,** CONTRIBUTOR
*I write, consult and lecture on white collar crime situations* FULL BIO

Opinions expressed by Forbes Contributors are their own.

If the government wishes to pursue its case against financier Benjamin Wey, it will have to do so without any of the evidence gathered during the FBI raids in January 2012 on Wey's business, New York Global Group Inc.(NYGG), and personal residence. On June 13, 2017, U.S. District Judge Alison Nathan delivered a blistering account of the raids calling them a violation of Wey's 4th Amendment rights.

Wey was indicted in September 2015 on securities fraud charges related to business dealings on NASDAQ traded companies. At the core of the government's case was that Wey had violated securities law by manipulating the trading activity of small-cap stocks he helped list on NASDAQ, something Wey had adamantly disputed since the beginning of the investigation. Wey was known on Wall Street for helping Chinese companies gain access to U.S. trading markets through a process known as a reverse merger. A reverse merger is a way for private companies to go public, typically through a simpler, shorter, and less expensive process. NYGG earned fees for putting these deals together but, as the government put it, "Wey was making way too much money to be accounted for by NYGG's advisory fees."



*Attorney David Siegal (left) with Benjamin Wey in Lower Manhattan* [-]

In January 2017, Wey was granted a hearing in the Southern District of NY to determine whether the government had improperly obtained evidence during the raids. Wey's attorney, David Siegal of Haynes and Boone, asked Judge Nathan to rule on whether the warrant was invalid because it was an un-particularized and over broad "General Warrant," something commonly conducted by the British in pre-Revolutionary America. In her decision, Judge Nathan stated that the warrants represented a "lack of particularity and overbreadth." She also took the opportunity to describe the chaos and apathetic approach government agents took in gathering the evidence.

First, according to testimony from former AUSA David Massey (now a white-collar attorney in private practice), the government wanted to search NYGG to obtain as much information as possible in the raid because it "needed to understand the entire business [NYGG] even if some part of the business was legitimate." So Massey and the FBI agents involved in the case thought that the best way to sort that out was to raid the office.

On the morning of January 25, 2012, Wey's office at 40 Wall Street was raided by twenty FBI agents who cordoned off NYGG's employees into a conference room while they went office to office grabbing files and taking information from computers. They gathered over 4,500 pages of documents and took (or copied data from) over 24 computers/cell phones, including Wey's. While there, one of NYGG's employees said that Wey's wife routinely kept the books and did some work from Wey's apartment. The FBI then sought a search warrant, just as broad as the NYGG warrant, for Wey's apartment.

While AUSA Massey and the FBI quickly put together a search warrant to present to a Magistrate judge for approval, they sent an agent to stand watch outside the Wey's apartment. At 4:30pm, seventeen FBI agents began searching Wey's home. According to the FBI agent who headed the search, the agents quickly gathered information during the raid out of a sense of urgency created by the FBI's "desire to not disrupt someone's life." As if a short raid of one's home is so much better than a prolonged one. Of special concern were the Wey's children who would soon be home from school. To accommodate this, the agents were instructed to search the children's playroom and bedrooms first so that they could be "segregated" from the rest of the search area.

That search resulted in over 4,000 documents being seized, including personal information like pharmaceutical prescriptions, medical information, the children's scholastic records, and numerous family photographs. AUSA Massey testified that such information would be within the scope of the search warrant because the Wey's children's medical prescription information would go to assessing the Wey's personal expenses and PSAT test scores of Wey's nephew could be used to assess where the child might be attending school in the future. In addition, twenty-five pieces of electronic equipment including cell phones were copied or seized. By 9:00pm, the search was completed.

So what has the government done with all of this information? Quite a bit, and that also is troubling. The FBI still has all of the articles recovered in the raid, no matter its relevance (irrelevance). The FBI estimates that it has over 18 terabytes of

information and nearly 9 months after the raid they were not even close to going through all of the data. Siegal said of cases like Wey's where there is a large amount of information that is analyzed over time, "We are in an age of Big Data and the government has not demonstrated that they can handle the issues that come with that."

Forbes / Investing / #TheVerdict

JUN 19, 2017 @ 03:31 PM

# FBI Searches Of Benjamin Wey Ruled A 4th Amendment Violation

**Walter Pavlo**, CONTRIBUTOR
*I write, consult and lecture on white collar crime situations* FULL BIO

Opinions expressed by Forbes Contributors are their own.

Continued from page 1

This is a particular problem when data from electronic equipment taken from a raid is analyzed over many months. During the 18 months after the raids, AUSA Massey devised theories as to Wey's alleged criminal activities and provided the FBI some guidance to help search the massive amounts of data. While there is nothing wrong with developing theories based on data seized, those theories should closely align with the material requested in the search warrant. With such a broad search, especially with terabytes of digital information, the government had the ability to search through nearly every aspect of Wey's business and personal life looking at various theories on which to charge him criminally. By September 2013, 20 months after the raid, most of the analysis of the seized information was completed. Two years after that, Wey was indicted.

The search warrant process is supposed to be very transparent and easy to follow. First, the government must suspect that there is some criminal activity in a certain location where they want to get permission to search. Next, the government must describe the place to be searched and, lastly, provide some specific information that the agents are searching for. The Feds then put all this together and present it to a Magistrate Judge for approval. In this case, Judge Nathan wrote that both warrant applications fell short of providing the Magistrate Judge "with sufficient probable cause to believe that Wey's entire business operation was a scam." The scope of the search and the length of time it has taken to go through the data, particularly the electronic data that contains an enormous amount of personal information, was also troubling to Judge Nathan.

What was more troubling to Judge Nathan was the seemingly scripted testimony in the January hearing of the FBI agent tasked with supervising the raid and that of AUSA Massey. Of the FBI agent's testimony at the hearing, Judge Nathan described the testimony as "evincing thorough preparation ... and a keen sensitivity to the legal

issues in play ..." Of a part of AUSA Massey's testimony, she wrote that it contained "assertions that the Court found too rehearsed to be persuasive." *Truth* is a hard thing to manufacture.

Wey's criminal trial is currently scheduled for October 2nd of this year, however, the government is going to have to come up with some new evidence to support its case. Siegal, himself a former Assistant US Attorney in the Southern District, said he is still preparing for trial but added, "In order for a case to be prosecuted, there has to be evidence."

Judge Nathan's 92-page Opinion and Order should be used as a training class in Quantico for how NOT to conduct a raid. It should also be a case study on why we have the 4th Amendment. As a reminder, here are the protections it offers:

> "
> *The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause supported by Oath or affirmation, and particularly describing the place to be searched and the person or things to be seized.*

This is not a case about white collar crime, but about how our freedom is protected from overreaching government searches. If it happened to a wealthy Wall Street investor who could afford the lawyers to fight, how often is it happening to so many others? One can only hope that it's not many. There is always hope.

When Walt is not writing on white collar crime, he works with experts who present on it. Check out 500 Pearl Street Speakers or contact him at walt.pavlo@500pearlstreet.com.

# EXHIBIT TWO

## 2010 SEARCH WARRANT

United States District Court

________________ DISTRICT OF CONNECTICUT

In the Matter of the Search of
(Name, address or Brief description of person, property or premises to be searched)

The office of NOVA BENEFIT PLANS LLC, also known as BENISTAR, located at 100 Grist Mill Road, Simsbury, Connecticut.

SEARCH WARRANT

CASE NUMBER:

To: Shaun Schrader, IRS-CID and any Authorized Officer of the United States

Affidavit(s) having been made before me by Special Agent Shaun Schrader who has reason to believe that on the person of or x on the property or premises known as (name, description and/or location)

The office of NOVA BENEFIT PLANS LLC, also known as BENISTAR, located at 100 Grist Mill Road, Simsbury, Connecticut, 06070. The property is described as a single story office building. The lower portion of the building consists of red brick and windows, while the upper portion of the building consists of horizontal gray siding. The property is accessed by a short driveway off of Grist Mill Road. At the bottom of the driveway is a red brick structure with a sign attached to it that says "100 GRIST MILL RD." At the top of the driveway, as you approach the parking lot, is a wooden sign that reads "DIRECTORY, ENTRANCE 1, BENISTAR." There is no signage on the exterior of the building itself.

in the ________________ District of CONNECTICUT there is now concealed a certain person or property, namely (describe the person or property to be seized)

*See* Attachment B.

I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the person or property so described is now concealed on the person or premises above-described and establish grounds for the issuance of this warrant.

YOU ARE HEREBY COMMANDED to search on or before April 25, 2010

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant and making the search (in the daytime - 6:00 A.M. to 10:00 P.M.) (~~at any time in the day or night as I find reasonable cause has been established~~) and if the person or property be found there to seize same, leaving copy of this warrant and receipt for the person or property taken, and prepare a written inventory of the person or property seized and promptly return this warrant to THOMAS P. SMITH, UNITED STATES MAGISTRATE JUDGE as required by law.

April 16, 2010 at 1:05 p.m.
Date and Time Issued

at HARTFORD, CONNECTICUT
City and State

THOMAS P. SMITH
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer

[signature]
Signature of Judicial Officer

# EXHIBIT THREE

## 2011 SEARCH WARRANT

11-92M-01 (JGM)

AO 93 (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the
District of Connecticut

COPY

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

The entirety of the premises located at 100 Grist Mill Road in Simsbury, Connecticut, and more particularly described in Attachment B

Case No.

## SEARCH AND SEIZURE WARRANT

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the ____________ District of Connecticut
*(identify the person or describe the property to be searched and give its location)*:
The entirety of the premises located at 100 Grist Mill Road in Simsbury, Connecticut, and more particularly described in Attachment B

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:
See Attachment D

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before 6/4/11 *(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10 p.m. ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge Joan G. Margolis
*(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐ for ______ days *(not to exceed 30)*.
☐ until, the facts justifying, the later specific date of ____________.

Date and time issued: 5/25/11, 12:43 p

*Judge's signature*

City and state: New Haven, CT

Joan G. Margolis
*Printed name and title*

# EXHIBIT FOUR

## CHIEF COUNSEL MEMORANDUM

Office of Chief Counsel
Internal Revenue Service

# memorandum

CC:CT-112064-04
EEBoody/MENeedle

MAR 1 9 2004

date: March 19, 2004

to: Chief, Criminal Investigation

from: Edward F. Cronin, Division Counsel/Associate Chief Counsel (Criminal Tax)

---

subject: *Groh v. Ramirez* (*Ramirez*)—Supreme Court Holds Flawed Search Warrant Invalid.

In *Groh v. Ramirez*, 124 S. Ct. 1284 (February 24, 2004) (copy attached), the U.S. Supreme Court held by a 7 to 2 majority that a search warrant that failed to describe the persons or things to be seized was invalid on its face, notwithstanding that the requisite particularized description was provided in the unincorporated search warrant application. By a slim 5 to 4 majority, the Court also ruled that the federal agent who had prepared the search warrant and supervised its execution was not entitled to qualified immunity from liability. This decision, along with the Ninth Circuit's recent decision in *United States v. Bridges*, 344 F.3d 1010 (9th Cir. 2003) (copy attached), clearly highlight the need for a warrant to contain on its face sufficient information to instruct both the executing officer as well as the occupant of the place to be searched of the nature of the alleged violation(s) and a description of the items to be seized. Accordingly, increased attention must be paid to the actual search warrant to ensure that there are no deficiencies in the document.

## BACKGROUND

**Procedure:**

Rule 41 of the Federal Rules of Criminal Procedure sets forth the procedures for obtaining a search warrant. Pursuant to Rule 41(d), a search warrant application is submitted to a magistrate judge along with an affidavit establishing probable cause to search for and seize property which evidences a crime. After finding probable cause, a magistrate judge will issue the actual court order authorizing the search (the warrant). Rule 41(e)(1). Rule 41(e)(2) further provides that the warrant must identify the property to be searched as well as the items to be seized. Thus, the warrant must instruct the executing officer where to go, why they are there (what crimes have been commited),

and what to look for. According to Rule 41(f)(3), the executing officer must also provide the occupant of the property with a copy of the warrant which describes the place to be searched, the alleged violations, and the items to be seized. One way to accomplish this is to include the information in an affidavit which is incorporated by reference and attached to the warrant. Affidavits which are sealed and not given to the occupant can not be considered in determining whether the requirements of Rule 41 have been satisfied.

## ***Groh v. Ramirez***

**Facts:**

Based on information received from a "concerned citizen," Groh, a veteran Bureau of Alcohol, Tobacco, and Firearms special agent, submitted an application for a warrant to search the Ramirez's large ranch in Montana. Although both the application and Groh's supporting affidavit stated that the search was for specified weapons, explosives, and records, the section of the warrant form calling for the description of the "person or property" to be seized, mistakenly contained a description of Ramirez's ranch house rather than the items of contraband being sought. Moreover, the warrant did not incorporate by reference the application's itemized list. Nevertheless, a U.S. Magistrate Judge signed the warrant form prepared by Groh, even though it failed to identify the items that Groh intended to seize.

The next day, Groh led a group of federal agents and county law enforcement officials to Ramirez's ranch to execute the search warrant. Mrs. Ramirez, but not Mr. Ramirez, was present during the search. No illegal weapons or explosives were discovered during the search. Groh left a copy of the warrant, but not the application with Mrs. Ramirez. Groh asserts that he orally described the objects of the search to Mrs. Ramirez in person, and to Mr. Ramirez by telephone. Mrs. Ramirez, however, disputes this assertion, claiming that Groh "explained only that he was searching for 'an explosive device in a box.'" The officers conducting the search acted professionally, exercising restraint in limiting the scope of the search to that indicated in the application. There is no evidence that suggests Groh acted maliciously, or that even his failure to include on the warrant form a list of the contraband that was being sought was anything other than a clerical oversight that was inadvertently made.

Ramirez filed a civil lawsuit against Groh and others in a *Bivens* action under 42 U.S.C. § 1983, claiming *inter alia*, a violation of his Fourth Amendment rights. The district court granted Groh and the other civil defendants summary judgment, finding no Fourth Amendment violation, and finding that even if such a violation occurred, all of the defendants were entitled to qualified immunity. The Ninth Circuit affirmed the district

court's ruling, except as to the Fourth Amendment claim against Groh, ruling that the warrant was invalid and that Groh was not entitled to qualified immunity because he was the leader of the search party.

**Holding:**

A 7 to 2 majority on the Supreme Court held that Ramirez's constitutional rights were violated because the search warrant was plainly invalid because it did not adequately describe the persons or things to be seized. The Court observed that "[i]t is incumbent on the officer executing a search warrant to ensure the search is lawfully authorized and lawfully conducted. Because [Groh] did not have in his possession a warrant particularly describing the things he intended to seize, proceeding with the search was clearly 'unreasonable' under the Fourth Amendment." Thus, the Court held the search to be unlawful despite clear probable cause and an adequate description contained in both the sealed affidavit and the unincorporated application.

By a 5 to 4 vote, the Supreme Court narrowly held that Groh, the affiant on the search warrant and the leader of the search party, acted unreasonably in carrying out a search with a fatally flawed warrant, and thus was not entitled to qualified immunity. Two dissents opined that Groh's actions were objectively reasonable under the circumstances and that he should be entitled to qualified immunity like the other agents and officers that participated in the search. Noteworthy *dicta* includes criticism of warrants that merely recite as items to be seized "fruits and instrumentalities" of a particular crime, noting that such warrants are considered invalid general searches under the Fourth Amendment.

***United States v. Bridges***

**Facts:**

Bridges, through his tax consulting business, ATC, advised clients to proclaim themselves non-resident aliens to avoid payment of Federal income taxes. From 1997 through 2000, ATC filed more than 100 claims with the IRS requesting tax refunds on behalf of its "non-resident alien" clients. After a successful undercover operation, a search warrant application was submitted and approved by a magistrate. The warrant, however, did not describe or allege the fraudulent activities that ATC and Bridges were suspected of committing. The closest the search warrant came to any allegation of criminal conduct was its reference to the affidavit. The affidavit, meanwhile, was neither incorporated by reference nor physically attached to the warrant. In fact, it was sealed. The attached list of items to be seized included a comprehensive laundry list of items one would expect to find in any small to medium sized business and included the following wording "including but not limited to."

IRS Special Agents executed the search warrant on ATC's offices in January 2000. The agents seized ATC's computer system, client files, tax codes, correspondence from ATC's clients, ATC's seminar video tapes, and other business documents and equipment found on the premises. In April 2001, Bridges was convicted of, *inter alia*, filing false claims for refund and attempting to interfere with the administration of tax laws, based on evidence seized pursuant to the search warrant. Bridges appealed his conviction, arguing the search and seizure violated the Fourth Amendment because the warrant was defective and overbroad.

**Holding:**

Although the Ninth Circuit found the application for the search warrant was supported by the affidavit and was more than sufficient to demonstrate probable cause, it found the scope of the warrant itself overly broad and tantamount to a general warrant, since the affidavit was neither attached to the warrant nor incorporated by reference. The Ninth Circuit reviewed the Supreme Court's interpretation of the Fourth Amendment's particularity requirement as well as its prior decisions over the past twenty years and noted the purpose of the requirement is to ensure targets of search warrants are able to ascertain what crimes are alleged to have been committed and what corresponding items are authorized for seizure. Here, the warrant itself failed to allege any specific violations being investigated even though the agent's affidavit included sufficient detail. The court noted a warrant may be construed by reference to the affidavit only if the affidavit accompanies the warrant and if the warrant incorporates it by reference, neither of which applied here.

The court also criticized language in the list of items to be seized attached to the warrant, finding the verbiage "including, but not limited to" overly broad, since the effect was unclear what exactly the agents were expected to seize. It was also not enough for the district court to find the business permeated with fraud since the agent's affidavit did not clearly state the business was entirely fraudulent and there was no evidence the government thought the business was permeated with fraud when making its application.

**ANALYSIS**

Following the decisions in *Bridges* and *Ramirez*, it is clear courts will hold search warrants to a high standard. They will ensure that the warrant serves as a guide to the executing officer and gives fair notice to the occupant(s) of the premises to be searched of the reasons supporting the search (i.e., the alleged violations) and the items sought. The warrant, therefore, must be complete and specific on its face. An executing officer must be able to ascertain where they are going and what they intend to take from the

warrant itself. Details contained in the search warrant application or affidavit that are not attached or incorporated by reference, will not be considered. Similarly, affidavits that are sealed will not be considered.

Moreover, the holding in *Ramirez* reinforces the vulnerability of CI special agents should there be errors in the drafting of a search warrant. The Supreme Court in *Ramirez* noted that the executing officer could not rely on the fact a magistrate had approved the warrant to avoid liability.

## CONCLUSION

The holdings in *Ramirez* and *Bridges* reinforce the need for the actual warrant to be complete on its face. Agents must be mindful of the particular requirements when preparing their search warrant applications. Much effort goes into the creation of the agent's affidavit; however, the actual warrant must not be overlooked. We would encourage you to have your agents submit to CT attorneys for review the actual warrant in addition to their affidavit and Enforcement Action Review Form.

As a related matter, it is our understanding that the search warrant template on CI's Document Manager (copy attached) does not clearly instruct agents to include a list of potential violations on the face of the search warrant.

If we can be of further assistance to you regarding this matter, please feel free to contact me or Martin Needle of the Criminal Tax Division at (202) 622-4470.

Attachment: As Stated

# EXHIBIT FIVE

## SYNOPSIS OF THE CASE

Synopsis of the Case

NOVA Benefit Plans is a company located in Simsbury, CT. Per its brochure, the company offers comprehensive welfare benefit plans -- with plans offering single or multiple benefits, ranging from sickness & accident to long term care and life coverage.

NOVA Benefit Plans was incorporated in 2004 in the state of Delaware. Numerous companies related to NOVA have also been identified, including Benistar, Benefit Plan Advisors, and US Benefits Group. It is believed that all of the companies are run by the same individuals and that the head of these companies is Wayne Bursey.

419 Plans, or Welfare Benefit Plans, are non-qualified plans which businesses can establish to compensate employees in the event of situations such as sickness, disability, and/or disfigurement. Due to the fact that the plans are non-qualified, as opposed to a qualified plan like a 401K, there are no funding limits for the Plan and employers do not have to fund the plan for all employees. Employers can be selective and fund the Plan for as few as one or two employees. Money that is contributed to the plans can be written off by the business as an expense in the year that the contribution is made. NOVA Plans sells its 419 Plans as "10 or more employer plans", meaning that purportedly at least 10 employers contribute to the same plan which is then considered a single plan. If an employer is invested in a 10 or more employer plan, the IRS allows the business to expense an unlimited contribution amount.

The funding of a 419 plan works as follows:

- A business signs up for the 419 Plan and sends a contribution to a trust administered by NOVA.
- The business then claims an expense for the full amount of the contribution.
- The trust, for its part, purchases an annuity or life insurance policy from an insurance company with the covered employee as the beneficiary.

If the plan is administered properly, beneficiaries of the 419 Plans are only able to receive a distribution by filing a valid claim for a sickness, disability, or disfigurement. Per IRS regulations, if a valid claim is approved, the beneficiary receives a distribution from the plan, usually tax free.

Information received from a reliable cooperating witness (CW), indicates that NOVA Benefit Plans is promoting and administering abusive 419 Plans. The CW is an independent broker who sold NOVA 419 Plans to numerous clients in the Milwaukee, WI area. The CW has been selling 419 and 412i Plans through NOVA and their predecessor Benistar since 2002. The CW said that 412i plans were similar to 419 plans; however in 2005, IRS rules changed and 412i plans became less attractive compared to 419 Plans. The CW provided information on 14 clients who he assisted in setting up NOVA and/or Benistar 419 Plans. The 14 Plans had contributions totaling well over $8 million.

Per the CW, NOVA knowingly administers their 419 Plans in a way that allows clients to use the plans as abusive tax shelters. The CW explained that he sold the 419 Plans to his clients as a disability plan with the option to get money out of the plan tax free. NOVA is allowing beneficiaries to abuse the Plans in at least two ways:

- First, per the CW, NOVA approves just about any claim that is filed by a beneficiary no matter how frivolous. For example, one of the CW's clients filed a claim for having a mole removed that left a small scar. NOVA approved the claim and is currently paying out the full contribution amount, less fees, over 60 months. The CW has had conversations with Wayne Bursey where Bursey said that if a beneficiary wants to get money out of the plan, NOVA encourages them to file a claim because they have made it so easy for a claim to be approved.

- Secondly, NOVA allows businesses to terminate their 419 Plans. If a business terminates the plan, NOVA gives the beneficiary the option of purchasing the Plan for 10% of its cash value. Once the beneficiary buys out the plan, they receive a 1099 from the insurance company that held the annuity. The 1099 will reflect the basis of the original purchase amount; however that is not the proper basis for the beneficiary. The beneficiary should have no basis in the annuity since the business, not the beneficiary, made the contribution. Due to the incorrect basis, the taxpayer is told that they owe little or no taxes. The CW said that NOVA knows that 1099's issued to the beneficiary by the insurance company are incorrect.

Of the 14 plans set up by the CW, eight plans, totaling well over $4 million in contributions, have been terminated and cashed out. In addition, multiple claims totaling approximately $1 million have been approved.

Due to the ease of getting money out of the plans virtually tax free, by filing a claim or terminating, the plans are being sold as abusive tax shelters.

The fact that NOVA's 419 Plans qualify for the 10 or more employer exemption is also in question. In a 10 or more employer plan, the contributions of all of the employers are supposed to be pooled together and accounted for as one plan. However, NOVA appears to be treating each employer separately. For example, NOVA purchases an annuity for each individual beneficiary. If the beneficiary files a claim or terminates the plan they are only entitled to what they contributed.

This investigation utilized a Three Contact Operation and also a Group II Undercover Operation. The undercover contacts confirmed the CW's allegations regarding NOVA. The end result of the abusive 419 plans is that individuals are able to circumvent IRS regulations and obtain money from businesses that they have an interest in virtually tax free. By using a 419A(f)(6) plan, a business can contribute money, which is deductible as a business expense, to the plan on behalf of a covered employee. Then, with the assistance of NOVA, at a later date the covered employee is able to obtain the money contributed to the plan tax free either through a ginned-up disability (disability payments are generally not includable in income under Section 104 of the Internal Revenue Code) or through a misstated basis when the 419A(f)(6) plan is terminated. In essence, NOVA is providing a blue print, and the means, for business owners and individuals to underpay their taxes.

A) Significance Evaluation

Per contacts with Neumann, NOVA has thousands of clients and over a billion dollars invested for those clients. The CW provided information that he alone has 14 clients who have invested over $8 million in the 419 Plans. Due to the statements of Neumann and the information provided by the CW, the tax loss associated with NOVA's clients is anticipated to be very significant.

SB/SE has identified some 419 Plans as Abusive Tax Avoidance Transactions. Per their website, promoters are offering plans that purport to provide employee pre-retirement or post-retirement benefits, such as death, medical, dental, life insurance, disability and severance pay. Promoters claim that employer contributions to these plans are tax-deductible when paid, relying on the use of single employer plans under IRC Section 419(e), the 10 or more employer exception in IRC Section 419A(f)(6) or the Bargaining Agreement exception in IRC 419A(f)(5). Arrangements providing welfare benefits may have tax consequences different than what the promoter claims. Depending on the facts and circumstances, a particular arrangement could instead be providing dividends to the owners of a business that are includible in the owners' income and not deductible by the business. The arrangement could also be subject to the split dollar regulations or be a nonqualified deferred compensation plan.

LMSB has an open Promoter Case, or "6700 Investigation", on Wayne Bursey and NOVA. Currently, the case is stalled due to the fact that Bursey has not complied with a summons issued for his testimony. LMSB is currently pursuing summons enforcement activities in order to force Bursey to comply. LMSB believes that the summons enforcement process could take several months.

Pursuant to an ongoing project, LMSB is currently disallowing NOVA 419 Plan contributions for companies that expense the contributions. The contributions may also be includable as income on the personal tax returns of beneficiaries in the year that the contributions are made.

The LMSB case on NOVA is related to an earlier investigation of a company by the name of Benistar. NOVA was created by the operators of Benistar. The CW believes that NOVA may have been created because the IRS was having issues with Benistar's 419 Plans.

B) Intrusiveness Evaluation

It is unlikely that records, including customer lists, pertinent to the investigation would be obtained through the use of a subpoena. LMSB currently has an open 6700 investigation on NOVA and Wayne Bursey. The case is stalled due to the fact that NOVA and Wayne Bursey have not complied with an IRS summons for documents and testimony. Due to the noncompliance with the summons, it is anticipated that a subpoena would garner the same result. Further, based on the investigation to date, it appears that NOVA makes a living out of impeding the IRS. Therefore, NOVA's cooperation with a criminal investigation is highly unlikely.

# EXHIBIT SIX

## GOVERNMENT *NOLLE PROSEQUI* IN *UNITED STATES V. WEY*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA :

-v.- : NOLLE PROSEQUI

BENJAMIN WEY, : 15 Cr. 611 (AJN)
a/k/a "Benjamin Wei,"
a/k/a "Tianbing Wei," and :
SEREF DOGAN ERBEK,
a/k/a "Dogan Erbek," :

Defendants. :

- - - - - - - - - - - - - - - - - - x

1. The filing of this nolle prosequi will dispose of this case against BENJAMIN WEY, a/k/a "Benjamin Wei," a/k/a "Tianbing Wei," the defendant.

2. On September 8, 2015, Indictment 15 Cr. 611 (AJN) was filed, which charged that BENJAMIN WEY, a/k/a "Benjamin Wei," a/k/a "Tianbing Wei," and SEREF DOGAN ERBEK, a/k/a "Dogan Erbek," the defendants, conspired to commit securities fraud and wire fraud, in violation of Title 18, United States Code, Section 371 (Count One); committed securities fraud in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2(Count Two); committed securities fraud in violation of Title 18, United States Code, Sections 1348 and 2 (Count Three); committed wire fraud, in

violation of Title 18, United States Code, Sections 1343 and 2 (Count Four); failed to disclose to the Securities and Exchange Commission (the "SEC") ownership in excess of five percent of certain stocks, in violation of Title 15, United States Code, Sections 78m(d) and 78ff, Title 17, Code of Federal Regulations, Sections 240.13d-1, and Title 18, United States Code, Section 2 (Counts Five and Six); and money laundering, in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2 (Counts Seven and Eight).

3. On June 13, 2017, the Court granted a motion, filed by BENJAMIN WEY, a/k/a "Benjamin Wei," a/k/a "Tianbing Wei," the defendant, to suppress evidence seized during a search of WEY's apartment and the New York offices of New York Global Group, Inc.

4. The Government sought charges in this matter based in significant part on materials seized during those searches. Because the Government can no longer rely on that evidence at trial against BENJAMIN WEY, a/k/a "Benjamin Wei," a/k/a "Tianbing Wei," the defendant, the Government has decided to dismiss the charges pending against Wey.

5. Accordingly, the Government recommends that an order of nolle prosequi be filed as to BENJAMIN WEY, a/k/a "Benjamin Wei," a/k/a "Tianbing Wei," the defendant, in the above-captioned matter.

Brooke E. Cucinella

BROOKE E. CUCINELLA
BRENDAN QUIGLEY
P. IAN McGinley
Assistant United States Attorneys
Tel.: (212) 637-2477/2190/2257

Dated: New York, New York
August 8, 2017

Case 1:15-cr-00611-AJN Document 128 Filed 08/08/17 Page 4 of 4

Upon the foregoing recommendation, I hereby direct, with leave of the Court, that an order of nolle prosequi be filed as to BENJAMIN WEY, a/k/a "Benjamin Wei," a/k/a "Tianbing Wei," the defendant, with respect to Indictment 15 Cr. 611 (AJN).

JOON H. KIM
Acting United States Attorney
Southern District of New York

Dated: New York, New York
August 8, 2017

SO ORDERED:

HONORABLE ALISON J. NATHAN
United States District Judge
Southern District of New York

Dated: New York, New York
August 8, 2017

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: AUG 0 8 2017

**CERTIFICATION**

This is to certify that on November 13, 2017, a copy of the foregoing Motion was served by email to all parties by operation of the Court's electronic filing system or by email on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

A.U.S.A. David Novick
Office of U.S. Attorney
157 Church Street, 25th Floor
New Haven, CT 06510

A.U.S.A. Neeraj Patel
Office of U.S. Attorney
157 Church Street, 25th Floor
New Haven, CT 06510

Richard Brown, Esq.
Brown Paindiris & Scott, LLP
100 Pearl Street, 2nd Floor
Hartford, CT 06103
Tel 860.522.3343
Fax 860.522.2490
Fed Bar No. ct00009