# EXHIBIT
# SIX

**Cherneski *Jencks* Statement**



### DEPARTMENT OF THE TREASURY
### Internal Revenue Service
### Criminal Investigation

## Memorandum of Interview

| | | | |
|---|---|---|---|
| Investigation #: | 1000230004 | Location: | NOVA/Benistar |
| Investigation Name: | Guy Neumann | | 100 Grist Mill Road |
| Date: | April 20, 2010 | | Simsbury, CT  06070 |
| Time: | ~9:05 - 11:10 am | | |
| Participant(s): | Stephen Cherneski, Witness | | |
| | Jeffrey A. Hencke, Special Agent | | |
| | Crystal Brinson, Special Agent | | |

On the above date and approximate time, Special Agent Crystal Brinson and I met with Stephen Cherneski at the above stated location. We identified ourselves to Cherneski and I explained to him that we were assisting the United States Attorney's Office located in the Eastern District of Wisconsin with a Grand Jury investigation and wanted to ask him some questions. Cherneski agreed to answer our questions, however, at one point during the interview Cherneski asked if he was required to answer the questions. I explained to Cherneski that he was not required to answer the questions and could choose not to answer some questions or stop the interview at any point. In response to our questions, Cherneski provided the following information.

1. Cherneski currently resides at 6-C Talcott Forrest Road, Farmington, CT. His cell phone number is ▮▮▮▮▮. Cherneski received a bachelor's degree in economics with a minor in finance from Central Connecticut State. Cherneski was previously a professional hockey player.

2. Cherneski described his role for NOVA Benefit Plans/Benistar as providing technical and educational support for employers and advisors. Cherneski currently receives his paycheck from Benistar Admin Services and has been working for Benistar Admin Services since February, 2005. Cherneski believes that all employees located at 100 Grist Mill Road, Simsbury, CT receive their paycheck from Benistar Admin Services even though there are various businesses being operated out of the building. Cherneski is paid $60,000 per year plus bonuses. Cherneski became employed by Benistar Admin Services because of his friendship with Guy Neumann.

3. Cherneski had no prior knowledge or experience with 419 welfare benefit plans prior to his employment for Benistar Admin Services and his work for NOVA/Benistar. Cherneski learned about 419 welfare benefit plans through on the job training and read various books and tax law to educate himself to do his

job. Cherneski reports to Guy Neumann and Wayne Bursey. No person reports to Cherneski.

4. US Benefits Group is a business that provides information on various employee plans to a network of brokers. US Benefits Group does not administer welfare benefit plans. Cherneski stated that US Benefits Group is run by a collection of people and no one person. Cherneski stated that many individuals work for various companies operating out of the building at 100 Grist Mill Road, Simsbury, CT. Cherneski believes that US Benefits Group was started prior to his employment.

5. Benistar is a 3rd party administer of various retirement plans. Benistar was started prior to Cherneski's employment. Molly Carpenter is the chair person of Benistar. Cherneski stated that he does not deal with Benistar plans and is not familiar with its' plans.

6. Benefit Plan Advisors previously administered 419(e) welfare benefit plans, including the Grist Mill Trust. Cherneski stated that as of January 1, 2010, all 419 plans are administered by NOVA Benefit Plans. (NOVA)

7. NOVA currently administers all 419 welfare benefit plans. Prior to 1/1/2010, NOVA only administered NOVA 419A(f)(6) plans. NOVA was started prior to Cherneski's employment. NOVA is operated through a board containing Cherneski, Guy Neumann, Wayne Bursey, Dan Carpenter, Molly Carpenter, and Kathy Kehoe. NOVA administers its 419A(f)(6) plans through four (4) trusts. These trusts are SADI, LTC, Life 1, and Life 5.

8. A 419A(f)(6) welfare benefit plan is a plan containing 10 or more employers. In a 419A(f)(6) plan, the employer can deduct the amount of the contribution as a business expense, with no limitation.

9. In a NOVA 419A(f)(6) welfare benefit plan, a company/employer contributes money for the benefit of one or more employees (covered employee) of that company. In the plan, a trust (i.e. SADI) is the owner and beneficiary of the policy. The covered employee than designates a beneficiary for the plan. The trust then purchases an annuity or life insurance policy with the proceeds contributed to the trust by the employer. The trust does keep 5% of the amount contributed and the employer is required to pay an additional $1,500 enrollment fee to NOVA. The initial contribution by the company/employer is given to the trust (i.e. SADI). The trust would then deposit the check and write a separate check to the appropriate insurance company in which the trust has purchased the annuity and life insurance from.

10. Beneficiaries in 419A(f)(6) plans administered by NOVA received benefits from the plan through either a qualifying event or death. The death benefit for the 419A(f)(6) plans is discussed in the plan documents, but is usually the value of the annuity or life insurance. A qualifying event is a permanent disability or disfigurement to the covered employee. An employer can also terminate the

plan. If the employer terminates the plan, the policy becomes an asset of the trust and the employer never receives any contributed money back. The covered employee can continue in the plan by purchasing the plan from the trust for the fair market value (FMV) of the annuity or life insurance policy purchased with the amount originally contributed by the employer. Revenue Procedure 2002-26 defines how the FMV of a life insurance policy is valued. The trust will also make a loan arrangement with the covered employee to assist the covered employee in purchasing the plan. In this loan arrangement, the covered employee is required to pay three years of interest up front. If NOVA loans money for the covered employee to purchase the plan, NOVA puts a collateral assignment on the policy. Collateral assignments are placed on both annuities and life insurance policies. Cherneski stated that he does not know much about the loan documents.

11. If the employer terminates the plan and the covered employee does not choose to continue in the plan, the money contributed by the employer is forfeited. Cherneski believes that money has been forfeited in the past but can not cite specific examples.

12. If an annuity is purchased with the employer contribution and there is a qualifying event, the covered employee receives money based upon a created formula. This money is paid out over 60 months after a one year waiting period. The formula is based upon the amount of the contribution and the amount of time in the plan. Cherneski stated that the covered employee can receive more money than what was initially contributed. Cherneski stated that the list of what qualifies as a disability of disfigurement is written in the plan documents, but does not know what the plans rely on for their definition of disability or disfigurement.

13. If a covered employee wishes to make a disability or disfigurement claim, the covered employee submits a claim form along with documents to the employer and a doctor. Wayne Bursey, the trustee, makes the decision to either accept or not accept the claim. Cherneski does not know if there have been any claims denied.

14. Cherneski stated the money contributed by employers into NOVA plans are comingled into trust accounts. (i.e. SADI) Cherneski stated that he does not deal with the accounting side of the client funds.

15. Cherneski is not familiar with the covered employee being able to pay 10% of the FMV of an annuity policy and obtain the proceeds of the annuity. (10% buy-out) Cherneski believes that 10% buyouts were allowed in prior to his employment, but a 100% buy-out has been required since Cherneski began his employment. Cherneski stated when he talks to clients, he advises them to never buy-out of the plans, however the plan documents do state the covered employee can pay 100% of the FMV to purchase the plan. Cherneski does not know of any employee of NOVA/Benistar that is allowing a 10% buy-out.

16. I explained to Cherneski that I believed that 10% buy-outs were still happening in the last few years. Cherneski stated that he is close to 100% sure that there are no 10% buy-outs. Cherneski again stated that he did not promote 10% buy-outs and has not heard of 10% buy-outs in the last 3 or 4 years. Cherneski stated that clients may ask about a 10% buy-out, however Cherneski would tell the client that there is only 100% buy-outs.

17. I explained to Cherneski that lying to a federal agent is a crime. Cherneski stated that he understood.

18. Cherneski stated that he does not believe that the NOVA 419 plans can be abused because the covered employee is required to pay 100% of the fair market value of the policy. Cherneski stated that he does not know of any way plans can be used as abusive tax shelters.

19. I showed Cherneski a document titled, "Sickness Accident Disability Indemnity Plan & Trust." (Attachments 1 - 24)  Cherneski stated that the document describes the SADI plan, however the document shown to him is an old version. The new version would show a revision date on the cover page.

20. I showed Cherneski a copy of a letter dated April 18, 2005 to NOVA Benefit Plans, LLC from John Reid of Edwards & Angell LLP.  (Attachments 25 - 38)  Cherneski stated he is familiar with the letter, but does not give the letter to clients unless the client requests it.  Cherneski has never met John Reid.

21. Cherneski is not aware of the insurance companies from whom they purchase annuities or life insurance contract having had concerns with the collateral assignments and any Forms 1099 to be issued by them.

22. Cherneski is aware that Benistar 419 Plan and Trust is in a dispute with the IRS and the dispute is being resolved through the courts.  The Benistar 419 Plan & Trust is a pre-2003 plan.

23. Cherneski stated that the SADI plan is not a listed transaction.  Cherneski stated there is a document that explains why NOVA plans are not listed transactions.  I then showed Cherneski a document title "NOVA Benefit Plans LLC and "Why we not a Tax Shelter..."  (Attachments 39 - 55)  Cherneski stated this document explains why NOVA plans are not listed transactions. Cherneski does not know who prepared the document, however the document I showed to him is an old version.  The new document does not contain the statement in the third paragraph about being audited if one files a Form 8886.

24. The difference between Grist Mill trust and the NOVA plans is in the timing of the deduction.  In the Grist Mill Trust, the employer is able to only deduct qualifying costs.  Also, in the Grist Mill Trust, the trust files Forms 8886 for clients even though it may not be required.  The Forms 8886 are filed as a precaution.

IRS00224

25. Other individuals that do the same type of work as Cherneski, include Guy Neumann, Rich Belding and Ron Lanza.

26. Neumann and Belding provide technical and education support for employers and advisors. Neumann also runs a life insurance business call Rex Insurance, Cherneski is not involved in Rex Insurance

27. Wayne Bursey is the trustee for all of the 419 plans. Bursey works full time at the offices locate at 100 Grist Mill Road, Simsbury, CT.

28. Kevin Slattery does not know much about 419 plans. Slattery handles much of the administrative stuff involving benefits.

29. Dan Carpenter is a consultant and outside counsel for all of the businesses. Carpenter also operates a business named ARIA.

30. Molly Carpenter is the Chairman of Benistar Admin Services, Inc. (BASI) Molly runs the day to day operations of the various businesses.

31. Cherneski stated that some of its clients are or have been audited by the IRS. Attorney Ira Stechel is representing Benistar Plan clients with the IRS.

32. STEP plans are older plans and are not currently sold.

33. Physical files for the clients are kept on site. Kathy Kehoe handles the administrative side of the business. Cherneski is now aware of files being stored off-site. Cherneski stated that a lot of the plan and client information is stored on the computers.

At approximately 11:10 am, Supervisory Special Agent Kathy Enstrom entered the room and stated that an attorney outside of the building wished to speak with Cherneski. The interview was then concluded.

I prepared this memorandum on April 23, 2010, after refreshing my memory from notes made during and immediately after the interview with Stephen Cherneski.

Memorandum Author   Jeffrey A. Hencke
Special Agent

U.S. Treasury Criminal Investigation

IRS00225

*Crystal & Brinson*
Crystal Brinson
Special Agent

U.S. Treasury Criminal Investigation

IRS00226